UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| CYCLONE USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03-0992 AJW |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OF DECISION |
| LL&C DEALER SERVICES, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . 3

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Cyclone USA's Claims Against LL&C . . . . . . . . . . 4

        1.   Cyclone USA's Federal Trademark Infringement Claim

            Against LL&C . . . . . . . . . . . . . . . . . . 4

        2.   Cyclone USA's Federal Counterfeiting Claim Against

            LL&C . . . . . . . . . . . . . . . . . . . . . . 24

        3.   Cyclone USA's Federal Unfair Competition Claim

            Against LL&C . . . . . . . . . . . . . . . . . . 25

        4.   Cyclone USA's Common Law Trade Name Infringement

            Claim Against LL&C . . . . . . . . . . . . . . . 30

        5.   Cyclone USA's State Unfair Competition Claim

Against LL&C . . . . . . . . . . . . . . . . . . . . 31

6.   Cyclone USA's Breach of Contract Claim

Against LL&C . . . . . . . . . . . . . . . . .  33

B.   Cyclone USA's Claims Against Sei Kim  . . . . . . . . 49

7.   Cyclone USA's Federal Trademark Infringement Claim

Against Sei Kim . . . . . . . . . . . . . . . . 49

8.   Cyclone USA's Federal Counterfeiting Claim Against

Sei Kim . . . . . . . . . . . . . . . . . . . 53

9.   Cyclone USA's Federal Unfair Competition Claim

Against Sei Kim . . . . . . . . . . . . . . . . 54

10.  Cyclone USA's Common Law Trade Name Infringement

Claim Against Sei Kim . . . . . . . . . . . . . . 55

11.  Cyclone USA's State Unfair Competition Claim Against

Sei Kim . . . . . . . . . . . . . . . . . . . 56

C.   LL&C's Claims Against Cyclone USA . . . . . . . . . 58

12.  LL&C's Federal Unfair Competition Claim Against

Cyclone USA . . . . . . . . . . . . . . . . . 58

13.  LL&C's Judicial Cancellation of Trademark Claim

Against Cyclone USA . . . . . . . . . . . . . . 60

14.  LL&C's Fraud and Deceit Claim Against

Cyclone USA . . . . . . . . . . . . . . . . . 81

15.  LL&C's Breach of Contract Claim Against

Cyclone USA . . . . . . . . . . . . . . . . . 94

16.  LL&C's State False Advertising and Unfair Business

Practices Claim Against Cyclone USA . . . . . . 102

D.   Sei Kim's Claims Against Cyclone USA . . . . . . . 103

17.  Sei Kim's False Marking of Patent Claim Against

Cyclone USA . . . . . . . . . . . . . . . . 103

18.  Sei Kim's Federal Unfair Competition Claim Against
     Cyclone USA . . . . . . . . . . . . . . . . . .  109

19.  Sei Kim's Declaratory Relief Regarding Trademark
     Ownership Claim Against Cyclone USA . . . . . .  111

20.  Sei Kim's Breach of Contract Claim Against
     Cyclone . . . . . . . . . . . . . . . . . . . .  111

E.  Sei Kim's Claim Against Jay Kim . . . . . . . . .  123

21.  Sei Kim's Federal Unfair Competition Claim Against
     Jay Kim . . . . . . . . . . . . . . . . . . . .  123

Conclusion . . . . . . . . . . . . . . . . . . . . . .  125

## Introduction

This case was tried to the Court sitting without a jury.  This memorandum of decision contains the Court's findings of fact and conclusions of law.  See Fed. R. Civ. P. 52(a).

The parties are: (1) plaintiff Cyclone USA, Inc. ("Cyclone USA"); (2) Cyclone USA's president and owner, third-party defendant Jay Kim [First Amended Joint Statement of Stipulated Facts ("SF") 1, filed August 4, 2004 (attached to Third Amended Final Pre-trial Conference Order, filed December 12, 2005 ("Pretrial Order") as Exhibit ("Ex.") A; Reporter's Transcript ("RT")[1] 169]; (3) defendant and counter-claimant LL&C Dealer Services, LLC ("LL&C"); and (4) defendant, counter-claimant, and third-party plaintiff Sei Kim ("Sei Kim"). Cyclone USA has conducted business under the trade name Tornado Air

---

[1]     The trial transcript consists of two components: (1) volumes 1 through 8 of the Reporter's Transcript, with pages sequentially numbered 1-1526; and (2) the Reporter's Transcript of the Closing Argument ("9 RT"), which consists of one volume containing pages numbered 1-153.

1   Management Systems, and derivatives thereof, such as Tornado Air and

2   Tornado, since 1994. [SF 134, 17; RT 174-76].  Sei Kim does business

3   under the name Korean Industrial Design, which the parties refer to as

4   Korean Industrial Design Corp. ("KIDC").  [SF 3; RT 1376-77].

5        The Court possesses subject matter jurisdiction over both the

6   federal and non-federal claims asserted in this case.  See 28 U.S.C.

7   §§ 1331, 1367.  Venue in this district is proper.  See 28 U.S.C. §

8   1391(b).

9        The parties have assumed that California law governs the state

10  law claims.  Since that choice of law appears to be correct, the Court

11  applies California law to all of the non-federal claims.

12       The Court adopts and incorporates by reference all of the facts

13  to which the parties have stipulated. [See SF 1-76].[2]  Other findings

14  of fact, and the Court's conclusions of law, are contained in the

15  discussion of the claim or defense to which they are relevant.

### Discussion

16

17  **A.   Cyclone USA's Claims Against LL&C**

18       **1.   Cyclone USA's Federal Trademark Infringement Claim Against**

19            **LL&C**

20       Cyclone USA alleges that LL&C infringed the following federally

21  registered trademarks: (1) Tornado; (2) "More Power, More Mileage!";

22  _____

23       [2]     There were instances during the trial when a witness's
     testimony seemed to deviate from a stipulated fact. [See, e.g., Sei
24   Kim's Revised Proposed Findings of Fact and Conclusions of Law, filed
     March 21, 2006 ("Sei Kim's Proposed Findings") at 12, 16 n.5; LL&C's
25   Proposed Findings of Fact and Conclusions of Law, filed March 20, 2006
     ("LL&C's Proposed Findings") at 20].  No party, however, formally
26   requested that any stipulated fact be modified or withdrawn.  Because
     it is important that parties be able to rely on stipulated facts in
27   preparing for trial, in the event of any inconsistency between a
     stipulated fact and evidence presented at trial, the stipulated fact
28   controls unless otherwise indicated.

4

1  (3) "Don't Drive Without It!"; and (4) "Under the Hood!".  [Plaintiff

2  and Jay Kim's Post-Trial Findings of Fact and Conclusions of Law,

3  filed March 20, 2006 ("Cyclone USA's Proposed Findings") at 11].[3]  To

4  establish trademark infringement, the plaintiff must prove by a

5  preponderance of the evidence that: (1) there is a valid trademark;

6  (2) the plaintiff is the owner of the trademark; (3) the defendant

7  used the trademark or a similar trademark without the plaintiff's

8  consent in a manner that was likely to cause confusion among ordinary

9  purchasers regarding the source of the goods; and (4) the plaintiff

10 was damaged by the defendant's infringement.  15 U.S.C. § 1114(1); KP

11 Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596,

12 602 (9th Cir. 2005); Model Civ. Jury Instr. 9th Cir. § 15.5 (2007).

13     If the plaintiff has an incontestable registration of the

14 trademark, then the first two elements are conclusively presumed.  15

15 U.S.C. § 1115(b).  By contrast, if the plaintiff has a contestable

16 registration of the trademark, then the burden merely shifts to the

17 defendant to prove, by a preponderance of the evidence, either the

18 invalidity of the trademark or that the plaintiff is not the owner of

19 the trademark.  15 U.S.C. § 1115(a); Tie Tech, Inc. v. Kinedyne Corp.,

20 296 F.3d 778, 783 (9th Cir. 2002); Sengoku Works Ltd. v. RMC Int'l,

21 Ltd., 96 F.3d 1217, 1219-20 (9th Cir. 1996), cert. denied, 521 U.S.

22 1103 (1997).

23     The third element, the likelihood of confusion, is determined by

24 weighing several non-exclusive factors.  Perfumebay.com Inc. v. eBay

25 Inc., __F.3d__, 2007 WL 3243998, at *5 (9th Cir. 2007) ("The core

26 element of trademark infringement is whether customers are likely to

27 _____

28     [3]   Trademarks (2)-(4) will be referred to as the "slogan
    trademarks."

1  be confused about the source or sponsorship of the products.")

2  (citation omitted). These factors include: (1) strength of the

3  trademark; (2) proximity of the goods; (3) similarity of the

4  trademarks; (4) evidence of actual confusion; (5) marketing channels

5  used; (6) types of goods and the degree of care likely to be exercised

6  by the purchaser; (7) defendant's intent in selecting the trademark;

7  and (8) likelihood of expansion of the product lines. Jada Toys, Inc.

8  v. Mattel, Inc., 496 F.3d 974, 979 (9th Cir. 2007) (applying the

9  eight-factor test devised in AMF Inc. v. Sleekcraft Boats, 599 F.2d

10  341, 348-49 (9th Cir. 1979), and indicating that no one factor is

11  dispositive).

12      The Court has determined that the following trademarks are valid:

13  Tornado, "Don't Drive Without It!", and "Under the Hood!".[4] The Court

14  also has determined that Cyclone USA owns all three of those

15  trademarks.[5]

16      The contract between Cyclone USA and LL&C authorized LL&C to

17  advertise and sell devices[6] bearing the Tornado trademark. [Ex. 43,

18  § 3.11]. That authorization was limited to devices supplied to LL&C

19  by Cyclone USA. [Ex. 43, § 3.11(a)]. The contract required LL&C to

20  discontinue use of the Tornado trademark upon termination of the

21  contract or at Cyclone USA's request. [Ex. 43, § 3.11(b)]. LL&C

22  understood that its right to use the Tornado trademark would end upon

23  termination of the agreement between Cyclone USA and LL&C. [RT 471,

24  _____

25      [4]    See discussion of Claim 13.

26      [5]    See discussion of Claim 13.

27      [6]    Unless otherwise indicated, the term "device" refers to air
    swirling fuel saver devices of the general type sold by Sei Kim,
28  Cyclone USA, and LL&C during the period 1991 through the date of
    trial. [See RT 174].

6

505-07].

While the contract between Cyclone USA and LL&C was in force, but without Cyclone USA's knowledge or consent [SF 62; RT 201], LL&C had approximately 60,900 devices manufactured by Poron during the period April through October 2002. [SF 61; Ex. 231, 232, 233. But see LL&C's Proposed Findings at 67 n.6 (contending that only 48,900 devices were delivered to LL&C, rather than the 56,277 devices apparently assumed by Cyclone USA's damages expert)]. LL&C advertised and sold those devices using the Tornado trademark and the slogan trademarks. [SF 61; Ex. 197, 231, 232, 233; RT 201, 726].[7]

LL&C terminated the contract between LL&C and Cyclone USA by December 2002. [SF 66, 69-72]. After it terminated the contract, LL&C continued to use the Tornado trademark [Ex. 436; RT 471, 505-06, 538, 563], the slogan trademarks [Ex. 166, 218, 436; RT 505-06, 515-17, 538, 563], and the TornadoFuelSaver term to advertise and sell similar or identical versions of the device. [SF 73; Ex. 166; RT 466, 483]. In addition, LL&C continued to refer to the device as "the Tornado." [Ex. 195, at 2]. LL&C did those things even though it understood that they were forbidden by the contract between LL&C and Cyclone USA [RT 471, 505, 1323], despite Cyclone USA's demands that it stop [Ex.117; RT 178-80], notwithstanding the provision in the contract between LL&C and Sei Kim drawing LL&C's attention to Cyclone USA's registration and ownership of the Tornado trademark [Ex. 119, para. 6.1 ("LL&C recognizes that . . . the trademark rights to the

---

[7]    Although LL&C contends that it purchased devices from Poron to satisfy demand that Cyclone USA was unable to meet [RT 726], there is evidence that it also was trying to save money by purchasing devices from sources other than Cyclone USA at a lower cost. [RT 1302].

name, 'Tornado' is owned or controlled by Jay Kim.)"], and despite Sei Kim's urging that LL&C use a different trademark in advertising and selling devices supplied by him.  [RT 151-52, 1444].  In fact, LL&C asked Cyclone USA for permission to continue using the Tornado trademark after termination of the contract between LL&C and Cyclone USA, but when Cyclone USA refused, LL&C kept using it anyway.  [RT 200].  LL&C kept using the Tornado trademark because LL&C had made a large investment in promoting it and to avoid the cost of redoing the infomercial.  [RT 483-87].

LL&C's use of the Tornado trademark was likely to cause confusion among purchasers as to the source of goods bearing that trademark. The trademark is a relatively strong one, since it is at least mildly suggestive of the device.  By the time that LL&C began misusing the Tornado trademark during the life of the contract between LL&C and Cyclone USA - and even more clearly, after the termination of that contract - that trademark had been used in advertising devices at trade shows, in print media, on radio shows, and in television infomercials. [SF 39; RT 176-87, 346, 569].  Hundreds of thousands of devices bearing the trademark had been sold. [See SF 19, 28, 31, 32, 34, 36, 54, 57, 63, 74].  LL&C used the trademark to advertise and sell devices similar or identical to the device on which Cyclone USA previously had used, and continued to use, the Tornado trademark [SF 69, 70, 72; RT 471].  LL&C also pursued many of the same customers through marketing channels that were the same as, or overlapped with, those Cyclone USA previously had used, and continued to use, including infomercials.  [RT 538, 563].  Moreover, LL&C intended to capitalize on the goodwill that the Tornado trademark had accrued during Cyclone USA's prior use of it, partly as a result of LL&C's advertisement of

the device in infomercials during the period when the contract between LL&C and Cyclone USA was in force.  [RT 150, 483, 971-72].  Finally, although the record contains no evidence of the typical purchaser's degree of care in buying comparable products, there is evidence that actual consumer confusion exists.  [Ex. 463.  See also RT 790-91].  LL&C essentially concedes as much.  As one of its principals testified: "[T]he public is very confused . . . . [T]hey think it's the same [device]." [RT 770].

The situation with respect to Cyclone USA's two valid slogan trademarks – "Don't Drive Without It!" and "Under the Hood!" is essentially the same.  LL&C used those slogan trademarks to advertise and sell devices not supplied by Cyclone USA (or even by Sei Kim) while the contract between Cyclone USA and LL&C was in force.  [See Ex. 166, 218; RT 468-72, 725-26].  LL&C continued to use those slogan trademarks to advertise and sell devices after it terminated its contract with Cyclone USA.  [Ex. 166, 218, 436; RT 505-06, 538, 563].  Using them in conjunction with the Tornado trademark to advertise and sell the same or similar devices to the same customers through the same or overlapping marketing channels used by Cyclone USA could only exacerbate the customer confusion that even LL&C concedes exists.  See Perfumebay.com, 2007 WL at *7 ("Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods.") (alteration and citation omitted).

The situation with respect to the unregistered TornadoFuelSaver term is similar.  LL&C adopted that term in an attempt to circumvent Cyclone USA's ownership of the Tornado trademark.  [RT 1323-24].  When used to market the devices, however, the TornadoFuelSaver term is confusingly similar to, and an infringement of, the Tornado trademark.

While LL&C had Cyclone USA's permission to use the TornadoFuelSaver term while the contract between LL&C and Cyclone USA was in force, at least for some purposes, [RT 381, 383], there is no basis on which LL&C reasonably could have believed that Cyclone USA's permission to use the TornadoFuelSaver term during the life of the contract between Cyclone USA and LL&C continued after that contract was terminated.

Finally, it is apparent that Cyclone USA was harmed by LL&C's infringement of the Tornado trademark and the slogan trademarks. LL&C's acquisition and sale of the Poron devices deprived Cyclone USA of sales while the contract between Cyclone USA and LL&C was in force, and given LL&C's concession that "the public is very confused" [RT 770], it is inconceivable that at least some of the sales made by LL&C after it terminated the contract between it and Cyclone USA would not have gone to Cyclone USA but for LL&C's infringement.

LL&C alleges two defenses to this claim: (1) unclean hands; and (2) estoppel. [Pretrial Order, Ex. B. at 1; LL&C's Proposed Findings at 43].

"Equitable defenses can be considered in trademark infringement actions, even against an incontestable mark." E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1294 (9th Cir. 1992). Accord Pyrodyne Corp. v. Pyrotronics Corp., 847 F.2d 1398, 1402 (9th Cir. 1988). See generally 15 U.S.C. § 1115(b)(9).

Equitable defenses such as unclean hands and estoppel may bar not only equitable relief, but recovery of monetary relief as well. Miller v. Glenn Miller Prods., 454 F.3d 975, 997 (9th Cir. 2006) ("It is well established that laches is a valid defense to Lanham Act claims for both monetary damages and injunctive relief."). See also Grupo Gigante S.A. de C.V. v. Dallo & Co., 391 F.3d 1088, 1102-05 (9th

Cir. 2004) (discussing six factors used to determine whether laches bars a claim for either damages or injunctive relief in an action for trademark infringement); Levi Strauss & Co. v. Shilon, 121 F.3d 1309, 1313-14 (9th Cir. 1997) (holding that unclean hands may bar the grant of an injunction for trademark infringement); Faberge, Inc. v. Saxony Prods. Inc., 605 F.2d 426, 429 (9th Cir. 1979) (explaining that "[w]illful infringement may support an award of profits to the plaintiff, but does not require one," and suggesting that unclean hands may bar monetary recovery).

A party's misconduct "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which [the party] seeks relief." Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 841 (9th Cir. 2002) (quoting Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)). This is because "[e]quitable remedies depend not only on a determination of legal rights and wrongs, but on such matters as laches, good (or bad) faith, and most important an appraisal of the public interest." Id. at 840 (quoting Maryland-National Capital Park & Planning Comm'n v. United States Postal Serv., 487 F.2d 1029, 1042 (D.C. Cir. 1973)). However, "[w]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts . . . ." Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 349 (9th Cir. 1963). See also Jarrow Formulas, 304 F.3d at 841 (stating that "[t]he party must have 'acted fairly and without fraud or deceit as to the controversy in issue.'") (quoting Adler v. Fed. Republic of Nigeria, 219 F.3d 869, 877 (9th Cir. 2000)).

"Trademark law's unclean hands defense springs from the rationale that it is essential that the plaintiff should not in his trademark,

or in his advertisements and business, be himself guilty of any false
or misleading representation." Perfumebay.com, 2007 WL at *10
(citation omitted).  The misconduct constituting unclean hands need
not be "of such a nature as to be punishable as a crime or as to
justify legal proceedings of any character"; rather, any "willful act
concerning the cause of action which rightfully can be said to
transgress equitable standards of conduct is sufficient" to bar
relief.  Precision Instrument Mfg. Co., 324 U.S. at 815.  See also
Coca-Cola Co v. Overland, Inc., 692 F.2d 1250, 1257-58 (9th Cir.
1982).  A defendant can establish the plaintiff's unclean hands by
proving that "plaintiff used the trademark to deceive consumers."
Japan Telecom, Inc. v. Japan Telecom Am., Inc., 287 F.3d 866, 870 (9th
Cir. 2002).  However, "[b]ecause a central concern in an unfair
competition case is protection of the public from confusion, courts
require clear, convincing evidence of 'egregious' misconduct before
invoking the doctrine of unclean hands" in that context.  Citizens
Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110,
129 (3d Cir. 2004), cert. denied, 544 U.S. 1018 (2005).

     The defendant's own misconduct (unclean hands) may deprive him of
the equitable basis to invoke an equitable defense, even where the
plaintiff also has behaved inequitably.  See Jarrow Formulas, 304 F.3d
at 841 (noting that a party with unclean hands may not assert laches);
Bell v. Streetwise Records, Ltd., 761 F.2d 67, 75-76 (1st Cir. 1985)
(Breyer, J. and Coffin, J., concurring) (concluding that the public
interest "normally requires an exclusive award. . . . [of trademark
ownership, and the] 'unclean hands' doctrine . . . [is not] sufficient
. . . to justify continuation of public confusion.").

     Courts retain wide discretion to accept, reject, or limit

application of an unclean hands defense based on an assessment of the equities of the case.  See Brother Records v. Jardine, 318 F.3d 900, 909-10 (9th Cir. 2003).  See also In re Napster, Inc., 191 F. Supp. 2d 1087, 1112-13 (N.D. Cal. 2002).  "[T]he court is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of [such] discretion."  Id. at 1113 (internal quotations omitted).

LL&C's unclean hands defense is rejected for two reasons.  First, regrettably, both Cyclone USA and LL&C have engaged in misconduct in relation to each other, so both of them have unclean hands.  The hands of Cyclone USA are dirty because (through Jay Kim) it lied to LL&C about its control of the marketing rights, technology, and manufacturing of the device.[8]  Cyclone USA also engaged in false patent marking,[9] and federal[10] and state[11] unfair competition, not to mention other sorts of misconduct.

However, LL&C's hands also are dirty.  LL&C secretly manufactured knock-off versions of the device in derogation of both Sei Kim's patent rights and Cyclone USA's rights as a trademark owner and an exclusive supplier during the life of the contract between Cyclone USA and LL&C.[12]  LL&C also continued using and infringing Cyclone USA's registered trademarks after LL&C terminated the contract between Cyclone USA and LL&C, despite the provision in the contract between

---

[8]     See discussion of Claim 14.

[9]     See discussion of Claim 17.

[10]    See discussion of Claim 12.

[11]    See discussion of Claim 16.

[12]    See discussion of Claims 1 and 2.

1  Cyclone USA and LL&C forbidding LL&C from doing so, despite Sei Kim's

2  explicit warning that Cyclone USA controlled the Tornado trademark,

3  and despite Sei Kim's urging that LL&C market the devices under a

4  different name.[13]

5      LL&C also engaged in federal[14] and state[15] unfair competition.

6  Finally, LL&C's federal trademark infringement was intentional and

7  blatant.  This alone suggests that it should not be permitted to

8  invoke any equitable defenses, including unclean hands.  See Jarrow

9  Formulas, 304 F.3d at 841-42.

10     In addition, much of the misconduct of Cyclone USA neither caused

11 nor was closely related to LL&C's infringement of Cyclone USA's

12 trademarks.  Cyclone USA's false patent marking, for example, lacks

13 the necessary linkage to trademark infringement.  See generally Tvetar

14 v. AB Turn-O-Matic, 633 F.2d 831, 838-39 (9th Cir. 1980) (finding that

15 the plaintiffs' misrepresentation that a patent was pending was not

16 sufficiently related to the claim for trademark infringement to

17 establish unclean hands).  Much of Cyclone USA's alleged misconduct

18 did not hurt LL&C, or occurred before LL&C had anything to do with

19 Cyclone USA.  For example, whether Cyclone USA properly registered

20 with the California Air Resource Board during the mid 1990s, or

21 whether Jay Kim misled or mistreated employees or investors bear no

22 relationship to the claims it is asserting against LL&C.  Further,

23 Cyclone USA did not act unfairly "in acquiring the right [that is, the

24

25

─────────────────────

26     [13]    See discussion of Claims 1 and 4.

27     [14]    See discussion of Claims 3 and 4.

28     [15]    See discussion of Claim 5.

trademarks] it asserts." <u>Republic Molding Corp.</u>, 319 F.2d at 349.[16]

Thus, the requisite connection between most of Cyclone USA's

misconduct and LL&C's trademark infringement is lacking. Cyclone USA

need not have led a "blameless life" in order to seek redress for

LL&C's wrongdoing. <u>See</u> <u>Loughran v. Loughran</u>, 292 U.S. 216, 229 (1934)

("Equity does not demand that its suitors shall have led blameless

lives."). Therefore, LL&C's defense of unclean hands is rejected.

To properly understand the defense of estoppel in the context of

a federal trademark infringement claim it is necessary to discuss it

along with the defenses of laches and acquiescence to which it is

closely related.[17]

In order to establish the defenses of laches, acquiescence, or

estoppel in the context of trademark infringement, the defendant must

prove that the plaintiff had notice of the defendant's infringement of

the plaintiff's trademark and: either (a) inexcusably delayed action

in asserting its rights (laches); or (b) failed to notify the

defendant of its objection to the infringement when it had the

opportunity to do so, thereby indicating implicit approval of the

defendant's conduct (acquiescence); or (c) allowed, encouraged, or

authorized defendant's use of the trademark, thereby causing the

defendant to rely on its ability to use the trademark to the

defendant's detriment (estoppel). <u>Salgado-Diaz v. Ashcroft</u>, 395 F.3d

1158, 1166 (9th Cir. 2005); <u>Westinghouse Elec. Corp. v. General</u>

<u>Circuit Breaker & Elec. Supply</u>, 106 F.3d 894, 899-900 (9th Cir. 1997);

---

[16]    See discussion of Claim 13.

[17]    Although LL&C is not asserting the latter two defenses, laches is asserted by Cyclone USA as a defense to claims alleged against it. For convenience, these three defenses are discussed together here.

1    Nat'l Lead Co. v. Wolfe, 223 F.2d 195, 202-03 (9th Cir. 1955); Safeway
2    Stores, Inc. v. Dunnell, 172 F.2d 649, 656 (9th Cir. 1949).

3         Courts often transpose or use interchangeably the terms "laches"
4    and "acquiescence".  If any distinction has evolved between the two in
5    trademark jurisprudence, it is that laches involves a passive form of
6    consent by the plaintiff while acquiescence involves a more active
7    form of consent.  SunAmerica Corp. v. Sun Life Assurance Co. of Can.,
8    77 F.3d 1325, 1334-38, 1344 n.7 (11th Cir. 1996); 6 J. Thomas
9    McCarthy, McCarthy on Trademarks and Unfair Competition § 31:41
10   (2007).

11        "Laches is an equitable time limitation on a party's right to
12   bring suit . . . [and] is a valid defense to Lanham Act claims." Reno
13   Air Racing Ass'n v. McCord, 452 F.3d 1126, 1138 (9th Cir. 2006)
14   (quoting Jarrow Formulas, 304 F.3d at 835).  The rationale behind the
15   defense of laches is that "one who seeks the help of a court of equity
16   must not sleep on his rights."  Jarrow Formulas, 304 F.3d at 835
17   (quoting Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 939
18   (7th Cir. 1984) (Posner, J., concurring).  Accordingly, "laches . . .
19   bar[s] trademark infringement claims only where the trademark holder
20   knowingly allowed the infringing mark to be used without objection for
21   a lengthy period of time."  Brother Records, 318 F.3d at 909 (internal
22   citations and quotations omitted).  To determine whether laches bars
23   recovery, the following factors are weighed: (1) the strength and
24   value of the trademark; (2) the plaintiff's diligence in enforcing its
25   trademark rights; (3) the extent of harm that the plaintiff would
26   suffer if relief was denied; (4) the good faith ignorance of the
27   defendant, such as unawareness of the existence of the plaintiff's
28   senior use of the trademark; (5) the degree and nature of commercial

competition between the plaintiff and the defendant; and (6) the extent of the harm that would be suffered by the defendant because of its reliance on the continued availability of the trademark as a result of the plaintiff's delay.  See Grupo Gigante, 391 F.3d at 1102-03 (citing E-Systems Inc. v. Monitek, Inc., 720 F.2d 604, 607 (9th Cir. 1983)).  However, "if the junior user of a mark moves into direct competition with the senior user [by] selling the same 'product' through the same channels and causing actual market confusion, laches is no defense." Prudential Ins. Co. v. Gibraltar Fin. Corp., 694 F.2d 1150, 1154 (9th Cir. 1982).  Accord Grupo Gigante, 391 F.3d at 1102-05.

A defendant may establish the defense of estoppel by proving that the plaintiff unreasonably delayed in asserting its trademark rights, and that the defendant relied to its detriment on its continued ability to use the trademark.  Compare Brother Records, 318 F.3d at 909 with Westinghouse Elec. Corp., 106 F.3d at 899 and Safeway Stores, 172 F.2d at 656.  Cf. American Int'l Group, Inc. v. American Int'l Bank, 926 F.2d 829, 837 (9th Cir. 1991) (Kozinski, J., dissenting) ("Estoppel requires detrimental reliance; laches does not.").  The same E-Systems factors used to evaluate a laches defense also are used to determine whether the defense of estoppel has been established. Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 515 (9th Cir. 1989).

Nothing that Cyclone USA did or failed to do estopped it from complaining of LL&C's trademark infringement.  The contract between LL&C and Cyclone USA put LL&C on notice of Cyclone USA's trademark rights [Ex. 43, § 3.11], and it provided that LL&C's license to use Cyclone USA's Tornado trademark expired upon termination of the contract.  [Ex. 43, § 3.11].  The contract between LL&C and Sei Kim

1   reminded LL&C of Cyclone USA's ownership of the Tornado trademark [Ex.
2   119, § 6.1], as did Cyclone USA's registrations of all of its
3   trademarks.  See 15 U.S.C. § 1072 ("Registration of a mark on the
4   principal register provided by this Act . . . shall be constructive
5   notice of the registrant's claim of ownership thereof.").  Even before
6   LL&C formally terminated its contract with Cyclone USA, Cyclone USA
7   reminded LL&C of its ownership of the Tornado trademark and the slogan
8   trademarks, and demanded in writing that LL&C stop misusing or
9   infringing Cyclone USA's trademarks.  [Ex. 117, 463; RT 790-91].
10  Finally, Cyclone USA filed this case alleging federal trademark
11  infringement by LL&C on February 11, 2003, less than three months
12  after the contract between Cyclone USA and LL&C was terminated.

13      Cyclone USA promptly and diligently asserted its trademark rights
14  shortly after it discovered LL&C's trademark infringement.  LL&C
15  cannot claim to have been surprised by Cyclone USA's assertion of its
16  trademark rights or to have justifiably relied on the continuing
17  ability to use the Tornado trademark or the slogan trademarks after
18  termination of the contract between Cyclone USA and LL&C.[18]  Therefore,
19  LL&C has not shown that Cyclone USA should be estopped from asserting
20  its claim of trademark infringement due to laches, acquiescence, or
21  for any other reason.

22      The only exception concerns any allegedly unauthorized use of the
23  TornadoFuelSaver term by LL&C during the period when the contract
24  between LL&C and Cyclone USA was in force.  During that period,
25  Cyclone USA authorized LL&C to use the TornadoFuelSaver term for some

---

27  [18]   Ironically, the cause of LL&C's inability to continue to use
    the Tornado trademark in advertising and selling devices was not
    anything Cyclone USA did or failed to do, but rather LL&C's own
28  termination of its contract with Cyclone USA.

purposes, but arguably not for others.  [RT 1180-81].  Given the rather vague and informal manner in which Cyclone USA conveyed that authorization and defined its scope, [RT 381, 383], LL&C reasonably could have believed that the authorization was broader than Cyclone USA now contends it was, at least so long as the contract between Cyclone USA and LL&C remained in force.  Accordingly, apart from its sales of the Poron devices, it was not infringement for LL&C to use the TornadoFuelSaver term as it did before it terminated the contract between LL&C and Cyclone USA, and Cyclone USA is estopped from complaining of such conduct.  This exception, of course, does not apply to use of the TornadoFuelSaver term after the contract between LL&C and Cyclone USA was terminated, or with respect to the Poron devices which LL&C wrongfully acquired and sold while the contract between LL&C and Cyclone USA was in force.

Cyclone USA seeks an award of LL&C's profits for 2003 in the amount of $604,422, and an accounting of LL&C's profits from January 1, 2004 to the present. [Cyclone USA's Proposed Findings at 19.  See also Ex. 154 at 11].  With respect to the Poron devices sold by LL&C, Cyclone USA seeks an award of LL&C's profits in the amount of $424,083.  [Cyclone USA's Proposed Findings at 19; Ex. 154 at 10].  Cyclone USA also seeks injunctive relief.  [Cyclone's Proposed Findings at 19].

"When a violation of any right of the registrant of a mark . . . shall have been established in any civil action arising under this Act, the plaintiff shall be entitled . . . to recover (1) [the] defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  In addition,

In  assessing  damages  the  court  may  enter

19

1          judgment, according to the circumstances of the

2          case, for any sum above the amount found as

3          actual damages, not exceeding three times such

4          amount.  If the court shall find that the amount

5          of the recovery based on profits is either

6          inadequate or excessive the court may in its

7          discretion enter judgment for such sum as the

8          court shall find to be just, according to the

9          circumstances of the case. . . .  The court in

10          exceptional cases may award reasonable attorney

11          fees to the prevailing party.

12  15 U.S.C. § 1117(a).

13        This provision "confers a wide scope of discretion upon the

14  district judge in the fashioning of a [just] remedy for a violation of

15  the Act" so that the purposes of the Act are accomplished by making

16  deliberate trademark infringement unprofitable.  Maier Brewing Co. v.

17  Fleischmann Distilling Corp., 390 F.2d 117, 121-23 (9th Cir. 1968).

18  However, "[u]nder . . . section[] 1117(a) . . . , awards are never

19  automatic and may be limited by equitable considerations."

20  Perfumebay.com, 2007 WL at *10 (citation omitted).

21        "Generally, in an innocent infringement, an injunction preserves

22  the complainant's rights by preventing the future use of the trademark

23  name. . . .  Thus, where there is no intent to capitalize on the trade

24  name of another, an accounting of profits is not warranted."  Lindy

25  Pen Co. v. Bic Pen Corp., 14 U.S.P.Q. 2d 1528, 1530 (C.D. Cal.

26  1989)(emphasis omitted), aff'd, 982 F.2d 1400 (9th Cir. 1993), and

27  cert. denied, 510 U.S. 815 (1993).  See also Restatement (Third) of

28  Unfair Competition § 37, cmt. e (1995) ("The better view limits an

accounting of profits to acts intended to create confusion or to deceive prospective purchasers."); 5 McCarthy, supra, § 30:62 ("Even though a defendant loses the case, if it is found that it acted in good faith in claiming ownership, and the case involves complex and difficult factual and legal issues, an injunction may suffice, and profits or damages may be refused.") (footnote omitted).

LL&C's infringement, however, was hardly innocent.  LL&C knew that Cyclone USA had a federal registration of the Tornado trademark.  The written contract between Cyclone USA and LL&C expressly provided that LL&C's right to use Cyclone USA's Tornado trademark and the slogan trademarks ended when the contract was terminated.  LL&C simply ignored that provision.  Even Sei Kim warned LL&C against using Cyclone USA's Tornado trademark and tried to dissuade it from doing so, yet LL&C persisted, even to the extent of attempting to register the TornadoFuelSaver term – which it knew perfectly well it did not own, but falsely represented that it did.  [Ex. 221; RT 467-71].[19] This is sufficient evidence of non-innocent infringement to warrant an award of profits.  See Wolfe v. Nat'l Lead Co., 272 F.2d 867, 871 (9th Cir. 1959) ("Whether he believed himself to be within the law or not, he was knowingly and deliberately cashing in upon the goodwill of [plaintiff].  This is such an infringement as will justify an accounting of profits."), overruled on other grounds by Maier Brewing Co. v. Fleischmann Distilling Corp., 359 F.2d 156 (9th Cir. 1966) and

---

[19]     LL&C also improperly used the ® symbol with the TornadoFuelSaver term, falsely representing that it had been registered.  [RT 501-02, 504].   Further, LL&C also lied in its application for federal registration of the TornadoFuelSaver term by alleging that it had used the TornadoFuelSaver term since June 1, 1999, nearly a year before it entered into the contract between Cyclone USA and LL&C. [RT 467; Ex. 221].

cert. denied, 362 U.S. 950 (1960).  See also Playboy Enters., Inc. v. Baccarat Clothing Co., 692 F.2d 1272, 1274 (9th Cir. 1982) ("[W]here trademark infringement is deliberate and willful both the trademark owner and the buying public are slighted if a court provides no greater remedy than an injunction. . . .[A]n accounting of profits would serve as a proper remedy both in those cases involving direct competition . . . and also in those instances where no direct competition exists."). Accordingly, Cyclone USA is entitled to an award of LL&C's profits.

"[I]f it can be shown that the infringement had no relation to profits made by the defendant, . . . the burden of showing this is upon the poacher."  Maier Brewing, 390 F.2d at 124 (quoting Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge, 316 U.S. 203, 206 (1942)). LL&C has not made such a showing.

The Court accepts the computation of Cyclone USA's damages expert as to the claim for 2003 profits and the claim for Poron-related profits.[20] Cyclone USA's request for an accounting of LL&C's profits from January 1, 2004 to the present also is accepted.

---

[20]    Cyclone USA adopted the methodology of LL&C's damage expert in calculating the damages LL&C would owe with respect to the Poron-related products.   [RT 1022-23].   While both Cyclone USA's original and supplemental damage reports state that 54,900 Poron units were sold to LL&C [Ex. 151, 154], Cyclone USA's expert testified that this figure was a typographical error and that the true number of units sold was 56,277.  [RT 1020].  LL&C relies on invoices from Poron USA, Inc. in contending that the number of Poron units sold is actually 48,900.  [Ex. 81, 231, 232, 233; LL&C's Proposed Findings of Fact and Conclusions of Law at 67 n.6].  However, the invoices alone do not reflect this figure.   Further, LL&C has neither explained its methodology in reaching this figure (other than to rely on the Poron invoices) nor offered any argument as to why Cyclone USA's analysis was inaccurate.   Because LL&C has not contested Cyclone USA's methodology in calculating the number of Poron units sold to LL&C, the Court adopts it.

The issues whether the Court should enhance or reduce the amount of damages awarded, or award prejudgment interest, or award attorneys fees, have not been fully briefed, so the Court makes no ruling on those issues at this time.  [See Pretrial Order para. 14].

Cyclone USA also is entitled to an injunction prohibiting future federal trademark infringement by LL&C.  While the voluntary cessation of wrongful conduct may moot a request for injunctive relief, "the reform of the defendant must be irrefutably demonstrated and total." 5 McCarthy, supra, § 30:11 (footnote omitted).  A party seeking a permanent injunction is not required to prove that the infringement is likely to be repeated in the future.  See Polo Fashions, Inc. v. Dick Bruhn, Inc., 793 F.2d 1132, 1135 (9th Cir. 1986).  "If the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives [the victim] substantial protection of its trademark."  Id. at 1135-36.  It is unclear whether LL&C has ceased its infringement of the Tornado trademark and the two slogan trademarks.[21]  However, there is no legal barrier to entry of a permanent injunction against LL&C, notwithstanding the possibility that it may have ceased some, or even all, of its infringement of Cyclone USA's trademarks, at least temporarily.[22]

_____

[21]     There is some evidence that LL&C has ceased using at least some of Cyclone USA's trademarks [RT 516-17], but it has continued to use the TornadoFuelSaver term.  [SF 73].

[22]     Cyclone USA apparently stopped using the "Under the Hood!" mark, at least temporarily, and now uses the phrase "We Know Fuel Economy!" instead. [Ex. 595; RT 1493-94].  There is no evidence as to exactly when that change occurred, or whether Cyclone USA intended that change to be permanent.  Further, there is no evidence that Cyclone USA has relinquished its registration of the trademark. Abandonment is an affirmative defense.  Neither LL&C nor Sei Kim has asserted it. [See Pretrial Order, Ex. B, at 1].  "Abandonment of a
(continued...)

## 2.   Cyclone USA's Federal Counterfeiting Claim Against LL&C

"Counterfeiting is the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark.  A 'counterfeit mark' is a false mark that is identical with, or substantially indistinguishable from, the genuine mark."  4 McCarthy, supra, § 25:10. See also 15 U.S.C. §§ 1114(1)(b), 1116(d)(1)(B).

While the contract between LL&C was in force, LL&C advertised and sold devices it purchased from Poron using the Tornado trademark and the slogan trademarks.  [See RT 468-72, 725-26].  After LL&C terminated the contract between Cyclone USA and LL&C, LL&C continued to use the Tornado trademark and the slogan trademarks to advertise and sell devices it purchased from Sei Kim rather than from Cyclone USA. [Ex. 166, 436; RT 505-06, 538, 563].  LL&C copied Cyclone USA's box, including the Tornado trademark and the two valid slogan trademarks.  [Ex. 166, 218; RT 987].

Cyclone USA permitted LL&C to use the TornadoFuelSaver term to some extent during the contractual relationship between LL&C and Cyclone USA.  Such permitted uses obviously do not constitute counterfeiting.  Moreover, although the TornadoFuelSaver term is confusingly similar to the Tornado trademark when used to advertise or sell devices, and is therefore infringing,[23] it is not identical to,

---

[22](...continued)
trademark, being in the nature of a forfeiture, must be strictly proved." Prudential Ins., 694 F.2d at 1156.  Obviously, it has not been.  Accordingly, for the purposes of injunctive relief, the Court will assume that the "Under the Hood!" mark has not been abandoned by Cyclone USA.

[23]    See discussion of Claim 1.

or substantially indistinguishable from, that trademark. Accordingly, LL&C's use of the TornadoFuelSaver term is not counterfeiting.

In response to this claim, LL&C asserts the following defenses: (1) unclean hands; and (2) estoppel. [Pretrial Order, Ex. B, at 1]. The law regarding these defenses was presented earlier.[24] LL&C's defenses to this claim are rejected for the same reasons that they were rejected when they were asserted in response to Claim 1.

If the defendant intentionally used a trademark or designation, knowing such trademark or designation is a counterfeit trademark, "the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee . . . . In such cases, the court may in its discretion award prejudgment interest . . . ." 15 U.S.C. § 1117(b).  See also Intel Corp. v. Terabyte Int'l, Inc., 6 F.3d 614, 621 (9th Cir. 1993).

Cyclone USA is entitled to monetary relief for counterfeiting the Tornado trademark and the two slogan trademarks.  As stated above,[25] the issues whether the Court should enhance or reduce the damages awarded, or award prejudgment interest, or award attorneys fees, have not been fully briefed, so the Court makes no ruling on those issues at this time.

Cyclone USA also is entitled to permanent injunction prohibiting LL&C from counterfeiting the Tornado trademark and the two slogan trademarks.

**3.   Cyclone USA's Federal Unfair Competition Claim Against LL&C**

---

[24]   See discussion of Claim 1.

[25]   See discussion of Claim 1.

1   This claim already has been partly resolved in Cyclone USA's
2   favor.   The Court previously found that LL&C violated 15 U.S.C. §
3   1125(a)(1) by obtaining devices from Poron, and then packaging them
4   and selling them to customers as Tornado-brand devices made by Sei Kim
5   without the permission of either Cyclone USA or Sei Kim.   The Court
6   also previously found that LL&C violated 15 U.S.C. § 1125(a) by
7   displaying a photograph of Cyclone USA's Tornado II device on LL&C's
8   website, on LL&C's device packaging, and in LL&C's infomercial,
9   despite the fact LL&C was not selling Cyclone USA's Tornado II device
10  during the relevant period.   [See Order Denying Third Party
11  Defendant's Jay Kim's Motion to Dismiss, etc., April 14, 2004, at 13-
12  20].[26]

13  Cyclone USA also alleges that LL&C infringed its trade dress.
14  [Cyclone USA's Proposed Findings, at 24-25].

15  "Trade dress refers generally to the total image, design, and
16  appearance of a product and may include features such as size, shape,
17  color, color combinations, texture or graphics." Clicks Billiards,
18  Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir. 2001). See
19  also Model Civ. Jury Instr. 9th Cir. § 15.2 (2007) ("Trade dress is
20  the non-functional physical detail and design of a product or its
21  packaging which [indicates] [or] [identifies] the product's source and
22  distinguishes it from the products of others."). Trade dress
23  infringement is similar to trademark infringement, the primary
24  distinction being that trade dress infringement involves the

25
_____
26      [26]   Cyclone USA's contention that LL&C deliberately or
   systematically violated the preliminary injunction entered in this
   case on April 14, 2004 is rejected.  To the contrary, LL&C responded
27 to that order in a prompt and appropriate manner.  Any shortcomings in
   its compliance with that order were unintentional, unavoidable, or
28 de minimis. [RT 798-800, 974, 985-86].

defendant's unauthorized use of imagery, color, or shape (as opposed to merely a word, phrase, or logo) that is likely to cause confusion as to the source of the goods as between the registrant and the non-registrant.   See Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 841 (9th Cir. 1987).

To prevail on a claim of trade dress infringement, the plaintiff must prove each of the following elements by a preponderance of the evidence: (1) the plaintiff's trade dress is distinctive; (2) the plaintiff owns its trade dress; (3) the plaintiff's trade dress is non-functional; (4) the defendant used the plaintiff's trade dress without the plaintiff's consent in a manner that is likely to cause confusion among ordinary purchasers regarding the source of the goods; and (5) the plaintiff was damaged by the defendant's infringement. Disc Golf Ass'n v. Champion Discs, 158 F.3d 1002, 1005 (9th Cir. 1998); Model Civ. Jury Instr. 9th Cir. § 15.6 (2007).

The trade dress at issue is the graphic design and color of the packaging used by Cyclone USA to contain its devices.   There is no evidence that Cyclone USA's trade dress is federally registered.

It is undisputed that Cyclone USA owns the trade dress in the packaging bearing the Tornado trademark. [RT 89, 269].   Further, the evidence suggests that LL&C intentionally copied Cyclone USA's box design in selling devices under the TornadoFuelSaver term after the contract between Cyclone USA and LL&C was terminated. [RT 987-89]. The Ninth Circuit has recognized that such "evidence of deliberate copying is relevant to a determination of secondary meaning" and that "in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning." Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1264 (9th Cir. 2001) (quoting

Fuddruckers, 826 F.2d at 844).  Because there is evidence that LL&C intentionally copied the overall design of Cyclone USA's packaging, the first two elements of trade dress infringement are met here.  [RT 987-89].

Trade dress protection only extends to the nonfunctional features of a product.  Disc Golf Ass'n, 158 F.3d at 1006.  The Supreme Court has said that a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related advantage." Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 165 (1995).  In determining whether a product feature is functional for purposes of trade dress protection, courts in the Ninth Circuit consider the following factors: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture."  Disc Golf Ass'n, 158 F.3d at 1006.  No one factor is dispositive.  Id.

The design of Cyclone USA's packaging is non-functional.  The overall aesthetic design of the Tornado box, comprised of the colors, graphics, layout, and font, is purely decorative and therefore yields no utilitarian advantage other than as an identifier of source. LL&C's officers contended that their reason for resisting re-branding the device was because of the cost and the labor they already had invested in developing the current brand visuals.  [RT 483]. Notwithstanding the added expense LL&C would have incurred if it had invested in the creation of new packaging, the availability of

1  virtually any other box design precludes a finding that Cyclone USA's

2  exclusive use of the box would put competitors such as LL&C at an

3  unfair disadvantage.

4      LL&C used virtually identical packaging in selling devices under

5  the TornadoFuelSaver term after the contract between LL&C and Cyclone

6  USA was terminated.  Because TornadoFuelSaver is confusingly similar

7  to Cyclone USA's Tornado trademark[27] and because the boxes used by LL&C

8  after the contract ended are virtually identical to the boxes first

9  used by Cyclone USA, LL&C's use of Cyclone USA's packing is likely to

10  cause confusion as to source among ordinary purchasers of the device.

11  Finally, for the reasons set forth above with respect to LL&C's

12  infringement of the Tornado trademark and the slogan trademarks,[28]

13  Cyclone USA was harmed by LL&C's infringement of Cyclone's trade

14  dress.  [See RT 90-91].

15      In response to this claim, LL&C asserts the following defenses

16  (1) unclean hands; and (2) estoppel.  [Pretrial Order, Ex. B, at 1].

17  The law regarding these defenses was presented earlier.[29]   LL&C's

18  defenses to this claim are rejected for the same reasons that they

19  were rejected when they were asserted in response to Claim 1.

20      Cyclone USA has not proven damages for federal unfair competition

21  that are not already encompassed within the damages awarded in respect

22  of Claim 1.  Accordingly, no separate damages are awarded on this

23  claim.  Cyclone USA, however, is entitled to a permanent injunction

24  prohibiting LL&C from engaging in such federal unfair competition in

25

26      [27]    See discussion of Claim 1.

27      [28]    See discussion of Claim 1.

28      [29]    See discussion of Claim 1.

1  the future.

2

3  **4.   Cyclone USA's Common Law Trade Name Infringement Claim**

4        **Against LL&C**[30]

5       Cyclone USA alleges that by using the Tornado trademark and the

6  TornadoFuelSaver term to advertise and sell devices after the contract

7  between LL&C and Cyclone USA was terminated, LL&C infringed Cyclone

8  USA's rights in its trade name, Tornado Air Management Systems.

9  [Cyclone USA's Proposed Findings at 31-32].

10      Cyclone USA has conducted business under the trade name Tornado

11 Air Management System and variants thereof since 1994. [SF 13, 17; RT

12 174-76].

13      The Court has determined that Cyclone USA owns an incontestable

14 federally registered trademark, namely, Tornado,[31] and that LL&C

15 infringed that trademark by using it and the confusingly similar term

16 TornadoFuelSaver to advertise and sell the same or similar devices to

17 the same customers through the same or overlapping channels after the

18 contract between LL&C and Cyclone USA was terminated.[32]  "[T]he same

19 broad standards of protection apply to trademarks and trade names."

20

21      [30]    Despite its reference to "common law," Cyclone USA invokes

22 15 U.S.C. § 1125(a) in asserting this claim. [Cyclone USA's Proposed
   Findings at 31].  Because section 1125(a) may be used as a vehicle for

23 asserting infringement of an unregistered trade name under federal
   law, the Court assumes that Cyclone USA intended to bring this claim

24 under the Lanham Act.  Accuride Int'l, Inc. v. Accuride Corp., 871
   F.2d 1531, 1534 (9th Cir. 1989) (stating that while trade names differ

25 from trademarks in that they may not be registered under 15 U.S.C. §
   1114, "analogous actions for trade name infringement can be brought

26 under section 43(a).").  See also 1 McCarthy, supra, § 9:4.

27      [31]    See discussion of Claim 13.

28      [32]    See discussion of Claim 1.

1  Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1534 (9th Cir.

2  1989).   Further, "trade name infringement . . . is based on

3  considerations similar to trade-mark infringement."   Id. at 1535

4  (quoting New West Corp. v. NYM Co., 595 F.2d 1194, 1201 (9th Cir.

5  1979)).   [See generally Cyclone USA's Proposed Findings at 32].

6  Therefore, LL&C's infringement of the Tornado trademark infringed

7  Cyclone USA's Tornado Air Management trade name as well.

8      In response to this claim, LL&C asserts the following defenses:

9  (1) unclean hands; and (2) estoppel [Pretrial Order, Ex. B, at 1].

10 The law regarding these defenses was presented earlier.[33]   LL&C's

11 defenses to this claim are rejected for the same reasons that they

12 were rejected when they were asserted in response to Claim 1.

13     Cyclone USA has not proven damages from common law trade name

14 infringement that are not already encompassed within the damages

15 previously awarded in respect of Claim 1.   Accordingly, no separate

16 damages are awarded on this claim.   Cyclone USA is, however, entitled

17 to a permanent injunction prohibiting LL&C from engaging in such trade

18 name infringement in the future.

19     **5.   Cyclone USA's State Unfair Competition Claim Against LL&C**

20     This claim already has been resolved in Cyclone USA's favor.   The

21 Court previously determined that the conduct of LL&C which violated 15

22 U.S.C. § 1125(a) also violated Cal. Bus. & Prof. Code § 17500.   [Order

23 Denying Third Party Defendant Jay Kim's Motion to Dismiss, etc., April

24 14, 2004, at 13-20].[34]

25     In addition, the Court has determined that LL&C infringed Cyclone

26

27     [33]   See discussion of Claim 1.

28     [34]   See discussion of Claim 3.

31

USA's trade dress and trade name.[35]   Such conduct constitutes state unfair competition.   Under California law, unfair competition is broadly defined to include "any unlawful, unfair or fraudulent business act or practice."   <u>Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co</u>., 973 P.2d 527, 539 (Cal. 1999) (quoting Cal. Bus. & Prof. Code § 17200).   California courts draw on federal definitions of unfair competition to help specify what constitutes unfair competition under California law.   See <u>People ex rel. Mosk v. Nat'l Research Co.</u>, 20 Cal. Rptr. 516, 522 (Cal. Ct. App. 1962) (stating that federal cases are "more than ordinarily persuasive" in giving content to California unfair competition law).   Therefore, further analysis of this claim is unnecessary.   [<u>See</u> Pretrial Order, ex. B, at 2 ("The parties have agreed not to pursue any further claims under California unfair competition, but are leaving the causes of action in place to the extent necessary to support the court's prior summary judgment orders of false advertising against Cyclone USA and LL&C.")].

LL&C asserts the following defenses in response to this claim: (1) unclean hands, and (2) estoppel. [Pretrial Order, Ex. B at 1].

These defenses are rejected.   LL&C has not shown that unclean hands is a defense that may be asserted in response to a claim brought under state unfair competition law.   <u>Page v. Bakersfield Unif. & Towel Supply Co.</u>, 49 Cal. Rptr. 46, 51 (Cal. Ct. App. 1966) (holding that unclean hands is not a defense to a claim alleging a violation of Cal. Bus. & Prof. Code §§ 17000 et seq. because to allow it "would result in permitting an act declared by statute to be void or against public policy." <u>Id.</u> at 52 (internal citations omitted).

---

[35]   See discussion of Claims 3 and 4.

Similarly, estoppel is probably not an available defense to a state unfair competition claim. Because of the equitable nature of the estoppel doctrine, it may not be used to allow a party to "take advantage of his own wrong." Cal. Civ. Code § 3517. See also 2 Ann Taylor Schwing, California Affirmative Defenses § 34.7 (2007). Moreover, "no court has expressly invoked principles of estoppel to contravene directly any statutory or constitutional limitations." Longshore v. County of Ventura, 598 P.2d 866, 874 (Cal. 1979). See also 2 Schwing, supra, § 34.7 (stating that estoppel cannot be used to defeat the proper application of a statute nor the future exercise of legislative power). However, as with other equitable defenses, estoppel may be considered in determining the appropriate remedy. See Cortez v. Purolator Air Filtration Prods. Co., 999 P.2d 706, 716 (Cal. 2000) (holding that "equitable defenses may not be asserted to wholly defeat a[n] [unfair competition law] claim since such claims arise out of unlawful conduct.").

Cyclone USA has not shown that it has suffered any damages under this claim that are not already encompassed within the damages previously awarded in respect of its federal claims, so no monetary relief is awarded in respect of this claim. Cyclone USA, however, is entitled to a permanent injunction prohibiting LL&C from engaging in such state law unfair competition in the future.[36]

---

[36] Although a successful plaintiff may recover attorneys fees under state unfair competition law, Cal. Civ. Proc. Code § 1021.5 (allowing for an award of attorneys fees to a prevailing party in actions affecting an important public interest), since all parties have engaged in state unfair competition (see discussion of Claims 5, 11, and 16), reallocating attorneys fees among the parties makes less sense than simply requiring that they bear their own, at least insofar as the state unfair competition claims are concerned.

1        **6.   Cyclone USA's Breach of Contract Claim Against LL&C**

2        Cyclone USA alleges that LL&C breached the April 2000 contract

3   between Cyclone USA and LL&C in three respects: (1) LL&C failed to pay

4   any profits to Cyclone USA; (2) LL&C unilaterally withheld a portion

5   of the purchase price of devices supplied to it by Cyclone USA; and

6   (3) LL&C continued to use the Tornado trademark after it terminated

7   the contract between LL&C and Cyclone USA.  [Cyclone USA's Proposed

8   Findings at 33].

9        The elements of a claim for breach of contract are: (1) a

10  contract existed between the plaintiff and the defendant; (2) the

11  plaintiff performed its material obligations under the contract, or

12  its performance was excused; (3) the defendant failed to perform a

13  material obligation required by the contract; and (4) the plaintiff

14  was damaged by the defendant's non-performance.  Acoustics, Inc. v.

15  Trepte Constr. Co., 92 Cal. Rptr. 723, 740 (Cal. Ct. App. 1971);

16  Sharpe v. FDIC, 126 F.3d 1147, 1153 (9th Cir. 1997) (applying

17  California law; Judicial Council of California, Civil Jury

18  Instructions, § 303 (2006) ("CACI").

19       There was a written contract between Cyclone USA and LL&C [SF 38;

20  Ex. 43], so that element is satisfied.

21       Cyclone USA contends LL&C breached the contract by failing to pay

22  Cyclone USA $324,372 for Cyclone USA's share of profits from LL&C's

23  authorized sale of devices.  [Ex. 154 at 9; Cyclone USA's Proposed

24  Findings at 35].

25       The contract between Cyclone USA and LL&C was modified in several

26  respects.  In March 2001, responsibility for processing credit card

27  transactions, handling customer service calls, and shipping devices to

28  consumers was transferred to a third-party fulfillment house retained

34

and compensated by LL&C.  [SF 44].  LL&C and Cyclone USA also agreed that LL&C would pay Cyclone USA $12 per unit (rather than $13), with 35% payable upon an order, 35% upon delivery, and 30% within 20 days of delivery.  [Ex. 52, 457; RT 691-92, 703-04)].  LL&C contends that LL&C and Cyclone USA also agreed to modify their contract so that they would no longer share in each other's net profits.  [LL&C's Proposed Findings at 57; 9RT 98-103].

Initially, the contract between Cyclone USA and LL&C divided the universe of possible customers into four groups: (1) those to whom only LL&C could sell, but as to which it would have to share profits with Cyclone USA [Ex. 43, § 3.09(a), Ex. A para. III(A), (B), & (C) & Ex. C para. I; (2) those to whom Cyclone USA could sell, without sharing profits with LL&C, but as to which Cyclone USA was required to charge retail rather than wholesale prices [Ex. 43, § 3.10, Ex. A para. IV]; (3) those to whom Cyclone USA could sell, but as to which Cyclone USA had an obligation to share profits with LL&C [Ex. 43, § 3.10, Ex. A, para. III(B) & IV, Ex. C. para. 1]; and (4) those to whom both LL&C and Cyclone USA could sell, but as to which each would have an obligation to share profits with the other.  [Ex. 43, Ex. A, para. III(D), Ex. C. para. II].  The parties, however, never performed the profit sharing obligation required by the contract.  LL&C never paid Cyclone USA a percentage of its profits [RT 526], and Cyclone USA never demanded payment of such profits.  [ RT 691-92, 740, 1144].[37] Cyclone USA never paid LL&C a percentage of its profits [RT 948, 1484], and LL&C never demanded payment of such profits.  [RT 1144].

---

[37]   Jay Kim's testimony to the contrary [RT 1484], which is not corroborated by any emails, correspondence, or other testimony is rejected.  Like some other aspects of his testimony, this is a bit too convenient to be credible.

LL&C, which initially had deposited funds into the joint account the parties had set up, stopped doing so [RT 527],[38] and Cyclone USA apparently never used that account for deposits. [RT 526]. At least one high-level employee of Cyclone USA believed that the parties had essentially abandoned the profit-sharing provision. [RT 1144-45].

There is no evidence, however, that the parties ever agreed, either orally or in writing that the contract would be modified to delete their profit sharing obligations. Tellingly, when LL&C proposed various changes to the contract, Cyclone USA expressly accepted some, but said nothing in response to LL&C's proposal that the parties' profit sharing obligations be eliminated. [Ex. 457. See also 9RT 98-103]. That, of course, weighs heavily against LL&C's position. So does the language of the contract which forbids implied waivers of contract rights [Ex. 43, § 5.05 ("The failure of either party at any time to require performance by the other party of any provision hereof shall not affect in any way the full right to require such performance at any time thereafter. Nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of the provision itself.")], and requires that all amendments be expressed in writing. [Ex. 43, § 5.03 ("This instrument contains all of the agreements, understandings, representations, conditions, warranties, and covenants made between the parties hereto. Unless set forth herein, neither party shall be liable for any representations made, and all modifications and amendments hereto must be in writing.")]. LL&C has presented no writing signed by both of

---

[38]   Having agreed in the contract to share profits with Cyclone USA, LL&C was not free to ignore that obligation merely because it decided that it no longer trusted Jay Kim. [See 9RT 99-100].

the parties to support its contention that Cyclone USA agreed to the proposed modification.  Furthermore, Jay Kim denied that he had agreed to the proposed modification or that he had authorized any of Cyclone USA's employees to agree to do so.  [RT 1352].  The fact that the parties agreed in writing to change some terms, but failed to agree in writing to change other terms suggests that they were following their contract's restrictions on modification, and that proposed changes not agreed upon in writing never became a part of their contract.  During closing argument LL&C's counsel was unable to specify any oral or written agreement removing the obligation to share profits from the contract between Cyclone USA and LL&C.  [9RT 98-103].  Therefore, the profit sharing provisions of the contract between LL&C and Cyclone USA were never formally deleted by amendment.

The obligation of the parties to share profits was a mutual obligation.  "Sharing" could not occur unless both parties contributed the sharable profits they had separately obtained.  Their obligations to share were concurrent conditions.  Pittman v. Canham, 3 Cal. Rptr. 2d 340, 342 (Cal. Ct. App. 1992) ("Concurrent conditions are conditions precedent which are mutually dependent . . . .").  Each party's performance of its sharing obligation was a condition precedent of the other's party's obligation to share.  Since neither party performed by tendering its profits,[39] neither's obligation to contribute its profits was triggered and neither breached the contract by failing to do so.  Id. (explaining that "the failure of both parties to perform concurrent conditions does not leave the contract

---

[39]   Since it would be unreasonable to assume that Cyclone USA made no sales under paragraphs III(B) or (D) of Ex. A of the contract, Cyclone USA must have obtained profits that it was obliged to share with LL&C.

open for an indefinite period so that either party can tender performance at his leisure.  The failure of both parties to perform concurrent conditions during the time for performance results in a discharge of both parties' duty to perform."). <u>See also</u> <u>Vidal v. Transcon. & W. Air</u>, 120 F.2d 67, 69 (3d Cir. 1941) ("Neither side having demanded performance by the other, neither side is in a position to complain or to assert any claim in an action of law against the other."); 15 Richard A. Lord, Williston on Contracts § 43:31 (4th ed. 2007) ("As a general principle, the mutual inability or unwillingness of the parties to a contract to perform will discharge the duty of each to the other.  According to the rule set forth in [section 238] the Restatement (Second) of Contracts, where all or part of the performances to be exchanged under an exchange of promises are due simultaneously, it is a condition of each party's duty to perform that the other party either render or, with manifested present ability to do so, offer performance of his or her part of the simultaneous exchange.  It necessarily follows that if neither party performs or tenders performance, the duty of neither party becomes due under the contract, and neither party can be in breach of contract, despite the fact that each party had failed to perform as promised.") (footnote omitted).  If Cyclone USA had promptly tendered its own performance and demanded that LL&C share profits as provided in the contract, it would be able to complain of LL&C's breach. <u>Consol. World Invs., Inc. v. Lido Preferred Ltd.</u>, 11 Cal. Rptr. 2d 524, 527 (Cal. Ct. App. 1992) ("It is elementary a plaintiff suing for breach of contract must prove it has performed all conditions on its part or that it was excused from performance.  Similarly, where defendant's duty to perform under the contract is conditioned on the happening of some event, the

plaintiff must prove the event transpired.") (internal citations omitted).  Cyclone USA, however, never did that until well after this case was filed.[40]

In <u>Pittman</u>, the contract specified a date for the simultaneous performance.  <u>Pittman</u>, 3 Cal. Rptr. 2d at 342.  The contract between LL&C and Cyclone USA, by contrast, did not.  But that does not mean that <u>Pittman</u> is inapposite.  Instead, the simultaneous performance of LL&C and Cyclone USA was due at a reasonable time.  <u>Consol. World Invs.</u>, 11 Cal. Rptr. 2d at 528 ("Where no time limit is specified for the performance of an act, a reasonable time is allowed. . . . What constitutes a 'reasonable time' for performance is a question of fact. . . . [that] depends, of course, on the circumstances of each case.") (citing Cal. Civ. Code § 1657; <u>Henry v. Sharma</u>, 201 Cal. Rptr. 478, 480 (Cal. Ct. App. 1984)).  <u>See also</u> Restatement (Second) of Contracts § 242.

"The determination of what is a reasonable time must be made from the evidence presented in each case.  The conduct and situation of the parties, the nature of the transaction, and the circumstances of the particular case should be considered."  <u>World Sav. & Loan Ass'n v. Kurtz Co.</u>, 6 Cal. Rptr. 665, 669 (Cal. Ct. App. 1960) (quotations omitted).  Under the circumstances, it would have been reasonable for the parties to deposit their respective profits into the joint account daily, monthly, or quarterly, but certainly no less frequently than annually.  <u>See Moss v. Crandell</u>, 16 Cal. Rptr. 912, 915 (Cal. Ct. App.

---

[40]    Jay Kim testified that Cyclone USA never offered to pay any profit share to LL&C.  [RT 1484].  Further, even in its initial complaint (filed on February 11, 2003), and in its First Amended complaint (filed on February 28, 2003), Cyclone USA neglected to claim that LL&C's failure to share its net profits was a breach or to demand that it do so.

1961) (adopting court appointed certified public accountant's testimony that "in an agreement where the compensation of one party is to be a percentage of the profits, the normal way is to compute such profits and compensation on an annual basis."). Nothing suggests that the parties contemplated that they would share profits only once every few years, or wait until the contract was terminated to do so. On the contrary, the fact that a joint account was set up specifically for the purpose of depositing profits suggests an intent to share profits long before Cyclone USA finally decided to tender its performance. Because neither party performed, tendered its performance, or demanded the other party's performance within any period remotely resembling a reasonable time, the obligations of LL&C and Cyclone USA to share profits lapsed and are no longer enforceable. Accordingly, Cyclone USA's request for an accounting of profits for authorized sales made by LL&C while the contract was in force is rejected.

From approximately October 2001 to March 2002 LL&C withheld 10% of the invoiced amount relating to some shipments of devices from Cyclone USA. The total amount withheld by LL&C, approximately $86,250, still has not been paid to Cyclone USA. [SF 58; Ex. 159 at 5].

Although LL&C notified Cyclone USA that it intended to withhold 10% of the invoiced amount [RT 1156-57], there is no evidence that Cyclone USA agreed to the practice or that the contract was modified to permit the practice. As vice present of Cyclone USA, Jim Ruschman told LL&C that he thought that withholding 10% of the invoiced amount was a "reasonable thing", but he also testified that at the time he said that he was attempting to dissuade LL&C from withholding payment, not authorizing it. [RT 1157]. The contract between LL&C and Cyclone

USA required that any modifications be made in writing and signed by both parties.  [Ex. 43, § 5.03].  LL&C has not proved even an oral agreement to modify the contract, and it certainly has not provided a written one.

LL&C does not appear to address this aspect of Cyclone USA's claim in its proposed findings.  Therefore, the Court deems LL&C to have conceded this aspect of Cyclone USA's claim, and Cyclone USA is entitled to recover from LL&C the $86,250 LL&C improperly withheld.  See Collins v. Hertz Corp., 50 Cal. Rptr. 3d 149, 157 (Cal. Ct. App. 2006) (stating that it falls on the parties "to direct the court to evidence that supports their claims.  It is not the court's duty to rummage through the papers to construct or resuscitate their case.").

Cyclone USA also seeks an award of prejudgment interest. [Cyclone USA's Proposed Findings at 35].  The prevailing party in a contract dispute is entitled to receive prejudgment interest if the amount owed is "certain, or capable of being made certain by calculation."  Cal. Civ. Code § 3287(a).  Since the contract between Cyclone USA and LL&C does not forbid it, Cyclone USA is entitled to recover prejudgment interest.  Cal. Civ. Code § 3302 ("The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon.").  The contract between Cyclone USA and LL&C did not specify an interest rate so the California statutory rate applies.  Cal. Civ. Code § 3289(b) ("If a contract entered into after January 1, 1986, does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach.").  However, prejudgment interest under section 3287(a) is awarded upon request "from the first day there exists both a breach and a

liquidated claim."   See N. Oakland Med. Clinic v. Rogers, 76 Cal. Rptr. 2d 743, 746 (Cal. Ct. App. 1998).  Here, it is not clear exactly when the obligation to pay the sum withheld accrued.  Therefore, the precise amount of prejudgment interest cannot be determined now.

LL&C does not address Cyclone USA's allegation that its post-termination use of the Tornado trademark breached the contract in its proposed findings.  Therefore, the Court deems LL&C to have conceded this aspect of Cyclone USA's claim.  However, Cyclone USA has not shown that it suffered any damages from LL&C's breach of this provision that are not adequately addressed by Cyclone USA's trademark infringement claim.  Therefore, no monetary or other relief is awarded on this aspect of Cyclone USA's breach of contract claim.  See Arcadia, California Ltd. v. Herbert, 353 P.2d 294, 299 (Cal. 1960) (noting that "the jury was properly instructed that it could not award damages under both contract and tort theories"); Pugh v. See's Candies, Inc., 250 Cal. Rptr. 195, 206 n.13 (Cal. Ct. App. 1988) ("Ordinarily, a plaintiff asserting both a contract and tort theory arising from the same factual setting cannot recover damages under both theories . . . .").

In response to Cyclone USA's breach of contract claim, LL&C asserts the following defenses: (1) unclean hands; (2) estoppel; (3) justification; and (4) waiver. [Pretrial Order, Ex. B].

Since it has been determined that the provision in the contract requiring the parties to share profits is no longer enforceable, LL&C's defenses to that aspect of this claim need not be considered.

The defense of unclean hands under California law bars the plaintiff from obtaining relief based upon the transaction because the plaintiff also engaged in improper or inequitable conduct in direct

relation to the transaction in question.  See Wong v. Tenneco, Inc., 702 P.2d 570, 574 (Cal. 1985); Watson v. Poore, 115 P.2d 478, 483-85 (Cal. 1941).  In California, "[a]ny conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient to invoke the doctrine." Kendall-Jackson Winery v. Superior Court, 90 Cal. Rptr. 2d 743, 749 (Cal. Ct. App. 1999).  See also 2 Schwing, supra, §§ 45:1-45:2 (stating that whether misconduct amounts to unclean hands depends on the nature of the misconduct, its relationship to the claimed injuries, and analogous case law, and noting that "[t]o a large extent, unconscionable conduct is in the eye of the beholder.").  Thus, where the defendant proves by a preponderance of the evidence that the plaintiff was guilty of inequitable conduct – such as fraud or bad faith – related to the transaction, the defense of unclean hands may bar the plaintiff's recovery.  See Adkins v. Lear, Inc., 435 P.2d 321, 344 (Cal. 1967) (applying California law), vacated on other grounds, 395 U.S. 653 (1969); Stone v. Lobsien, 247 P.2d 357, 361 (Cal. Ct. App. 1952 ("It is probably the law that the unclean hands doctrine will bar a party from relief in equity where there is a mere intent to defraud without actual fraud resulting.  But that rule applies as a matter of law only where the evidence is susceptible of but the one inference that the transaction was entered into with the intent to defraud.").

Unlike the defense of laches, the equitable defense of unclean hands may bar an action at law for damages, such as a suit for breach of contract.  See Ghirardo v. Antonioli, 924 P.2d 996, 999 (Cal. 1996); Wong, 702 P.2d at 574; Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists, 39 Cal. Rptr 64, 97 (Cal. Ct. App. 1964) ("We are satisfied that the equitable defense of unclean hands is available

in this state as a defense to a legal action."). The determination that unclean hands bars a claim, however, is a matter of judicial discretion. In re Brandie W., 203 Cal. Rptr. 537, 540 (Cal. Ct. App. 1984).

While Cyclone USA may have shipped devices that LL&C deemed to be defective or nonconforming, merely breaching a contract is not the sort of inequitable conduct necessary to trigger an unclean hands defense. Further, LL&C has asserted a claim alleging that Cyclone USA breached the contract by delivering defective or nonconforming goods,[41] so the issues surrounding the adequacy of Cyclone USA's performance are better addressed in that context than in this one.

LL&C's unclean hands defense to Cyclone USA's claim that LL&C breached the contract by continuing to use the Tornado trademark also is rejected. Cyclone USA did not act inequitably in obtaining or policing its rights in the Tornado trademark.[42]

However, Cyclone USA did make fraudulent misrepresentations to LL&C relating to the inventorship, patent ownership, and manufacturing of the devices.[43] Fraud is the sort of misconduct that may support an unclean hands defense. Stone, 247 P.2d at 360-61. Further, it appears that Cyclone USA's misrepresentations are at least somewhat related to LL&C's breach of contract claim. Still, the defense of unclean hands is nevertheless rejected becuase the harm LL&C suffered was not caused by Cyclone USA's misrepresentations. In addition, both LL&C and Cyclone USA behaved inequitably. Finally, because LL&C has

---

[41]   See discussion of Claim 15.

[42]   See discussion of Claims 1 and 13.

[43]   See discussion of Claim 14.

asserted a fraud claim against Cyclone USA,[44] the appropriate remedy for Cyclone USA's misrepresentations is better addressed in the context of that claim, and the Court exercises its discretion to reject LL&C's unclean hands defense. See Lovett, 73 Cal. Rptr. 2d at 500 ("Whether the unclean hands doctrine applies in a particular case is within the trial court's sound discretion.").

The elements of the defense of estoppel under California law are: (1) the party to be estopped must have knowledge of the facts; (2) the party to be estopped must intend that the conduct at issue be acted on or must act in such a way that the party seeking estoppel has a right to believe it was so intended; (3) the party seeking estoppel must be ignorant of the truth; and (4) the party seeking estoppel must rely on the conduct at issue with resulting detriment. Lentz v. McMahon, 261 Cal. Rptr. 310, 312 (Cal. Ct. App. 1989); 2 Schwing, supra, § 34:1.

Under California law, the defense of estoppel is available if equity requires that the plaintiff be estopped from asserting a claim because the defendant's potential liability on that claim is in substantial part due to the defendant's detrimental reliance on a statement or conduct of the plaintiff. See Waller v. Truck Ins. Exch., Inc., 900 P.2d 619, 637-38 (Cal. 1995); Cont'l Airlines, Inc. v. Intra Brokers, Inc., 24 F.3d 1099, 1104 (9th Cir. 1994) (applying California law and stating that "an estoppel requires a party to plead detrimental reliance and injury."). Thus, where the defendant proves that it detrimentally relied on the statements or conduct of the plaintiff party, the plaintiff may be estopped from asserting the claim based on conduct that was some part in causing the defending

---

[44]   See discussion of Claim 14.

party's alleged breach.   See Waller, 900 P.2d at 637-38; Rand v. Andreatta, 389 P.2d 382, 384-85 (Cal. 1964).

The defense of equitable estoppel also is available if the plaintiff previously induced the defendant to refrain from taking action by which the defendant might have retrieved his position and saved himself from a loss or loss of claim.   Vu v. Prudential Prop. & Cas. Ins. Co., 33 P.3d 487, 493 (Cal. 2001) (quoting Benner Indus. Accident Comm'n, 159 P.2d 24, 26 (Cal. 1945).   Thus, where a delay in commencing action is induced by the conduct of the other party, the other party cannot use that delay to support a claim or defense. Lantzy v. Centex Homes, 73 P.3d 517, 533 (Cal. 2003); Waller, 900 P.2d at 637-38.

LL&C's contention that Cyclone USA is estopped from asserting a breach of contract claim based on LL&C's withholding a portion of the purchase price of some of the devices is rejected.   Withholding 10% of the purchase price for the allegedly defective devices was LL&C's idea, not Cyclone USA's.   Further, the adequacy of Cyclone USA's performance under the contract is better considered in the context of LL&C's breach of contract claim.[45]

Similarly, nothing in the record suggests that anything that Cyclone USA did or failed to do reasonably could have led LL&C to believe that its continued use of the Tornado trademark after termination of the contract between LL&C and Cyclone USA was permissible.   This is especially so in light of the fact that both Cyclone USA and Sei Kim reminded LL&C of Cyclone USA's rights in the Tornado trademark around the time when the contract between LL&C and

---

[45]   See discussion of Claim 15.

Cyclone USA ended.   Therefore, LL&C's estoppel defense as to its continued use of the Tornado trademark after termination of the contract is rejected.

The defense of justification relies on the definition of breach of contract; only the "wrongful, i.e., the unjustified or unexcused, failure to perform a contract is a breach." Sharpe, 126 F.3d at 1153 (applying California law) (citations and internal quotations omitted); 1 Bernard E. Witkin, Summary of California Law: Contracts § 847 (10th ed. 2005) ("Where the nonperformance is legally justified, or excused, there may be a failure of consideration, but not a breach."). Where a party proves by a preponderance of the evidence that its conduct was legally justified (in the sense that its conduct was required by law or that the law excused his conduct so as to defeat liability), then the party's nonperformance will not be construed as breach. See L.B. Labs., Inc. v. Mitchell, 244 P.2d 385, 389 (Cal. 1952) (concluding that when the defendant "contracted to do a specific thing" and there was "no equivocation or shading of the obligation," he assumed "a specific duty," but that "[a]ny justification or excuse for failure to perform it could be a matter of defense"); Sharpe, 126 F.3d at 1153. See also Comunale v. Traders & Gen. Ins. Co., 328 P.2d 198, 201-02 (Cal. 1958).

As with LL&C's defenses of unclean hands and estoppel, the defense of justification as to LL&C's withholding of a portion of the purchase price for some devices is better considered in the context of LL&C's claim for breach of contract.[46]

LL&C's argument that Cyclone USA's conduct justified it in

---

[46]   See discussion of Claim 15.

ignoring the plain language of the contract by continuing to use the Tornado trademark is rejected.  LL&C's conduct was not required by law and it violated Cyclone USA's federal trademark rights.

To establish the defense of waiver, the defendant must prove that: (1) the plaintiff knew that the defendant was required to do a specified act under the contract; and (2) the plaintiff freely and knowingly gave up his right to have the defendant perform that contractual obligation.  Waller, 900 P.2d at 636 ("[W]aiver is the intentional relinquishment of a known right after knowledge of the facts."); Craig v. White, 202 P. 648, 652 (Cal. 1921) ("No man can be bound by a waiver of his rights, unless waiver is distinctly made, with full knowledge of the rights which he intends to waive; and the fact that he knows his rights, and intends to waive them.").  The defendant must prove both of these elements by clear and convincing evidence.  Waller, 900 P.2d at 636 ("The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver.") (alteration in original) (internal quotations omitted).  The key question is one of intent: where the evidence of intentional relinquishment is doubtful, waiver will not be found and liability for breach will not be evaded.  Waller, 900 P.2d at 636; City of Ukiah v. Fones, 410 P.2d 369, 370-71 (Cal. 1966).

The contract between Cyclone USA and LL&C forbids implied waivers.  [Ex. 43, § 5.05].  Because parties to an agreement are generally free to contract as they please, the provision barring implied waivers is valid.  See Aerojet-General Corp. v. Transp. Indem. Co., 948 P.2d 909, 932 (Cal. 1997).  No written waiver of its right to

48

collect the 10% of the purchase price withheld by LL&C signed by Cyclone USA has been proven. Thus, Cyclone USA did not waive its right to recover the 10% of the purchase price that LL&C improperly withheld.

Finally, LL&C's contention that Cyclone USA waived its claim for breach as to LL&C's continued use of the Tornado trademark is rejected. There nothing in the record to support such a defense.

**B.   Cyclone USA's Claims Against Sei Kim**

**7.   Cyclone USA's Federal Trademark Infringement Claim Against Sei Kim**

"To be liable for contributory trademark infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied." Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 807 (9th Cir. 2007) (quoting Inwood Labs, Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 (1982)). See also Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 984-85 (9th Cir. 1999); Rolex Watch, USA, Inc. v. Michael Co., 179 F.3d 704, 712-13 (9th Cir. 1999). The plaintiff, then, must prove each of the following elements by a preponderance of the evidence: (1) the defendant supplied goods to a direct infringer; (2) the direct infringer used the goods sold by the defendant to infringe the plaintiff's trademark; (3) the defendant knew or should have known that the direct infringer would use the goods to infringe the plaintiff's trademark; and (4) the plaintiff was damaged by the infringement. Model Civ. Jury Instr. 9th Cir. § 15.19 (2007).

If Sei Kim knew or reasonably should have known of LL&C's

infringement, Sei Kim is liable for any federal trademark infringement committed by LL&C during the period when the contract between Sei Kim and LL&C was in force.  See Inwood Labs., 456 U.S. at 854 ("[I]f a manufacturer or distributor . . . continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.") (footnote omitted); Sealy, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1382 (9th Cir. 1984) (quoting Inwood Labs., 456 U.S. at 854); H-D Mich., Inc. v. Bikers Dream, Inc., 48 U.S.P.Q. 2d 1108, 1111 (C.D. Cal. 1998) (finding motorcycle manufacturer contributorially liable for trademark infringement when it was aware of and participated in its customer's infringement, even though it was not the manufacturer who sold the infringing motorcycles to the public), aff'd in part, 230 F.3d 1366 (9th Cir. 2000).

The Court already has determined that LL&C infringed Cyclone USA's trademarks and that Cyclone USA was injured thereby.[47]  Sei Kim supplied devices to LL&C.  [RT 1424].  Sei Kim also knew, or reasonably should have known that LL&C was engaging in trademark infringement.  By the time he entered into the contract with LL&C, Sei Kim knew that Cyclone USA had registered the Tornado trademark in its own name.  [Ex. 119, § 6.1; RT 143-44, 147, 1436].  See also 15 U.S.C. § 1072 ("Registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership thereof.").  Sei Kim also knew that LL&C intended to market his devices using Cyclone USA's Tornado trademark or confusingly similar

---

[47]   See discussion of Claim 1.

variations thereof, such as TornadoFuelSaver.  Although Sei Kim attempted to dissuade LL&C from using the Tornado trademark in selling devices supplied by Sei Kim, LL&C wanted to continue using it, and Sei Kim eventually acquiesced.  [RT 147, 150-52, 1444].  Despite his knowledge of LL&C's wrongful conduct, Sei Kim continued to supply devices to LL&C.  [RT 1425].  Sei Kim even stamped some of the devices he supplied to LL&C with the Tornado trademark himself.  [RT 1424]. That makes him a direct, rather than merely a contributory, infringer and counterfeiter.

In sum, Sei Kim knew that LL&C was infringing Cyclone USA's registered Tornado trademark by using it to advertise and sell devices supplied by Sei Kim, and he could have prevented that by refusing to sell devices to LL&C unless it agreed to advertise and sell them using a non-infringing trademark, but he elected not to do so.  Therefore, Sei Kim is liable to Cyclone USA for any federal trademark infringement by LL&C which occurred during the period when the contract between LL&C and Sei Kim was in force.

Sei Kim has asserted the following defenses in response to this claim:  (1) declaratory relief/ownership; (2) cancellation; (3) estoppel; (4) unclean hands; and (5) acquiescence.  [Pretrial Order, Ex. B, at 1].

For the reasons explained elsewhere, the defenses of declaratory relief/ownership and cancellation are rejected.[48]

The law regarding the defenses of estoppel, unclean hands, and acquiescence was presented earlier.[49]

---

[48]   See discussion of Claims 13 and 19.

[49]   See discussion of Claim 1.

1　　　The defenses of estoppel and acquiescence are rejected for

2　reasons similar to those that led to their rejection when they were

3　asserted by LL&C.[50]  Sei Kim was aware of Cyclone USA's registration

4　and use of the Tornado trademark and the slogan trademarks. [Ex. 119,

5　§ 6.1; RT 147].  See also 15 U.S.C. § 1072.  Nothing Cyclone USA did

6　or failed to do could reasonably be construed as suggesting to Sei Kim

7　that either he or LL&C could continue to use those trademarks after

8　Sei Kim and LL&C terminated their contracts with Cyclone USA and

9　entered into their own contract.

10　　　Sei Kim's unclean hands defense also is rejected.  Sei Kim's own

11　hands are dirty because he acquiesced in LL&C's marketing of devices

12　using the Tornado trademark, thereby rendering him contributorially

13　liable for the trademark infringement, trademark counterfeiting, and

14　much of the unfair competition of false advertising committed by LL&C

15　after he entered into the contract with LL&C.[51]  Therefore, he is

16　precluded from relying on any equitable defense, including unclean

17　hands.  In addition, the conduct on which Sei Kim's liability is based

18　occurred as the result of Sei Kim's choice to continue supplying LL&C

19　with devices despite his knowledge of LL&C's federal trademark

20　infringement, federal counterfeiting, and federal unfair competition

21　after Sei Kim terminated his contract with Cyclone USA.  Finally, the

22　Court has determined that Cyclone USA's trademark registrations should

23

24　　　　　[50]　See discussion of Claim 1.

25　　　　　[51]　There is, however, a distinction between the culpability of
LL&C and Sei Kim: Sei Kim warned LL&C of the inadvisability of
26　continuing to use the Tornado trademark, and initially opposed its
use, before eventually acquiescing in its use by LL&C.  LL&C, by
27　contrast, insisted on using the Tornado trademark for financial
reasons in the face of Cyclone USA's incontestable registration and
28　despite Sei Kim's warnings and reluctance.

1  not be cancelled for fraud or misuse.[52]  Thus, nothing that Cyclone did

2  or failed to do in connection with the registration or use of those

3  trademarks can provide a basis for an unclean hands defense.

4      Cyclone USA, however, properly concedes that Sei Kim did not

5  participate in the manufacture or sale of the Poron devices acquired

6  and sold by LL&C.   [Cyclone USA's Proposed Findings at 14].

7  Therefore, Sei Kim is not liable for any trademark infringement or

8  trademark counterfeiting, or unfair competition arising from LL&C's

9  sale of those devices.[53]

10     Sei Kim directly and contributorily infringed Cyclone USA's

11 trademarks during the period when the contract between Sei Kim and

12 LL&C was in force.   Therefore, to the extent that LL&C is liable to

13 Cyclone USA for trademark infringement during that time, Sei Kim is

14 also personally liable to Cyclone USA.[54]

15     **8.  Cyclone USA's Federal Counterfeiting Claim Against Sei Kim**

16     For the reasons previously discussed, Sei Kim is liable for

17 federal trademark counterfeiting committed by LL&C during the period

18 when the contract between Sei Kim and LL&C was in force.[55]

19     Sei Kim has pleaded the following defenses in response to this

20 claim: (1) declaratory relief/ownership; (2) cancellation; (3)

21 estoppel; (4) unclean hands; and (5) acquiescence.  [Pretrial Order,

22

23     [52]  See discussion of Claim 13.

24     [53]  For the same reason, Sei Kim also is not liable to Cyclone
   USA on any other theory under which LL&C may be liable to Cyclone USA
25 for LL&C's purchase and sale of the Poron devices (i.e., federal
   trademark counterfeiting, federal unfair competition, common law trade
26 name infringement, state unfair competition, etc.).

27     [54]  See discussion of Claim 1.

28     [55]  See discussion of Claims 2 and 7.

1  Ex. B, at 1].

2      For the reasons explained elsewhere, the defenses of declaratory

3  relief/ownership and cancellation are rejected.[56]

4      The law regarding the defenses of estoppel, unclean hands, and

5  acquiescence was presented earlier.[57]  Those defenses are rejected for

6  the same reasons they were rejected when they were asserted in

7  response to Claim 7.

8      Therefore, to the extent that LL&C is liable to Cyclone USA for

9  federal trademark counterfeiting during the period when the contract

10  between Sei Kim and LL&C was in force, Sei Kim is also personally

11  liable to Cyclone USA.[58]

12      **9.**  **Cyclone USA's Federal Unfair Competition Claim Against Sei**

13         **Kim**

14      For the reasons previously discussed, Sei Kim is liable for any

15  federal unfair competition committed by LL&C by LL&C while the

16  contract between Sei Kim and LL&C was in force.[59]

17      Sei Kim has pleaded the following defenses in response to this

18  claim: (1) declaratory relief/ownership; (2) cancellation; (3)

19  estoppel; (4) unclean hands; and (5) acquiescence. [Pretrial Order,

20  Ex. B, at 1].

21      For the reasons explained elsewhere, the defenses of declaratory

22

23

24  _____

25      [56]    See discussion of Claims 13 and 19.

26      [57]    See discussion of Claim 1.

27      [58]    See discussion of Claim 2.

28      [59]    See discussion of Claims 3 and 7.

relief/ownership and cancellation are rejected.[60]

The law regarding the defenses of estoppel, unclean hands, and acquiescence was presented earlier.[61]  Those defenses are rejected for the same reasons they were rejected when they were asserted in response to Claim 7.

Therefore, to the extent that LL&C is liable to Cyclone USA for federal unfair competition during the period when the contract between Sei Kim and LL&C was in force, Sei Kim is also personally liable to Cyclone USA.[62]

**10.  Cyclone USA's Common Law Trade Name Infringement Claim Against Sei Kim**

For the reasons previously discussed,[63] Sei Kim is liable for trade name infringement committed by LL&C while the contract between LL&C and Sei Kim was in force.

Sei Kim has pleaded the following defenses in response to this claim: (1) declaratory relief/ownership; (2) cancellation; (3) estoppel; (4) unclean hands; and (5) acquiescence. [Pretrial Order, Ex. B, at 1].

For the reasons explained elsewhere, the defenses of declaratory relief/ownership and cancellation are rejected.[64]

The law regarding the defenses of estoppel, unclean hands, and

---

[60]   See discussion of Claims 13 and 19.

[61]   See discussion of Claim 1.

[62]   See discussion of Claim 3.

[63]   See discussion of Claims 4 and 7.

[64]   See discussion of Claims 13 and 19.

1  acquiescence was presented earlier.[65]  Those defenses are rejected for

2  the same reasons they were rejected when they were asserted in

3  response to Claim 7.

4      Therefore, to the extent that LL&C is liable to Cyclone USA for

5  trade name infringement during the period when the contract between

6  Sei Kim and LL&C was in force, Sei Kim is also personally liable to

7  Cyclone USA.[66]

8      **11.  Cyclone USA's State Unfair Competition Claim Against Sei Kim**

9      In evaluating claims brought under state unfair competition laws,

10  California courts often look to federal unfair competition law for

11  guidance.  See, e.g., Cel-Tech Commc'ns., 973 P.2d at 543 (turning to

12  parallel federal unfair competition statute in applying state unfair

13  competition law); People ex rel. Mosk, 20 Cal. Rptr. at 522 (stating

14  that federal cases are "more than ordinarily persuasive" in

15  interpreting California's unfair competition law); Denbicare U.S.A.,

16  Inc. v. Toys "R" Us, Inc., 84 F.3d 1143, 1152 (9th Cir. 1996) ("State

17  common law claims of unfair competition and actions pursuant to

18  California Business and Professions Code § 17200 are substantially

19  congruent to claims made under the Lanham Act.") (internal citations

20  and quotations omitted).[67]  For the reasons previously discussed,[68] Sei

21  _____

22      [65]    See discussion of Claim 1.

23      [66]    See discussion of Claim 4.

24      [67]    California courts have held that a section 17200 unfair
   practices claim cannot be predicated on vicarious liability.  See,
25  e.g., Emery v. Visa Int'l Serv. Ass'n, 116 Cal. Rptr. 2d 25, 33 (Cal.
   Ct. App. 2002) ("The concept of vicarious liability has no application
26  to actions brought under the unfair business practices act.") (quoting
   People v. Toomey, 203 Cal. Rptr. 642, 650 (Cal. Ct. App. 1984).
27  However, this case does not involve allegations of vicarious liability
   based on the principles of agency law as was the case in Emery.
28                                                      (continued...)

1   Kim is liable for state unfair competition committed by LL&C while the

2   contract between Sei Kim and LL&C was in force.  See Inwood Labs., 456

3   U.S. at 854.  Sei Kim was aware of LL&C's state unfair competition but

4   did not do what he could have done to stop it.

5        Further analysis of this claim is unnecessary.  [See Pretrial

6   Order, ext. B, at 2 ("The parties have agreed not to pursue any

7   further claims under California unfair competition, but are leaving

8   the causes of action in place to the extent necessary to support the

9   court's prior summary judgment orders of false advertising against

10  Cyclone USA and LL&C.")].

11       Sei Kim has pleaded the following defenses in response to this

12  claim: (1) declaratory relief/ownership; (2) cancellation; (3)

13  estoppel; (4) unclean hands; (5) acquiescence.  [Pretrial Order, Ex.

14  B, at 1].

15       For the reasons explained elsewhere, the defenses of declaratory

16  relief/ownership and cancellation are rejected.[69]

17       The law regarding the defenses of estoppel, unclean hands, and

18  acquiescence was presented earlier.[70]  Those defenses are rejected for

19  the same reasons they were rejected when they were asserted in

20  response to Claim 7.

21       Therefore, to the extent that LL&C is liable to Cyclone USA for

22

23       [67](...continued)
    Rather, the issue here is whether Sei Kim's "personal participation in
24  the unlawful practices and unbridled control over the practices that
    are found to violate section 17200 or 17500" may properly give rise to
25  contributory liability.  Id.  (internal citations omitted).

26       [68]   See discussion of Claims 5 and 7.

27       [69]   See discussion of Claims 13 and 19.

28       [70]   See discussion of Claim 6.

1   state unfair competition during the period when the contract between

2   Sei Kim and LL&C was in force, Sei Kim is also personally liable to

3   Cyclone USA.[71]

4   **C.    LL&C's Claims Against Cyclone USA**

5        **12.   LL&C's Federal Unfair Competition Claim Against Cyclone USA**

6        This claim already has been resolved in LL&C's favor.  The Court

7   previously determined that Cyclone USA committed false advertising

8   under 15 U.S.C. § 1125(a) by promoting sales of devices not

9   manufactured by Sei Kim using test data regarding devices manufactured

10  by Sei Kim, and testimonials concerning the performance of devices

11  manufactured by Sei Kim, on packaging, on Cyclone USA's website, or in

12  marketing materials relating to devices not manufactured by Sei Kim.

13  The Court also concluded that Cyclone USA violated 15 U.S.C. § 1125(a)

14  by using photographs or video depicting devices manufactured by Sei

15  Kim to promote sales of devices not manufactured by Sei Kim.  [See

16  Order Granting in Part LL&C's Motion for Partial Summary Judgment,

17  August 11, 2003, at 6-13].

18       Cyclone USA asserts the following defenses in response to this

19  claim: (1) laches; (2) equitable estoppel; (3) acquiescence; and (4)

20  unclean hands.  [Pretrial Order, Ex. B at 1].  The law regarding these

21  defenses was discussed earlier.[72]

22       The defense of laches is rejected.  LL&C filed its federal unfair

23  competition claim as a counterclaim on April 14, 2003.  "While laches

24  and the statute of limitations are distinct defenses . . . [i]f the

25  plaintiff filed suit within the analogous limitations period, the

26

_____

27    [71]    See discussion of Claim 5.

28    [72]    See discussion of Claim 1.

1   strong presumption is that laches is inapplicable." <u>Reno Air Racing</u>

2   <u>Ass'n</u>, 452 F.3d at 1138-39 (quoting <u>Jarrow Formulas</u>, 304 F.3d at 835).

3   Further, "[b]ecause the Lanham Act contains no explicit statute of

4   limitation, courts borrow the analogous state time period." <u>Id.</u> at

5   1139.  LL&C asserted its federal unfair competition claim well within

6   the three year time period prescribed by California's "catchall"

7   statute of limitation.  <u>Id.</u> (applying Nevada's "catchall" statute of

8   limitation by analogy in evaluating the availability of laches as a

9   defense to a Lanham Act claim); Cal. Civ. Proc. Code § 338.

10  Therefore, any delay by LL&C was not unreasonable.

11       The defense of estoppel is rejected.  As stated above, LL&C filed

12  its unfair competition counterclaim promptly and within the period of

13  limitation.  Because Cyclone USA has not shown that any delay on the

14  part of LL&C in asserting its unfair competition claim resulted in

15  Cyclone USA's detrimental reliance, this defense is rejected.  <u>See</u>

16  <u>American Int'l Group</u>, 926 F.2d at 837 (Kozinski, J., dissenting).

17       The defense of acquiescence also is rejected.  As stated earlier,

18  courts often use the terms "laches" and "acquiescence"

19  interchangeably.[73]  However, acquiescence is distinguishable in that

20  it usually involves a more active form of consent.  <u>SunAmerica Corp.</u>,

21  77 F.3d at 1334-38, 1344 n.7; 6 McCarthy, <u>supra</u>, § 31:41.  Nothing in

22  the record supports the assertion that there was any consent, active

23  or passive, on the part of LL&C to Cyclone USA's use of the test data,

24  pictures, photographs and testimonials relating to devices

25  manufactured by Sei Kim.  The Court already has rejected Cyclone USA's

26  defense of unclean hands with respect to LL&C's claim for false

27

28       [73]   See discussion of Claim 1.

advertising under 15 U.S.C. § 1125(a).  [See Order Granting in Part LL&C's Motion for Partial Summary Judgment, August 11, 2003, at 13]. Therefore, this defense need not be discussed further.

LL&C has not proven the amount of damages, if any, it suffered as a result of Cyclone USA's federal unfair competition, so no damages are awarded.  However, LL&C is entitled to a permanent injunction prohibiting Cyclone USA from engaging in such federal unfair competition in the future.

### 13.  LL&C's Judicial Cancellation of Trademark Claim Against Cyclone USA

"The Lanham Act authorizes district courts to order trademark cancellation in any action involving a registered mark." Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1085 (9th Cir. 2000) (citing 15 U.S.C. § 1119).  Even when grounds for cancellation exist, however, cancellation is not required.  Instead, a court "may" cancel a federal trademark registration if it concludes that the public interest in cancellation outweighs the interest of the registrant in preserving the registration.  15 U.S.C. § 1064; Idaho Potato Comm'n v. G & Terminal Packaging, Inc., 425 F.3d 700, 716-17 (9th Cir. 2005) (noting that the statute merely "allows" cancellation).

The effect of judicial cancellation of a federal trademark registration is limited.  Canceling the registration of a trademark does not change the ownership of the trademark or allow others to use the trademark.  The trademark retains whatever validity it possesses based upon its character and use, and its ownership remains with the senior user, albeit without the favorable presumptions or other benefits flowing from registration.  See Keebler Co. v. Rovira Biscuit

60

Corp., 624 F.2d 366, 372 (1st Cir. 1980) ("[R]egistration does not create the underlying right in a trademark.  That right, which accrues from the use of a particular name or symbol, is essentially a common-law property right, and cancellation cannot extinguish a right that federal registration did not confer.") (internal citation omitted); 6 McCarthy, supra, § 31:60 ("It has been held several times that even if [the] defendant succeeds in proving that the plaintiff's registration was fraudulently obtained, plaintiff's common law rights in the mark continue unabated . . . .") (footnote omitted).

LL&C has standing to seek cancellation of any of Cyclone USA's federal trademark registrations, regardless of whether such registrations are contestable or incontestable.  See 15 U.S.C. § 1064(3); Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 735 F.2d 346, 349 (9th Cir. 1984) ("The Lanham Act requires only that the cancellation petitioner plead and prove facts showing a real interest in the proceeding in order to establish standing.") (internal citations omitted).[74]

"Under 15 U.S.C. § 1065, a federally registered trademark that is used continuously for five years becomes 'incontestable,' entitling the holder to an exclusive right to use the mark that can only be defeated on specifically enumerated grounds." Watec Co. v. Liu, 403 F.3d 645, 652 (9th Cir. 2005) (quoting Casual Corner Assocs., Inc. v. Casual Stores of Nevada, Inc., 493 F.2d 709, 711-12 (9th Cir. 1974)). See also 15 U.S.C. § 1065.

In actuality, the term "incontestable," is "somewhat confusing

---

[74]   Although Sei Kim did not file a claim seeking cancellation of Cyclone USA's trademarks, he did assert cancellation as an affirmative defense to Cyclone USA's claims against him [Pretrial Order, Ex. B at 1], so he is entitled to address this issue as well.

and misleading because the Lanham Act expressly identifies over 20 situations in which infringement of an allegedly incontestable mark is permitted." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 206 (1985) (Stevens, J., dissenting) (footnote omitted). Nevertheless, incontestability confers significant advantages. See 6 McCarthy, supra, § 32:147 (observing that although incontestability is a "swiss cheese" rule, "[i]ncontestable status is by no means an empty formalism."); Park'N Fly, 469 U.S. at 198 (explaining that "[t]he incontestability provisions . . . provide a means for the registrant to quiet title in the ownership of his mark."). Those advantages include a powerful evidentiary presumption:

> To the extent that the right to use the registered mark has become incontestable . . . the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.

15 U.S.C. § 1115(b).

The Tornado trademark became incontestable effective July 5, 2002. [SF 75; Ex. 123, 421, at 9-12].

Because an incontestable trademark registration constitutes "conclusive evidence" of "the registrant's ownership of the mark," unless Cyclone USA's registration of the Tornado trademark is canceled, it is unnecessary to consider any other evidence regarding ownership of the Tornado trademark. 15 U.S.C. § 1115(b).

LL&C contends that Cyclone USA's registration of the Tornado

trademark should be cancelled because (1) it "was obtained fraudulently" and (2) it "is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods . . . ." 15 U.S.C. § 1064(3).  [LL&C's Proposed Findings at 15].

Fraud in procuring registration of a trademark occurs when an applicant knowingly makes false, material misrepresentations of fact in the application for registration.  Quiksilver, Inc. v. Kymsta Corp., 466 F.3d 749, 755 (9th Cir. 2006) (quoting L.D. Kichler Co. v. Davoil, Inc., 192 F.3d 1349, 1351 (Fed. Cir. 1999)).  The "burden of proving that a party fraudulently procured a trademark registration is heavy . . . ."  Robi v. Five Platters, Inc., 918 F.2d 1439, 1444 (9th Cir. 1990).  The quantum of proof required is clear and convincing evidence.  See Money Store v. Harriscorp Finance, Inc., 689 F.2d 666, 670 (7th Cir. 1982) ("Fraud must be shown by clear and convincing evidence in order to provide a basis for either cancellation or damages.  Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent [and Trademark] Office into registering the mark.") (internal citations omitted); Yocum v. Covington, 216 U.S.P.Q. 210, 217 (T.T.A.B. 1982) ("Fraud in a trademark cancellation is something that must be 'proved to the hilt' with little or no room for speculation or surmise; considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission; and any doubts resolved against the charging party."); Smith Int'l, Inc. v. Olin Corp., 209 U.S.P.Q. 1033, 1043 (T.T.A.B. 1981) ("Fraud . . . will not lie if it can be proven that the statement, though false, was made with a reasonable and honest belief that it was true . . . or that the false statement is not

material to the issuance or maintenance of the registration.").[75]

The elements that must be proven by clear and convincing evidence to establish fraud in procuring registration of a trademark are: (1) a false representation of a material fact in the application for registration or in the application for incontestability; (2) the registrant's knowledge or belief that the representation was false at the time it was made; (3) the registrant's "intent to induce reliance upon the misrepresentation"; (4) "reasonable reliance" on the misrepresentation; and (5) "damages proximately resulting from the reliance." <u>Robi</u>, 918 F.2d at 1444.  <u>See also</u> <u>Pony Express Courier Corp. v. Pony Express Delivery Serv.</u>, 872 F.2d 317, 319 (9th Cir. 1989).

As one court has explained:

> Only in the rare circumstance that another user

---

[75]    The standard of frankness required in the context of application trademark registration is different from, and lower than, is the standard of frankness required in the context of patent applications.

> There does not exist in trademark cases the fundamental reason for being on the alert to find fraud on the Patent Office which exists in patent cases. Every right a patentee has is given to him by the Patent Office.  On the other hand, the acquisition of the right to exclude others from the use of a trademark results from the fact of use and the common law, independently of registration in the Patent Office. . . . It is in the public interest to maintain registrations of technically good trademarks on the register so long as they are still in use.  The register then reflects commercial reality.  Assertions of "fraud" should be dealt with realistically, comprehending . . . that trademark rights, unlike patent rights, continue notwithstanding cancellation of those additional rights which the Patent Office is empowered by statute to grant.

<u>Morehouse Mfg. Corp. v. J. Strickland & Co.</u>, 407 F.2d 881, 888 (C.C.P.A. 1969).

> of the same mark's rights are "clearly
> established" must this use be disclosed. . . .
> [R]ights may be "clearly established" by "a court
> decree, by . . . a settlement agreement, or by a
> [trademark] registration."  In most cases, the
> registration applicant has no obligation to
> report other users.

Ecash Techs., Inc. v. Guagliardo, 210 F. Supp. 2d 1138, 1149 (C.D. Cal. 2000) (quoting Rosso & Mastracco, Inc. v. Giant Food, Inc., 720 F.2d 1263, 1266 (Fed. Cir. 1983)).

On the other hand,

> [I]f an applicant clearly knows that its company
> does not own the mark, or responds to an
> examiner's inquiry with a knowingly false
> statement that the mark was assigned to
> applicant, then fraud is proven.  For example,
> fraud was proven where a distributor obtained a
> trademark registration, fraudulently asserting in
> the application oath that it was the owner of the
> mark, knowing that the manufacturer was in fact
> the owner of the mark.

6 McCarthy, supra, § 31:71 (footnotes omitted).  See also Robi, 918 F.2d at 1444 ("Given the adverse 1974 Decision, which denied FPI's claim that it was the only entity entitled to use the name 'The Platters' and contained numerous findings adverse to FPI's ownership interest, the affidavit was, as the district court properly concluded, clearly false.") (citing Rosso & Mastracco, 720 F.2d at 1266); Hank Thorp, Inc. v. Minilite, Inc., 474 F. Supp. 228, 238 (D. Del. 1979)

(canceling a registration where a U.S. distributor of a foreign product knew that his company did not own the trademark at the time the U.S. distributor applied to register it).

The key is the applicant's subjective belief at the time it applied for registration. See 6 McCarthy, supra, § 31:76 ("The oath is phrased in terms of a subjective belief, such that it is difficult, if not impossible, to prove objective falsity and fraud so long as the affiant or declarant has an honestly held, good faith belief.") (footnote omitted) (emphasis in original); Metro Traffic Control, Inc. v. Shadow Network, Inc., 104 F.3d 336, 340-41 (Fed. Cir. 1997) (explaining that although the applicant falsely stated in the application that his company was the exclusive user of the trademark, because of the complexity of the relationship with another party that was using the same trademark in a different territory, the false oath was not fraudulent; the applicant's misstatements did not represent a "conscious effort to obtain for his business a registration to which he knew it was not entitled"). As the Ninth Circuit has said, "the statement of an applicant that no other person 'to the best of his knowledge' has the right to use the trademark does not require the applicant to disclose those persons whom he may have heard are using the trademark if he feels that the rights of such others are not superior to his." Quiksilver, 466 F.3d at 755 (emphasis in original) (quoting Yocum, 216 U.S.P.Q. at 216-17).

LL&C contends that Cyclone USA made the following false statements in its application for registration of the Tornado trademark: (1) "his brother Sei Kim had the right to use the mark in commerce in identical forms"; and (2) "the registration was for the

1   benefit of Sei Kim." [LL&C's Proposed Findings at 15-17].[76]

2        As part of the application for trademark registration, Jay Kim

3   was required to declare, on behalf of Cyclone USA, that "he . . .

4   believes the applicant to be the owner of the trademark . . . sought

5   to be registered . . . [and that] to the best of his . . . knowledge

6   and belief no other person, firm, corporation, or association has the

7   right to use the above identified mark in commerce . . . as to be

8   likely, when used on or in connection with the goods . . . of such

9   other person, to cause confusion, or to cause mistake, or to deceive

10  . . . ." [Ex. 421, at 25].

11       The alleged misstatements identified by LL&C are insufficient to

12  establish that Cyclone USA committed fraud on the Patent and Trademark

13  _____

14       [76]   LL&C also complains that the application for registration
    was inaccurate in other, less important respects, but those arguable
15  misstatements are immaterial.  LL&C has not shown, for example, that
    whether Cyclone USA was or was not the manufacturer of the devices
16  sold under the trademark, or other details of the relationship between
    Cyclone USA and Sei Kim, were material to the Patent and Trademark
17  Office ("PTO").  See Robi, 918 F.2d at 1444.  The registration
    probably could have been obtained by Cyclone USA as a dealer's
18  trademark even if Cyclone USA had disclosed every detail of its
    relationship with Sei Kim.  Similarly, the application's inconsistency
19  about where the product was made was probably immaterial; in any case,
    if the examiner had been confused or interested in it he or she could
20  have asked for clarification.  There is no reason to believe that the
    application would have been denied if Cyclone USA had clearly and
21  consistently stated that the product was manufactured in Korea.
    Further, a misstatement of the date of a trademark's first use when
22  the actual first-use date preceded the application date was found to
    be false but immaterial.  See Pony Express Courier, 872 F.2d at 319;
23  6 McCarthy, supra, § 31:67 (explaining that "it is probably the law
    that in the trademark context, a material misrepresentation arises
24  only if the registration should not have issued if the truth were
    known to the examiner.") (footnote omitted).  Finally, Cyclone USA's
25  failure to disclose that Sei Kim had used a similar slogan ("more
    power") to the slogan Jay Kim was attempting to register ("More Power,
26  More Mileage!") was not fraudulent.  The two phrases are not
    identical, so it was possible for Jay Kim to have an honest good faith
27  belief that Sei Kim had not previously used a trademark identical to
    the one that he was attempting to register.
28

Office ("PTO").   To begin with, at the time of the application for registration, Sei Kim's right to use the trademark had not been "clearly established" by judicial decision, administrative decision, settlement agreement, or trademark registration.   See Ecash Techs., 210 F. Supp. 2d at 1149-50.

Further, there is no evidence that Jay Kim subjectively believed that Sei Kim's rights to use the trademark were superior to Cyclone USA's rights.   At best, the situation was unclear.   Among other things, neither Jay Kim nor Cyclone USA and Sei Kim ever entered into an agreement regarding ownership of the Tornado trademark [RT 145-46, 1384-87].   In addition, the evidence shows that it was Cyclone USA rather than Sei Kim which first suggested using Tornado as a trademark. [RT 173, 810].   Even if Jay Kim was aware of the reference to a Tornado in Sei Kim's promotional videotapes, which Jay Kim denies, that would not matter, because the prior use was not use as a trademark.   See 6 McCarthy, supra, § 31:76 ("There is no fraud if applicant signs the oath and is aware of another party's prior use of the designation in a non-trademark sense, such as use in a purely descriptive sense or in an ornamental manner.").   Finally, the application was for registration of Tornado Air Management System, a phrase which even Sei Kim concedes he does not own. [RT 113].   As it turns out, Jay Kim's statement that to the best of his information and belief no other party had a right to use the trademarks was accurate, but even if it had not been, it could not be shown by clear and convincing evidence to have been fraudulent.   6 McCarthy, supra, § 31:76 ("The signer of an application oath should not be put in the position of a fortune teller as to what the courts will hold in future as to the trademark rights of others.").

Perhaps the strongest evidence LL&C presented on this issue is Jay Kim's written request for reimbursement by Sei Kim of expenses incurred by Cyclone USA in registering the Tornado trademark.  In a letter to Sei Kim dated December 6, 1994, Jay Kim said: "Since Cyclone USA, Inc. is in distribution only and not manufacturing, the manufacturer should have paid for each of these items as follows: . . . . B. Obtaining new trade name - over $5,000.00." [Ex. 24].  That request was made about three months after the application for registration was filed on September 7, 1994.  [SF 23].

Jay Kim's letter requesting reimbursement of registration expenses, however, is ambiguous.  While it might be read to suggest that Jay Kim knew that he was registering the trademark for Sei Kim's benefit, it also could be viewed in a different light.  For one thing, Jay Kim registered the trademark in Cyclone USA's name, not Sei Kim's name, which suggests that Jay Kim intended to register the trademark for Cyclone USA rather than for Sei Kim.[77]  Further, Jay Kim testified that Sei Kim had threatened to terminate the contract between Cyclone USA and Sei Kim shortly after Cyclone USA registered the Tornado trademark. [RT 407].  Under the circumstances, Jay Kim could simply have been trying to make the best argument he could for recouping

---

[77]  There was no credible evidence that Sei Kim reimbursed Jay Kim for the registration expenses.  In closing argument, Sei Kim's counsel argued that Sei Kim reimbursed Jay Kim for the registration expenses by lowering the price of the devices several times. [9RT 145.  See also RT 126-27].  Jay Kim, however, denied that any such reimbursement took place.  [RT 407].  Moreover, the price reductions were neither specifically identified nor shown to be linked to Jay Kim's request for reimbursement of the expenses he incurred in registering the Tornado trademark.  [9RT 145].  Instead, they appear to have been made in the normal course of business for unrelated reasons, something which suggests that even Sei Kim did not believe that the Tornado trademark was being registered in his name or for his benefit.

1  expenses that he or Cyclone USA had incurred in reliance on the
2  continuation of the contract, expenses which appeared to have been
3  wasted.  Finally, Jay Kim's request for reimbursement of registration
4  expenses could simply mean that he viewed Sei Kim as having promised
5  to provide him with a trademark that could be used in the United
6  States, and that when the Cyclone trademark turned out to be
7  problematic, Cyclone USA had to incur expense in obtaining a suitable
8  new trademark, and Jay Kim felt that in fairness Sei Kim should
9  compensate Cyclone USA for those unanticipated expenses even if
10 Cyclone USA owned the trademark.

11     Considering all the circumstances, this is not a situation such
12 as the one presented in the <u>Hank Thorp</u> case, where a distributor
13 falsely stated that it owned a trademark, knowing full well that the
14 trademark had long been used by the manufacturer as a trademark
15 independently of the distributor and plainly was owned by the
16 manufacturer.  <u>See</u> <u>generally</u> <u>Hank Thorp</u>, 474 F. Supp. 228.

17     Although the statements in Cyclone USA's application for
18 registration of the Tornado trademark may not have been entirely
19 consistent or perfectly accurate, LL&C has failed to prove by clear
20 and convincing evidence that Jay Kim (and therefore Cyclone USA)
21 intended to deceive the PTO.[78]  Therefore, the Tornado trademark is not

22

23     [78]   LL&C's allegations of fraud in Cyclone USA's application for
registration are somewhat ironic in view of the false statements LL&C
24 made when applying for registration of the term TornadoFuelSaver. [SF
41].  While it might be debatable whether Sei Kim or Cyclone USA owned
25 the Tornado trademark, it is clear that LL&C did not own it. [RT 467-
71, 480-93].  Nevertheless, LL&C intentionally falsely stated under
26 penalty of perjury that it owned the TornadoFuelSaver term simply
because it wanted to prevent Cyclone USA from registering it.  [RT
27 467-68].  LL&C also provided a date of first use of June 1, 1999, a
time when it had nothing to do with Cyclone USA or the devices.  [Ex.
28                                                        (continued...)

subject to cancellation on that ground.

An incontestable trademark also may be canceled if "it is being used by, or with the permission of, the registrant so as to misrepresent the source of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1064(3). To demonstrate misrepresentation of source sufficient to warrant cancellation of a federal trademark registration, the party seeking cancellation must show a "deliberate and blatant misrepresentation of the source wherein the registration is merely a vehicle for the misuse rather than evidence of even a colorable ownership claim, and where the mark is intentionally displayed in such a manner as to facilitate passing off the goods as those of another." Global Maschinen GmbH v. Global Banking Sys., Inc., 227 U.S.P.Q. 862, 863-64 n.3 (T.T.A.B. 1985). This requirement is not satisfied in this case. Under any view of the evidence, Cyclone USA had a colorable claim to ownership of the Tornado trademark.

Most claims for cancellation of registration based upon misrepresentation of source involve two different trademarks and a situation in which one competitor has attempted to capitalize on the goodwill of a more famous competitor either by adopting a confusingly similar trademark or by deliberately blurring a distinction that previously had existed between them. See, e.g., Red Bull GmbH v. Matador Concepts, Inc., 2006 WL 4749923, *1-5 (C.D. Cal. 2006); Liquid Glass Enters. Inc. v. Liquid Glass Indus. of Canada Ltd., 14 U.S.P.Q.

---

[78](...continued)
221; RT 468]. LL&C further improperly used the "®" symbol with the TornadoFuelSaver domain name, misrepresenting that it had been registered, when in fact it had not been. [RT 502, 504]. Finally, LL&C improperly used the "SM" symbol with the TornadoFuelSaver term promoting its Tire Minder product. [Ex. 218; RT 530-31].

1   2d 1976, 1978-80 (E.D. Mich. 1989); <u>E.E. Dickinson Co. v. T.N.</u>

2   <u>Dickinson Co.</u>, 221 U.S.P.Q. 713, 714-15 (T.T.A.B. 1984); <u>Cuban Cigar</u>

3   <u>Brands N.V. v. Upmann Int'l, Inc.</u>, 457 F. Supp. 1090, 1099-1101

4   (S.D.N.Y. 1978); <u>H.H. Scott, Inc. v. Annapolis Electroacoustic Corp.</u>,

5   195 F. Supp. 208, 210-12 (D. Md. 1961).  <u>See also</u> Theodore Davis,

6   <u>Cancellation Under Section 14(3) for Registrant Misrepresentation of</u>

7   <u>Source</u>, 85 Trademark Rep. 67, 73-81 (1995).

8        This case does not fit comfortably into that paradigm.  First, it

9   involves just one trademark, not two.  Second, realistically, as

10  between Sei Kim and Cyclone USA, the latter probably was viewed by

11  nearly every customer as the source of the devices, if only because

12  KIDC was mentioned as a source on packages and in promotional

13  materials for only a relatively brief period of time, and even then

14  always in connection with more prominent mention of Cyclone USA. [Ex.

15  421 at 5; RT 437].  It is highly unlikely that consumers identified

16  Sei Kim or KIDC as the source of devices sold by Cyclone USA rather

17  than the far more frequently and prominently mentioned Cyclone USA.

18  Similarly, Cyclone USA, not Sei Kim handled all contacts with

19  consumers, at least until LL&C became involved. [RT 413-14].  As Sei

20  Kim conceded, he and KIDC were not known to the public. [RT 128].

21       To the extent that LL&C believes that <u>Liquid Glass</u> supports its

22  position, it is mistaken.  In that case, the registrant deliberately

23  procured a trademark confusingly similar to the one its former

24  supplier had long used, and then modified its trade dress to make it

25  more similar to the trade dress its former supplier had used.  <u>Liquid</u>

26  <u>Glass</u>, 14 U.S.P.Q. 2d at 1980.  That is not what happened in this

27  case.

28       LL&C's reliance on <u>Kemin Indus., Inc. v. Watkins Prods., Inc.</u>,

1   192 U.S.P.Q. 327, 330-31 (T.T.A.B. 1976) is equally unavailing.  While

2   the Kemin proceeding involved just one trademark, as this case does,

3   the tribunal in that proceeding denied a request for cancellation.

4   Even apart from its holding, the Kemin decision provides scant support

5   for LL&C's arguments in this case.  First, like the registrant in

6   Kemin, Cyclone USA had, at a minimum, "a not altogether unsupported

7   belief that it has always been the owner of the . . . mark . . . ."

8   Id. at 330.  Second, unlike in Kemin, the packaging and advertising of

9   the device always identified it as a product of the registrant Cyclone

10  USA, and only briefly (and even then with much less prominence) as a

11  product of KIDC.  Id. at 329-30.  Third, as the tribunal in Kemin

12  acknowledged, trademark registrants frequently change the designs of

13  their products, the materials used to make their products, and their

14  manufacturing sources, or some combination thereof, all without

15  abandoning their trademarks or suffering cancellation of their

16  trademark registrations.  Id. at 330 ("To this, there must be added

17  the realistic fact of the marketing world that vendors often change

18  their manufacturing sources without abandoning the trademark.").

19  Fourth, one of the grounds relied upon in Kemin is suspect.

20  Specifically, Kemin seems to suggest that if a registrant's product

21  was "in any way inferior to [the product] manufactured by [the party

22  seeking cancellation] and offered under the mark" or "the purchasing

23  public voiced any discontent with the [registrant's] product," that

24  would weigh in favor of cancellation.  Id. at 330-31.  However, this

25  reasoning is unsound.  The mere fact that a trademark registrant has

26  switched, whether temporarily or permanently, to an inferior or

27  problematic design, or used inferior or problematic materials or

28  manufacturing processees, cannot constitute misrepresentation of

source sufficient to warrant cancellation of the federal trademark registration. While such actions may damage the registrant's goodwill in its brand, or even transform its trademark from a badge of high quality to a sign of low quality, it would not on its own constitute misrepresentation as to source. Even a registrant who sells what some - or even many - might regard as inferior goods is nevertheless entitled to the protections afforded by trademark registration. If cancellation could be so easily obtained, then the purpose of incontestability - to "quiet title" to trademarks - would be frustrated. The result would be uncertainty about the effect of incontestable trademark registrations, discouragement of innovation and experimentation on the part of vendors, foreclosure of competition among providers of materials or manufacturing services, proliferation of requests for cancellation of trademarks, and a widening gap between the register and the universe of trademarks actually in use. See Davis, supra, at 84-87. While Cyclone USA's own designs and materials may have been inferior to Sei Kim's, and although Lavang may have been a lower quality manufacturer than Sei Kim, that does not mean that Cyclone USA used the Tornado trademark to misrepresent the source of its goods.

LL&C recites a long list of acts by Cyclone USA or Jay Kim that do or might amount to unfair competition. [LL&C's Proposed Findings at 45-50]. It is doubtful, however, whether most of the conduct on which LL&C relies even falls within the words of the statute. The statute authorizes cancellation of the registration of a trademark if "it", that is, the trademark, is being used to misrepresent the source of goods with which it used. See 15 U.S.C. § 1064(3). It does not authorize cancellation if the registrant is merely engaging in any

sort of false advertising, unfair competition, or other wrongful conduct.  While Cyclone USA engaged in false advertising and unfair competition - including such misconduct as using test data regarding the performance of devices manufactured by Sei Kim to promote the sale of devices not manufactured by Sei Kim[79] - that does not mean that Cyclone USA used <u>the</u> <u>trademark</u> to misrepresent the source of its goods.  Moreover, LL&C and Sei Kim have alleged other claims, including state and federal claims for false advertising and unfair competition, which offer adequate remedies for such conduct.

Finally, as one commentator persuasively explained, cancellation of registration on the basis of misrepresentation of source is an anomalous feature of the statutory scheme because "the statutory language itself is inconsistent with the remainder of the [Lanham] Act." Davis, <u>supra</u>, at 88.  Accordingly, he has advocated eliminating registrant misrepresentation of source as a basis for cancellation on grounds that it is "an ill-advised provision."  <u>Id.</u>  While this obviously does not suggest that section 1064(3) can or should be ignored by the courts, it does counsel against unnecessarily expanding it beyond a narrow scope compatible with a fair reading of its text.[80]

For the foregoing reasons, the Court declines to cancel Cyclone

---

[79]   See discussion of Claims 12 and 16.

[80]   A ruling arguably suggesting a different application of the misrepresentation of source exception to incontestability was made earlier in this case.  [<u>See</u> Order Denying Plaintiff's Cyclone Motion for Partial Summary Judgment Against Defendant LL&C, etc., February 7, 2005, at 6-10].  To the extent that the Court's earlier view differs from its later one, the latter, of course, controls.

USA's incontestable registration of the Tornado trademark.[81]

This resolution makes practical sense. Cyclone USA is the only party that has used the Tornado trademark both prominently and consistently in advertising and selling devices since 1994. Canceling Cyclone USA's registration of the Tornado trademark would divorce the register from commercial reality and would serve only to exacerbate any consumer confusion that presently exists.

The slogan trademarks are: (1) "More Power, More Mileage!"; (2) "Under the Hood!"; and (3) "Don't Drive Without It!".

The slogan trademarks are registered. [SF 40]. The registrations were obtained by Jay Kim, but later assigned to Cyclone USA. [SF 40]. Unlike the registration of the Tornado trademark, the registrations of the slogan trademarks are contestable rather than incontestable. A contestable registration of a trademark is merely presumptive - not conclusive - evidence of the validity of the trademark and the registrant's ownership of the trademark. 15 U.S.C. § 1115(a). That presumption is rebutted if the defendant shows that the trademark is invalid or that the plaintiff does not own the trademark by a preponderance of the evidence. Quiksilver, 466 F.3d at 760-61; Sengoku, 96 F.3d at 1219-20; Vuitton et Fils, 644 F.2d at 775-

---

[81] Because the Court has declined to cancel Cyclone USA's incontestable registration of the Tornado trademark, there is a conclusive presumption that Cyclone USA owns that trademark. See 15 U.S.C. § 1115(b). Therefore, further discussion of the ownership of that trademark is unnecessary. In particular, it unnecessary to address the framework for resolving disputes regarding trademark ownership between manufacturer and distributor applied in Sengoku, 96 F.3d at 1220. Because Sengoku involved a contestable registration, nothing suggests that Sengoku displaces the conclusive presumption of ownership created by 15 U.S.C. § 1115(b) simply because it is a distributor who has obtained an incontestable registration. See id. at 1219-22.

1 76.

2     LL&C argues that the registration of the slogan trademarks should

3 be canceled because: (1) Sei Kim owns the "More Power, More Mileage!"

4 trademark; (2) the "More Power, More Mileage!" and "Under the Hood!,"

5 trademarks are invalid because they are descriptive and lack secondary

6 meaning; (3) the "Don't Drive Without It!" trademark is invalid

7 because it is merely a self-laudatory phrase and lacks secondary

8 meaning; and (4) Cyclone USA used all three of the slogan trademarks

9 to misrepresent the source of its goods. [LL&C's Proposed Findings at

10 36-41].

11     The Court already has rejected LL&C's contention that Cyclone USA

12 used the Tornado trademark to misrepresent the source of the goods

13 bearing that trademark.[82]   LL&C has not shown that Cyclone USA did

14 something different or more egregious with the slogan trademarks than

15 it did with the Tornado trademark.   Therefore, this basis for

16 canceling the registrations of the slogan trademarks is rejected.

17     Insofar as ownership of the "More Power, More Mileage!" trademark

18 is concerned, LL&C does not claim to own any of the slogan trademarks.

19 [RT 516-17, 530].   It contends, however, that because Sei Kim owns the

20 "More Power, More Mileage!" trademark, Cyclone USA's registration of

21 that trademark should be cancelled.   The problem is that Sei Kim does

22 not claim to own any of the slogan trademarks either.   [RT 1417-19].

23 Therefore, this basis for cancelling the registration of the "More

24 Power More Mileage!" trademark is rejected.   Since there is no

25 persuasive evidence that anyone other than Cyclone USA owns the "More

26 Power, More Mileage!" trademark, the presumption of its ownership of

27

28     [82]   See discussion of Claim 13.

1  that trademark has not been rebutted.

2       Descriptive trademarks "define a particular characteristic of the
3  product in a way that does not require any exercise of the
4  imagination." Quiksilver, 466 F.3d at 760 (quoting Yellow Cab Co. of
5  Sacramento v. Yellow Cab of Elk Grove, Inc., 419 F.3d 925, 927 (9th
6  Cir. 2005)). See also 2 McCarthy, supra, § 11:18 ("A descriptive term
7  merely informs the buyer of an alleged quality of the product.  Many
8  other products may have similar qualities, and use of the term will
9  not help the consumer to distinguish products of different sellers.")
10 (footnote omitted).  A descriptive trademark possesses secondary
11 meaning if it has "become distinctive of the applicant's goods in
12 commerce."  15 U.S.C. § 1052(f).  Although merely descriptive
13 trademarks are invalid, even a descriptive trademark is protectable if
14 it has acquired secondary meaning.  Japan Telecom, 287 F.3d at 872
15 ("[A] descriptive term can become protectable provided that it has
16 acquired secondary meaning in the minds of consumers, i.e., it has
17 become distinctive of the trademark applicant's goods in commerce.")
18 (internal citations omitted);  Filipino Yellow Pages, Inc. v. Asian
19 Journal Publ'ns., 198 F.3d 1143, 1147 (9th Cir. 1999) (same); Bada Co.
20 v. Montgomery Ward & Co., 426 F.2d 8, 11 (9th Cir. 1970) ("If . . . a
21 mark which is merely descriptive in its primary meaning acquires over
22 time a secondary and distinctive meaning which serves to identify the
23 goods of a single merchant, then the law will afford protection
24 against unfair appropriation of the benefits resulting from the mark's
25 secondary meaning.").

26      A contestable registration of a descriptive trademark is
27 presumptive proof of secondary meaning.  Americana Trading, Inc. v.
28 Russ Berrie & Co., 966 F.2d 1284, 1287 (9th Cir. 1992).  Where the PTO

78

issues a registration without requiring proof of secondary meaning, the registrant "enjoys a presumption that the purchasing public perceives the mark to be inherently distinctive." Quiksilver, 466 F.3d at 760.  In addition, "[p]roof of exact copying, without any opposing proof, can be sufficient to establish secondary meaning [since] [t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." Transgo, Inc. v. Ajac Transmission Parts Co., 768 F.2d 1001, 1016 (9th Cir. 1985), cert. denied 474 U.S. 1059 (1986).  See also Addidas-Salomon AG v. Target Corp., 228 F. Supp. 2d 1192, 1209 (D. Or. 2002) (same).

A court should not lightly disregard the decision of the PTO, "to whose care Congress has entrusted the preliminary determination as to whether a mark fulfills the requirements of the statute" to register an apparently descriptive trademark without proof of secondary meaning.  Aluminum Fabricating Co. v. Season-All Window Corp., 259 F.2d 314, 316 (2d Cir. 1958).  See also RFE Indus., Inc. v. SPM Corp., 105 F.3d 923, 926 (4th Cir. 1997) ("It must by now be apparent that a district court should not freely substitute its opinion for the PTO's.").

The record contains some evidence not presented to the PTO, namely, the testimony of various witnesses that the slogan trademarks are descriptive.  For example, there was testimony that the "Under the Hood!" trademark describes where the product should be installed.  [RT 883-84].  There also was testimony that the trademark "More Power, More Mileage!" means "what the product does".  [RT 529, 574, 604, 883].  While this testimony shows that the slogan trademarks "More Power, More Mileage!" and "Under the Hood!" possess descriptive

1   meaning, taken alone, it does not rebut the presumption that they also

2   possess secondary meaning.

3        Unlike the "Under the Hood!" trademark, however, there is

4   additional evidence that "More Power, More Mileage!" trademark lacks

5   secondary meaning and simply describes the quality of the device or

6   the effect of using the device.   Cyclone USA's application for

7   registration of the Tornado trademark describes the goods with which

8   the Tornado trademark is used as: "air swirlers for automobile, truck

9   and other vehicle engines to enhance fuel economy and power." [Ex.

10  421, at 3, 15].   In addition, the "More Power, More Mileage!" slogan

11  could be, and probably is, used to describe the quality or effect of

12  a wide range of goods and services such as automobiles, gasoline,

13  motor oil, motor oil additives, automotive tuning, spark plugs,

14  automobile tires, automobile exhaust systems, and so on.   Further,

15  even Cyclone USA concedes that the phrase "more power" is widely used

16  in the automotive industry.   [RT 265].   That alone makes secondary

17  meaning unlikely.   See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo

18  Winery, 150 F.3d 1042, 1049 (9th Cir. 1998) ("Because the grape leaf

19  is used widely in the [wine] industry, it has lost the power to

20  differentiate brands.").   Considering all the circumstances, allowing

21  one supplier to control the use of the phrases "more power", "more

22  mileage", a combination of the two, or close substitutes therefor,

23  would be contrary to public policy.   See Bada, 426 F.2d at 11

24  (explaining that "one competitor will not be permitted to impoverish

25  the language of commerce by preventing his fellows from fairly

26  describing their own goods").   Accordingly, as to the "More Power,

27  More Mileage!" trademark, the presumption of secondary meaning has

28  been rebutted.

The "Don't Drive Without It!" trademark is a puffing or self-laudatory phrase, akin to calling the device indispensable or the best.  A trademark of this sort can be valid, however, if it has acquired secondary meaning.  See, e.g., American Express Co. v. CFK, Inc., 947 F. Supp. 310, 312 (E.D. Mich. 1996) (discussing the "Don't Leave Home Without It" trademark).  Cyclone USA's contestable registration of that trademark gives rise to a presumption of secondary meaning.  LL&C has not rebutted that presumption.

Therefore, the registration of the "More Power, More Mileage" trademark should be cancelled, but the registration of the "Under the Hood!" and "Don't Drive Without It!" trademarks should not be cancelled.[83]

**14.  LL&C's Fraud and Deceit Claim Against Cyclone USA**

LL&C contends that Cyclone USA made the following four fraudulent misrepresentations in an attempt to induce LL&C to enter into the contract with Cyclone USA: (1) Cyclone USA was the manufacturer of the device actually manufactured by Sei Kim; (2) Cyclone USA or Jay Kim held the patent on the device actually on which Sei Kim held the patent; (3) Jay Kim invented the device actually invented by Sei Kim; and (4) Cyclone USA's cost for the device was $13 per unit.  [LL&C's Proposed Findings at 60].

To recover for fraud, the plaintiff must prove that: (1) that the defendant represented to the plaintiff that a material fact was true; (2) the defendant's representation was false; (3) the defendant knew

---

[83]     Sei Kim has not advanced any materially different arguments for cancellation of the registrations of the Tornado trademark or the "Under the Hood!" and "Don't Drive Without It!" trademarks. Therefore, his contention that the Tornado trademark and the slogan trademarks should be canceled also are rejected.

1  that the representation was false when it made it, or made it

2  recklessly without regard for its truth; (4) the defendant intended

3  that the plaintiff rely on that representation; (5) the plaintiff

4  reasonably and justifiably relied on the defendant's representation;

5  (6) the plaintiff was harmed; and (7) the plaintiff's reliance on the

6  defendant's representation was a substantial factor in causing the

7  counterclaim plaintiff's harm. See Engalla v. Permanente Med. Group,

8  Inc., 938 P.2d 903, 917-18 (Cal. 1997). Compare Cal. Civ. Code § 1572

9  (defining actual fraud) with Cal. Civ. Code §§ 1709, 1710 (defining

10  fraudulent deceit). The quantum of evidence required is a

11  preponderance of the evidence. Liodas v. Sahadi, 562 P.2d 316, 320-22

12  (Cal. 1977); Sierra Nat'l Bank v. Brown, 95 Cal. Rptr. 742, 746 (Cal.

13  Ct. App. 1971).

14  The evidence about whether Jay Kim represented that he or Cyclone

15  USA was the inventor, manufacturer, or patent holder of the device

16  conflicts. LL&C contends that he did. [RT 480, 521, 536, 769, 773-

17  75. See also RT 1140, 1308-09]. Cyclone USA, however, denies it.

18  [RT 1350. But see RT 319, 321, 390. See also RT 304, 317, 323, 330

19  (all arguing that Cyclone USA actually was a manufacturer)]. On

20  balance the Court finds LL&C's evidence more persuasive.

21  Sei Kim was the inventor of the device and held a patent on it.

22  [SF 4, 6]. The first patent Jay Kim or Cyclone USA obtained concerned

23  the Tornado II. That patent was applied for on September 21, 1999 and

24  issued on December 12, 2002. [Ex. 46]. Therefore, from the date on

25  which Cyclone USA and LL&C began negotiations until the date they

26  entered into their contract, neither Jay Kim nor Cyclone USA owned a

27  patent on any device. Moreover, the Tornado II device on which Jay

28  Kim eventually obtained a patent was not the device with which LL&C

82

already was familiar or which was displayed to LL&C by Cyclone USA during contract negotiations. [RT 523-24, 536]. Therefore, Jay Kim falsely represented to LL&C that he or Cyclone USA was the inventor and patent holder of the device.

There is no evidence that Cyclone USA ever manufactured any devices itself. Cyclone USA did not purchase devices from any other source other than Sei Kim before 2001. [SF 19, 28, 31, 32, 34, 36, 42; RT 224]. In particular, Cyclone USA did not begin negotiating with Lavang until April 2001, and did not issue a purchase order to Lavang until June 6, 2001. [SF 46, 47]. LL&C and Cyclone USA began exploring the possibility of entering into a contract during February and March 2000. [SF 37]. The contract between them was signed on April 11, 2000. [Ex. 43]. Therefore, Cyclone USA was not a manufacturer of devices at the time it entered into the contract between Cyclone USA and LLC.[84]

The language of the contract between LL&C and Cyclone USA supports this conclusion. At one point, that contract refers to "products manufactured by the Company." [Ex. 43, § 1.04(a). See also Ex. 43, at 1 (stating that pursuant to the contract LL&C "will promote the sale of, and distribute, contain products manufactured by your company"); Ex. 43, § 1.03 ("The Company [i.e., Cyclone USA] is engaged in the manufacture and sale of certain automotive products manufactured and sold under the trade name 'Tornado.'")]. Overall, the contract makes it sound like the role Cyclone USA played in the contract between LL&C and Cyclone USA was similar to the role Sei Kim

---

[84]   Jay Kim's testimony to the contrary [RT 253, 280-82, 284-86] contradicts his previous testimony, is not credible, and is inconsistent with the facts to which all parties have stipulated, so it is rejected.

1   played in the contract between Sei Kim and Cyclone USA.  That was not

2   an accurate description of the actual role played by Cyclone USA, at

3   least until Cyclone USA began obtaining devices of its own design from

4   Lavang.

5      Jay Kim made the three representations knowing perfectly well

6   that they were false for the purpose of inducing LL&C to enter into a

7   contract with Cyclone USA, and to do on terms more favorable to

8   Cyclone USA than might otherwise have been acceptable to LL&C.

9      A fact is material if a reasonable person in the position of the

10   plaintiff would deem it to be material.  Holz Rubber Co. v. Am. Star

11   Ins. Co., 533 P.2d 1055, 1065 (Cal. 1975).  Actual reliance may be

12   inferred when the fact misrepresented is material.  Engalla, 938 P.2d

13   at 919.

14      The three misrepresentations were material, and LL&C actually

15   relied on them. [RT 524-26, 737-39].

16      LL&C's reliance on those representations was justified.  Reliance

17   is justifiable if the plaintiff actually relies on a misrepresentation

18   (i.e., the defendant's representation is a substantial, though not

19   necessarily predominant, cause of the plaintiff's decision to enter

20   the transaction) and that reliance is objectively reasonable.

21   Engalla, 938 P.2d at 919.  See also Alliance Mortgage Co. v. Rothwell,

22   900 P.2d 601, 608-09 (Cal. 1995).  "If the conduct of the plaintiff in

23   the light of his own intelligence and information [or experience] was

24   manifestly unreasonable, . . . he will be denied a recovery."  Id. at

25   609 (citations and quotations omitted).  Accord Seeger v. Odell, 115

26   P.2d 977 (Cal. 1941).  The plaintiff "may not put faith in

27   representations which are preposterous, or which are shown by facts

28   within his observation to be so patently and obviously false that he

must have closed his eyes [in order] to avoid discovery of the truth."
Id. at 981.     Although LL&C's failure to obtain a copy of the patent
or more thoroughly investigate Cyclone USA's manufacturing capacity
seems    inexplicable    in    hindsight,    its    reliance    on    the
misrepresentations was not unreasonable.  See id. at 980 ("Negligence
on the part of the plaintiff in failing to discover the falsity of a
statement is no defense when the misrepresentation was intentional
rather than negligent."); Carroll v. Gava, 159 Cal. Rptr. 778, 780-81
(Cal. Ct. App. 1979) (affirming trial court's finding that plaintiff
justifiably relied on defendant's representations as to the zoning
status of a park sold to plaintiff where defendant's business was
concerned with the subject of the transaction, i.e., the mobile home
business, where defendant was experienced in a related industry, and
where defendant had engaged in similar land sales in the past).

     The evidence concerning whether Cyclone USA told LL&C that
Cyclone USA's cost was $13 per unit also conflicts.  LL&C says it did.
[RT 668, 674].  There is some support for its assertion.  [RT 1296,
1313].  Cyclone USA, however, denies it.  [See RT 1495].  On this
issue, the Court finds Cyclone USA's evidence more persuasive.  The
contract between LL&C and Cyclone USA provides: "The Distributor
[i.e., LL&C] shall pay the Company [i.e., Cyclone USA] for its
products according to the schedule of prices set forth on Exhibit B."
[Ex. 43, § 3.02(a)].  That Exhibit states that the "Product Cost To
Distributor [i.e., LL&C]" is "$13.00 per unit." [Ex. 43, Ex. B].  The
contract, which contains an integration clause [Ex. 43, § 5.03], does
not mention Cyclone USA's cost, explain how Cyclone USA's cost would
be determined, or obligate Cyclone USA to supply devices to LL&C at
Cyclone USA's cost.  If the parties had discussed Cyclone USA's cost,

and if Cyclone USA's cost was material to LL&C, one would expect that those matters would have been addressed in the contract.  Since they were not, the Court concludes that there was no such representation by Cyclone USA, and that if there was, it was neither material to LL&C nor a statement on which LL&C could justifiably rely in the circumstances.  See generally Agosta v. Astor, 15 Cal. Rptr. 3d 565, 572 (Cal. Ct. App. 2004) (concluding that plaintiff could not justifiably rely on a collateral promise of long-term employment when his written employment agreement specified that employment was at-will).

Cyclone USA asserts the following defenses to this claim: (1) laches; (2) equitable estoppel; (3) unclean hands; and (4) waiver. [Pretrial Order, Ex. B, at 1].  Except for laches, the law regarding these defenses was described earlier.[85]

Under California law, laches is an equitable defense that bars relief if the plaintiff inexcusably delayed in seeking to vindicate his rights.  Cal. Civ. Code § 3527 (2006) ("The law helps the vigilant, before those who sleep on their rights."); Finnie v. Town of Tiburon, 244 Cal. Rptr. 581, 588 (Cal. Ct. App. 1988) ("[L]aches is established by showing unreasonable delay in bringing the action and prejudice to defendant resulting from this delay.").

To establish laches, the defendant must prove by a preponderance of the evidence that: (1) the plaintiff knew of its rights and their violation at the time in question; (2) the plaintiff unreasonably delayed in seeking to vindicate its rights;  and (3) the defendant will suffer manifest injustice if the plaintiff is allowed to prevail.

---

[85]    See discussion of Claim 6.

See <u>Miller v. Eisenhower Med. Ctr.</u>, 614 P.2d 258, 264 (Cal. 1980); <u>Dep't of Mental Hygiene v. McGilvery</u>, 329 P.2d 689, 694 (Cal. 1958); <u>Maquire v. Hibernia Sav. & Loan Soc'y</u>, 146 P.2d 673, 682 (Cal. 1944); <u>In re Marriage of Powers</u>, 267 Cal. Rptr. 350, 359 (Cal. Ct. App. 1990).

Nothing suggests that LL&C delayed unreasonably in asserting its fraud claim. Moreover, Cyclone USA has not shown that any delay that did occur prejudiced it. LL&C filed its fraud claim as a counterclaim on April 14, 2003, approximately one year after it learned of Cyclone USA's misrepresentations. Since the statute of limitations for fraud is three years from discovery of the fraud, this is not an inordinate delay. Cal. Civ. Proc. Code § 338(d). <u>See also</u> <u>David Welch Co. v. Erskine & Tulley</u>, 250 Cal. Rptr. 339, 344 (Cal. Ct. App. 1988) ("In determining the reasonableness of a delay in filing an action, the courts are guided by the applicable statute of limitations."); <u>Butler v. Holman</u>, 303 P.2d 573, 577 (Cal. Ct. App. 1956) (an action brought within the statute of limitations is generally not viewed as an unreasonable delay).

More fundamentally, laches is not available in an action at law for damages, even when the action includes a request for an equitable remedy such as declaratory relief. <u>Abbott v. City of Los Angeles</u>, 326 P.2d 484, 498 (Cal. 1958) ("Inasmuch as laches is not available as a defense to an action at law even though combined with the cumulative remedy of declaratory relief, it follows that it is not available to defendants here as a defense to the causes of action seeking money judgments."); <u>Mandracio v. Bartenders Union</u>, 256 P.2d 927, 929 (Cal. 1953) ("The defense of laches is not available in an action at law for damages."); <u>Wells Fargo Bank v. Bank of Am. NT&SA</u>, 38 Cal. Rptr. 2d

1  521, 530 (Cal. Ct. App. 1995) ("[T]he laches defense is unavailable in

2  an action at law for damages even though combined with the cumulative

3  remedy of declaratory relief.") (internal quotations and citations

4  omitted). Accordingly, Cyclone USA's laches defense is rejected.

5  Cyclone USA's defense of estoppel is rejected. As discussed

6  earlier,[86] the party seeking estoppel must be ignorant of the truth.

7  Lentz, 261 Cal. App. Rptr. at 312; 2 Schwing, supra, § 34:1. Because

8  it was Cyclone USA, not LL&C that made the misrepresentations, this

9  element is not satisfied, and the defense must be rejected.

10  Cyclone USA's defense of unclean hands also is rejected. As

11  noted with respect to Cyclone USA's defense of estoppel, Jay Kim

12  knowingly made false statements to LL&C on Cyclone USA's behalf.

13  Under the circumstances that precludes Cyclone USA from being able to

14  rely on an unclean hands defense. See Lovett v. Carrasco, 73 Cal.

15  Rptr. 2d 496, 500 (Cal. Ct. App. 1998) ("Whether the unclean hands

16  doctrine applies in a particular case is within the trial court's

17  sound discretion."). Moreover, at the time Cyclone USA made these

18  misrepresentations, there was nothing unclean about LL&C's hands. It

19  was not until well after the contract was signed that LL&C acquired

20  and sold the Poron devices, and it was not until after the contract

21  between LL&C and Cyclone USA was terminated that LL&C engaged in more

22  wide-ranging misconduct. Because LL&C's misconduct did not occur

23  until after the contract between LL&C and Cyclone USA was signed, and

24  long after Cyclone USA's misrepresentations were made, the requisite

25  connection between LL&C's wrongful conduct and the claim it is

26  asserting is lacking.

27

28        [86]   See discussion of Claim 6.

Finally, Cyclone USA's defense of waiver is rejected.  While LL&C continued to do business with Cyclone USA after learning of the misrepresentations, this does not constitute a waiver of LL&C's claim for fraud.  In addition to the requirement that the party alleged to have waived a right have knowledge of the pertinent information, there must also be an intent to relinquish the right.  Lekse v. Mun. Court, 187 Cal. Rptr. 698, 701 (Cal. Ct. App. 1982); 2 Schwing, supra, § 47:1.  Nothing in the record suggests that LL&C intended to waive its right to bring a fraud claim against Cyclone USA.

Perhaps the most natural remedy for Cyclone USA's fraudulent inducement would be rescission, but LL&C does not want that.  LL&C has not requested rescission of the contract between it and Cyclone USA, and LL&C contends that such a remedy would be unfair to it.  [9RT 91-93, 96-97].  Since LL&C is the aggrieved party with respect to this claim and does not desire rescission, the Court will not impose it.  Persson v. Smart Inventions, Inc., 23 Cal. Rptr. 3d 335, 1153 (Cal. Ct. App. 2005) (explaining that "if a defrauded party is induced by false representations to execute a contract, the party has the option of rescinding the contract or affirming it and recovering damages for fraud.").

LL&C's position on rescission, however, has implications for other forms of relief that it is requesting.  In particular, it undercuts what LL&C's damages expert referred to as LL&C's "mitigation theory," which allegedly consists of "the extra windfall that Cyclone [USA] enjoyed due to LL&C's efforts in marketing, distributing, and the results of the infomercial that it ran, which Cyclone [USA] enjoyed due to the fraudulent inducement by them . . . ."  [RT 1231.  See also RT 1228].  Assuming that LL&C's methodology is sound and that

its computations are correct, LL&C's "mitigation theory" is simply an effort to deprive Cyclone USA of the benefits it received from LL&C under the contract without requiring LL&C to do likewise by restoring the benefits it received from Cyclone USA under the contract.  LL&C has cited no authority suggesting that such a one-sided, half-rescission is an available remedy for fraudulent inducement, and the Court is aware of none.  See Simmons v. Cal. Inst. of Tech., Inc., 209 P.2d 581, 587 (Cal. 1949) ("The general rule is that one must rescind all of his contract and may not retain rights under it which he deems desirable to have and repudiate the remainder of its provisions.  The theory underlying such a rule is that retention of only the benefits of the transaction amounts to unjust enrichment and binds the parties to a contract which they did not contemplate.") (citations omitted). Therefore, this element of LL&C's damages claim is rejected.

In order to recover damages, the plaintiff must prove that the representation was the proximate or reasonably foreseeable cause of its actual loss.  Alliance Mortgage, 900 P.2d at 614.  See also Cal. Civ. Code § 3333 ("For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."); Kransco v. Am. Empire Surplus Lines Ins. Co., 2 P.3d 1, 13-15 (Cal. 2000).  LL&C has satisfied this requirement, but only barely.  Although LL&C was harmed by the misrepresentations, the extent of that harm was less than LL&C suggests.

For nearly all of the time that the contract between Cyclone USA and LL&C was in force, LL&C had the right to sell the devices.  The fact that Cyclone USA had not invented the devices and did not hold a

patent on them posed no problem for LL&C.  Shortly after, and perhaps even before, LL&C terminated its contract with Cyclone USA, it entered into a contract with Sei Kim and began purchasing devices from him. [SF 69-70].  Thus, notwithstanding Jay Kim's misrepresentation about inventorship and holding a patent, LL&C had an essentially uninterrupted right to sell Sei Kim's devices.

The fact that Cyclone USA did not manufacture the Sei Kim devices also was not the real source of LL&C's problems.  Sei Kim apparently was unable to meet much of Cyclone USA's demand for devices after demand sky-rocketed in response to the infomercial.  [RT 129-31]. Nothing suggests that Sei Kim would have been able to manufacture enough devices to satisfy the heightened demand if he had been dealing with LL&C directly rather than indirectly through Cyclone USA.  Thus, even if the representations had been true (i.e., if Cyclone USA had occupied the position actually occupied by Sei Kim), LL&C would not necessarily have been any better off.  In addition, the contract between LL&C and Cyclone USA contains no guarantee that LL&C's quantity requirements would be satisfied.  Nor does it restrict the source or prescribe the quality of the devices LL&C would receive.[87] Even if Cyclone USA had manufactured the devices, the contract still would have left LL&C vulnerable to quantity and quality shortfalls.

The two measures of damages for fraud under California law are (1) out of pocket; and (2) benefit of the bargain.  Alliance Mortgage, 900 P.2d at 609; Fragale v. Faulkner, 1 Cal. Rptr. 3d 616, 621 (Cal. Ct. App. 2003).  The out of pocket measure "restores a plaintiff to the financial position he enjoyed prior to the fraudulent transaction,

---

[87]  See discussion of Claim 15.

awarding the difference in actual value between what the plaintiff gave and what he received," while the benefit of the bargain measure "places a defrauded plaintiff in the position he would have enjoyed had the false representation been true, awarding him the difference in value between what he actually received and what he was fraudulently led to believe he would receive."  Fragale, 1 Cal. Rptr. at 621 (citing Alliance Mortgage, 900 P.2d at 609).  In cases involving the "purchase, sale or exchange of property," the out of pocket measure of damages, rather than the benefit of the bargain measure should apply. Alliance Mortgage, 900 P.2d at 609.

LL&C seeks $1,250,000 as compensation for the cost of creating a new market and brand for devices manufactured by Sei Kim.  This amount is broken down as follows: (1) cost of producing a new infomercial: $300,000; (2) cost to produce and ship new tapes (1,000 tapes at $100 per tape): $100,000; (3) cost to redesign box: $20,000; (4) cost to print new inserts: $10,000; and (5) lost profits while producing new infomercial and creating new market: $820,000.  [LL&C's Proposed Findings at 58-60, 69-70].

These elements of LL&C's damages claim are rejected.  First, the projected cost of producing a new infomercial - $300,000 - is based on a "guess" made by one of LL&C's principals.  [RT 731.  See also RT 796].  Although he characterized his "guess" as "pretty accurate," the information on which his "guess" was based is not in the record, and his estimate vastly exceeds the approximately $20,000 which LL&C expended in creating the original infomercial in 2000, even if it is assumed that $20,000 expenditure did not cover all of LL&C's costs. [Ex. 43, Ex. A; RT 763-64].  While costs undoubtedly rose in the interim, there is no evidence that they rose anywhere that much.

1   Damages for fraud cannot be based on guesswork or speculation.

2       Second, LL&C's principal testified that LL&C would create 500 to
3   1,000 tapes, not 1,000.  [RT 731-32].  Moreover, his estimate of $100
4   per tape [RT 732], is unsupported by any documentation, bids, or
5   explanation.

6       Third, LL&C's principal's estimates of $20,000 to replace boxes,
7   and $7,000 to $10,000 to replace inserts, are unsupported by any
8   documentation, bids, or explanation.  There is not even any indication
9   of the number of boxes or inserts involved, or the cost per box or per
10  insert.

11      Finally, LL&C's principal estimated that LL&C would lose "a
12  little over a million dollars" in profits during the time that would
13  be required to create a new infomercial and create a new market for
14  the devices.  [RT 732-33].  In its proposed findings, however, LL&C
15  has reduced this estimate to $820,000.  [LL&C's Proposed Findings at
16  70].  No explanation for that change has been provided.  In addition,
17  LL&C's lost profits estimate is speculative.  It is not supported by
18  any expert testimony, and there is no explanation as to the manner in
19  which it was calculated or the information on which the calculation is
20  based is in the record.  Finally, the Court previously excluded LL&C's
21  lost profits claim because it was not adequately disclosed prior to
22  trial.  [See Order dated March 14, 2007].  Accordingly, it is
23  rejected.

24      Therefore, although LL&C has proven that Cyclone USA committed
25  fraud as to three of the four alleged misrepresentations, it has
26  eschewed rescission and it has not proven that it is entitled to
27  recover damages.

28

**15.  LL&C's Breach of Contract Claim Against Cyclone USA**

LL&C alleges that Cyclone USA breached their contract in the following respects: (1) supplying to LL&C devices other than devices designed and manufactured by Sei Kim in Korea; (2) supplying defective devices to LL&C; (3) not using its best efforts to fill orders placed by LL&C as promptly as practicable; (4) selling devices directly to customers generated by LL&C's infomercials; (5) not dividing the profits with LL&C as required by the contract; (6) diverting funds from a joint Cyclone USA - LL&C account secretly for its own use; and (7) failing to update the installation guide.   [LL&C's Proposed Findings at 58-60].

The elements of a claim for breach of contract were presented earlier.[88]

There obviously was a written contract between Cyclone USA and LL&C [SF 38; Ex. 43], and LL&C largely fulfilled its material obligations under the contract.[89]

The contract between LL&C and Cyclone USA states that "[t]he products and/or equipment covered by the above-referenced agreement include certain equipment, parts and systems manufactured, produced or otherwise sold by the Company [i.e., Cyclone USA] and related entities . . . ." [Ex. 43, Ex. A].  Nothing in the contract limited Cyclone USA to supplying devices designed by Sei Kim or manufactured by Sei Kim or

---

[88]    See discussion of Claim 6.

[89]    As previously explained, the parties' mutual obligation to share profits is unenforceable.  See discussion of Claim 6.  LL&C's withholding of 10% of the purchase price and continuing to use Cyclone USA's trademarks after termination of the contract, though unauthorized does not preclude it from satisfying this element given the nature of the breaches it alleges.

1  otherwise made in Korea.  [See RT 406].  Similarly, the contract does
2  not restrict the design of the devices or the materials from which
3  they must be made.  Rather, the LL&C contract merely states that
4  Cyclone USA's is to provide unspecified fuel saving devices to LL&C.
5  [See RT 496].  If the exact nature or quality of the devices was
6  agreed upon, or if that mattered to LL&C, one would expect the
7  contract to provide that the devices must conform to a specified
8  description or example or refer to attached drawings or
9  specifications.  The contract, however, does none of these things.
10 Moreover, the contract between LL&C and Cyclone USA contains an
11 integration clause providing that "[t]his instrument contains all of
12 the agreements, understandings, representations, conditions,
13 warranties, and covenants made between the parties hereto." [Ex. 43,
14 § 5.03].  It also requires that "all modifications and amendments
15 hereto must be in writing." [Ex. 43, § 5.03].

16      The fundamental goal of contract interpretation is to give effect
17 to the mutual intention of the parties.  People v. Shelton, 125 P.3d
18 290, 294 (Cal. 2006).  While LL&C apparently contemplated that those
19 fuel saving devices would be the particular device LL&C later learned
20 was designed and manufactured by Sei Kim [RT 783 ("[W]e [i.e., LL&C]
21 were very specific about wanting to sell the devices that had the
22 testimonials and upon which the testing had been done."). See also RT
23 449-50], LL&C has not shown that this was also the understanding of
24 Cyclone USA at the time of contract formation.[90] The fact that Cyclone
25 USA presented LL&C with its bullet device design roughly three months

26

27      [90]   The fact that LL&C evidently had no qualms about selling devices
28 made in China by Poron [SF 61] undercuts its contention that it was only
    willing to acquire and sell devices not made by Sei Kim in Korea.

95

after the contract was signed [RT 783-84] indicates that Cyclone USA always construed the contractual definition of fuel saver devices to be broader than LL&C now urges.   Given these facts, there is no persuasive evidence that the contract between LL&C and Cyclone USA limited Cyclone USA to selling only devices designed or manufactured by Sei Kim to LL&C.

Although Cyclone USA concedes that it eventually agreed to restrict the types of devices it would ship to LL&C to those designed and manufactured by Sei Kim [RT 788-89], and although it may not have complied perfectly with that self-imposed restriction [RT 785-89, 897-99], LL&C has not shown that Cyclone USA shipped an appreciable amount of nonconforming devices after that restriction was agreed upon.  [RT 786-87].

There is little doubt that Cyclone USA shipped some defective devices to LL&C.  [RT 1287, 1292, 1496.  See also RT 451-52].  The evidence also suggests that the return rate was higher for Tornado II and Tornado III devices than it was for devices designed and manufactured by Sei Kim.  [RT 1287].  Under the contract between LL&C and Cyclone USA, Cyclone USA was obligated to exchange or issue a credit for defective devices shipped to LL&C.  [Ex. 43, § 3.06(a)].  Cyclone USA complied with that obligation on at least one occasion.  [Ex. 217, 219; RT 1448].  Evidently, LL&C did not request other exchanges or credits [RT 1448], although it did notify Cyclone USA that it was unilaterally withholding 10% of the purchase price of devices shipped to it by Cyclone USA.  [RT 1156-57].  Contrary to Cyclone USA's contention, however, the contract does not state that exchanges or credits are LL&C's exclusive remedy, and it even seems to contemplate that other remedies may be available for defective

1   devices.  [See Ex. 43, § 3.06(b)].  While LL&C was not entitled to

2   unilaterally withhold 10% of the purchase price of devices sent by

3   Cyclone USA,[91] it is entitled to recover the cost of excess returns or

4   exchanges caused by defective or nonconforming devices.

5        The contract between LL&C and Cyclone USA required Cyclone USA to

6   "use its best efforts to fill the accepted orders as promptly as

7   practicable, subject, however, to delays caused by . . . any . . .

8   cause beyond [Cyclone USA]'s control." [Ex. 43, § 3.01(b)].  Cyclone

9   USA was unable to fulfill all of LL&C's requirements for devices when

10  the demand for them increased substantially as a result of the success

11  of the infomercial.  [RT 1297.  See also RT 451-52, 1293].  Although

12  Cyclone USA attempts to blame the delays on untimely deliveries by Sei

13  Kim [see Cyclone USA's Proposed Findings at 57], and although that may

14  be partly accurate [RT 129-31], there is evidence that Cyclone USA

15  shipped devices to customers other than LL&C when it had a choice.

16  [RT 1297].  While the contract between LL&C and Cyclone USA

17  contemplates that Cyclone USA may sell to other customers, if Cyclone

18  USA's inability to meet LL&C's requirements in a timely manner was

19  caused by an appreciable amount of sales by Cyclone USA to other

20  customers because it believed that sales to those customers would be

21  more profitable than sales to LL&C, that might violate Cyclone USA's

22  obligation to "use its best efforts to fill the accepted orders

23  [placed by LL&C] as promptly as practicable . . . ." [Ex. 43, §

24  3.01(b)].  LL&C, however, has not proven the specific amount of the

25  shortfall in Cyclone USA's ability to meet LL&C's requirements or

26  linked that shortfall to specific sales by Cyclone USA to customers

27

28        [91]   See discussion of Claim 6.

1  other than LL&C.

2      There is evidence that Cyclone USA continued to sell devices to
3  customers other than LL&C during the period when the contract between
4  LL&C and Cyclone USA was in force.  [RT 1297].  While it is possible
5  that some of those customers of Cyclone USA were introduced to the
6  device by the infomercial, LL&C has not shown which ones fall into
7  this category and which ones do not.  Thus, LL&C has not demonstrated
8  that Cyclone USA failed to pay its share of profits on direct sales by
9  Cyclone USA that were attributable to the infomercial.  In addition,
10  the Court has already determined that the provision of the contract
11  purporting to require profit sharing is unenforceable.[92]

12      Cyclone USA asserts the following defenses to this claim: (1)
13  laches; (2) equitable estoppel; (3) unclean hands; and (4) waiver.
14  [Pretrial Order, Ex. B, at 1].  The law regarding these defenses was
15  presented earlier.[93]

16      As previously explained, the defense of laches is not available
17  in an action at law for damages.[94]  Therefore, it is not a defense to
18  this claim.

19      As to Cyclone USA's defense of estoppel, Cyclone USA has offered
20  no evidence that shows that any action or inaction on the part of LL&C
21  caused Cyclone USA detrimental reliance.  Because Cyclone USA
22  submitted no proposed findings as to this defense, it is deemed to
23  have been abandoned as far as this claim is concerned.  In any event,
24  there does not appear to be any factual support for this defense in

25

26    [92]    See discussion of claim 6.

27    [93]    See discussion of Claims 6 and 14.

28    [94]    See discussion of Claim 14.

the record.  Because it is not the Court's place to scour the record for evidence supporting claims or defenses, this defense is rejected. Collins, 50 Cal. Rptr. 3d at 157.

The defense of unclean hands is rejected.  LL&C's wrongful conduct (such as trademark infringement) occurred after the breaches of contract by Cyclone USA had occurred, and arguably was prompted in part (though not excused) by such breaches.  Thus, LL&C's misconduct is not sufficiently related to the rights on which LL&C seeks to recover to provide the basis for an unclean hands defense.

The defense of waiver is rejected.  The contract forbids implied waivers.  [Ex. 43, § 5.05].  No written waiver has been proven.

LL&C's claimed damages for breach of contract include: $278,457 for excess returns and exchanges,[95] an accounting of Cyclone USA's profits generated by the Napa Auto Parts account, $29,000 in funds improperly appropriated by Cyclone USA from a joint account, and $20,000 spent by LL&C to create a database.  [RT 1213-14; LL&C's Proposed Findings at 68].

The request for an accounting of Cyclone USA's profits on sales to Napa Auto Parts ("Napa") is rejected.  Jay Kim's testimony that Napa was first introduced to the devices during the 1990s, long before LL&C was involved, is uncontroverted.  [RT 1502].  The fact that the infomercial contributed to an increase in sales to Napa [RT 1155] does not make profits on sales to Napa shareable under the contract.  [Ex. 43, Ex. A para.  III(D) ("Distributor is granted the exclusive right

---

[95]   LL&C calculated this figure based on three subparts: (1) total cost to LL&C in the amount of $105,943; (2) additional advertising costs that would have been avoided had LL&C known that there would be such a large excess of returns and exchanges, totaling $120,342; and (3) incremental profit on the lost sales relating to these excess returns in the amount of $52,172.  [RT 1222-27].

to sell the 'Products' to . . . [c]ustomers generated by, derived from or otherwise introduced to the Products by so-called 'infomercials,' whether arranged, contracted or otherwise commissioned by Company or Distributor, or Distributor's internet location."); RT 1064-65]. Moreover, the profit sharing provision has been determined to be unenforceable.[96]

LL&C estimates that the total cost to LL&C for excess returns or exchanges of devices is $105,943 [RT 1223] and that it lost profits in the amount of $52,172 as a result of these excess returns. [RT 1226]. As Cyclone USA's expert conceded, the methodology employed by LL&C's expert was reasonable. [Ex. 154 at 12]. While some of the returns or exchanges might have been caused by factors not attributable to Cyclone USA [RT 1246], there clearly were excessive returns or exchanges for the period in question. [RT 1067-73, 1287-88]. Many of those excess returns and exchanges resulted from defective devices shipped by Cyclone USA, or other respects in which Cyclone USA's performance under the contract was deficient, such as the failure to properly maintain the installation guide. [Ex. 512; RT 709-11, 805, 1079-80, 1130]. Accordingly, LL&C may recover this element of its damages claim with prejudgment interest at a rate of 10% per annum. [97]

---

[96]    See discussion of Claim 6.

[97]    LL&C's expert calculated prejudgment opportunity interest based on the one-year treasury rate provided by 28 U.S.C. § 1961. [RT 1227]. However, "[w]here state law provides the rule of decision, it is the duty of federal courts to ascertain and apply that law." Witzman v. Gross, 148 F.3d 988, 990 (8th Cir. 1998). While this case involves both federal and state law claims, "state law applies to [a] claim for prejudgment interest under state law unless federal law preempts it." Sea Hawk Seafoods v. Exxon Corp., 484 F.3d 1098, 1101 (9th Cir. 2007). Because the damages claimed arise from Cyclone USA's breach of contract, California law applies.

1  Cal. Civ. Code §§ 3287(a); 3289(b).  Because the record is unclear as

2  to when the breach occurred, the precise amount of interest due cannot

3  be determined now.

4       LL&C also seeks to recover $120,342 for "additional advertising

5  costs that wouldn't have been spent had [it] known that there would be

6  such a large excess of returns and exchanges."  [RT 1223-25].  This

7  element of LL&C's damages claim is based entirely on hearsay -

8  specifically, statements made by LL&C's employees to LL&C's damage

9  experts - rather than testimony or other evidence about LL&C would

10 have done if it had known how high returns or exchanges would be.  [RT

11 1224, 1258-60].  Regardless of whether such statements properly can be

12 admitted by means of an expert's testimony, the basis for this aspect

13 of LL&C's damages claim is unreliable, so it is rejected.  Moreover,

14 LL&C actually stopped advertising when it deemed it appropriate to do

15 so.  [RT 982].  It is unclear why it should be inferred that it also

16 would have stopped advertising on other occasions when it actually

17 chose to continue advertising.[98]

18      As to the $29,000 of checks allegedly inappropriately written by

19 Jay Kim, on the joint account, LL&C's claim is accepted.  The Court

20 believes that what Jay Kim did was unauthorized.  LL&C was genuinely

21 shocked by it, and the incident altered the relationship between LL&C

22 and Cyclone USA.  [RT 526-27, 683-87, 958].  Although Jay Kim

23 testified that the money was repaid [RT 1482], LL&C disagrees [RT

24 733], and the Court is skeptical of that contention, partly because it

25

26      [98]   Further, if LL&C had not advertised during the period in
   which the excess returns and exchanges occurred, it would have
27 achieved fewer sales and suffered a resulting decrease in profits and
   revenues, since only 25% of the devices sold during the applicable
28 periods were returned.  [RT 1223].  LL&C's expert does not appear to
   have taken that into account.

is neither tied to any particular discount nor supported by any documentation.  Accordingly, LL&C is entitled to recover on this portion of its breach of contract claim with prejudgment interest as provided above.

Last, the request for the $20,000 spent by LL&C to create a database is rejected.  The evidence suggests that LL&C and Cyclone USA contemplated that Cyclone USA would maintain the installation guide [SF 51; RT 709-11], and further that the failure to update the installation guide accounted for at least some of the returns and exchanges of the devices [RT 805, 1079-80].  However, nothing in the contract explicitly assigns the duty to maintain the installation guide to Cyclone USA or defines the level of accuracy the installation guide must attain.

### 16.  LL&C's State False Advertising and Unfair Business Practices Claim Against Cyclone USA

This claim already has been resolved in LL&C's favor.  The Court previously has determined that the conduct which formed the basis of LL&C's federal unfair competition claim against Cyclone USA also amounted to false advertising and unfair competition under California law.  Cal. Bus. & Prof. Code §§ 17200 & 17500.  [See Order Granting in Part LL&C's Motion for Partial Summary Judgment, August 11, 2003, 13-15].

Further analysis of this claim is unnecessary.  [See Pretrial Order, Ex. B, at 2 ("The parties have agreed not to pursue any further claims under California unfair competition, but are leaving the causes of action in place to the extent necessary to support the court's prior summary judgment orders of false advertising against Cyclone USA and LL&C.")].

1     Cyclone USA asserts the following defenses to this claim: (1)
2  equitable estoppel; and (2) unclean hands.

3     These defenses are rejected for the same reasons they were
4  rejected with respect to Cyclone USA's state unfair competition claim
5  against LL&C.[99]   Therefore, further discussion of these defenses is
6  unnecessary.

7     LL&C has not proven that it suffered any damages from Cyclone
8  USA's state unfair competition, so no monetary relief is awarded.
9  LL&C, however, is entitled to a permanent injunction prohibiting
10  Cyclone USA from engaging in such state unfair competition in the
11  future.

12  **D.   Sei Kim's Claims Against Cyclone USA**

13       **17.   Sei Kim's False Marking of Patent Claim Against Cyclone USA**

14     Falsely marking unpatented devices as "patented" is prohibited by
15  federal law.  35 U.S.C. § 292(a).  To establish false patent marking,
16  the plaintiff must show that the defendant: (1) affixed the word
17  "patented" to an unpatented item; (2) with the purpose of deceiving
18  the public.  Mayview Corp. v. Rodstein, 620 F.2d 1347, 1359 (9th Cir.
19  1980).  Section 292 is penal in nature, and therefore "must be
20  strictly construed."  Id.  The party asserting a false marking claim
21  bears the burden of persuasion.  Id.

22     On behalf of Cyclone USA, Jay Kim directed the manufacturer of
23  the Tornado III to label that device as patented, even though neither
24  he nor Cyclone USA held a patent on the Tornado III.  [SF 53, 54; RT
25  412-13].  Therefore, the Tornado III was falsely marked as patented,
26  and the only issue is whether Cyclone USA acted with the intent to

27  ─────────────────────
28       [99]   See discussion of Claim 5.

deceive.

The Federal Circuit has offered the following guidance about determining whether there was intent to deceive:

> Intent to deceive, while subjective in nature, is established in law by objective criteria. Thus, objective standards control and the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent. Thus, under such circumstances, the mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability.

Clontech Labs., Inc. v. Invitrogen Corp., 406 F.3d 1347, 1352-53 (Fed. Cir. 2005) (citations omitted).

The evidence regarding intent to deceive conflicts. The circumstances reflect an intent to deceive. Jay Kim knew that neither he nor Cyclone USA owned a patent on the Tornado III [RT 268], and he also knew that the Tornado II and the Tornado III differed in several material respects. [See SF 46, 52; RT 915-17]. He applied for a design patent on the Tornado III on June 5, 2002 [SF 53], a date which was during the period November 2001 through February 4, 2003 when the false patent marking occurred. [SF 54]. That suggests that he understood that the Tornado III was not covered by the application relating to the Tornado II, otherwise, the application concerning the Tornado III may have been superfluous. Cyclone USA also took other steps to enhance the attractiveness of the devices to consumers artificially by removing the "made in Mexico" stickers placed on them

by the manufacturer. [RT 238, 1085].  This is consistent with a pattern of behavior by Jay Kim of puffing or lying about his or his company's value or importance.[100]

Jay Kim claims that a patent agent, who evidently was not a lawyer, told him that marking the Tornado III as patented was permissible because the Tornado III was covered by the patent on the Tornado II.  Jay Kim says that he (and Cyclone USA) relied on that advice.  [RT 413, 420].  Even if it is assumed that Jay Kim received such advice, it does not matter.

Cyclone USA has not shown that any reliance by Jay Kim on his patent agent's advice would have been reasonable under the circumstances.  The record contains no evidence concerning the expertise or reliability of the patent agent.  However, courts have suggested that in some circumstances reliance on even advice of patent counsel is not sufficient to negate the element of specific intent in the context of a false marking claim.  See Sadler-Cisar, Inc. v. Commercial Sales Network, Inc., 786 F. Supp. 1287, 1296 (N.D. Ohio 1991) ("Evidence at trial indicated that Defendants had indeed the specific intent to deceive, and the mere fact that they had consulted a patent attorney does not exonerate them.").  But see Victoria-Voque, Inc. v. Valcourt, Inc., 148 F. Supp. 160, 171 (S.D.N.Y. 1956) (finding no liability under section 292 where defendant acted in good faith reliance on the advice of counsel, and not with the purpose of deceiving the public).  The fact that a patent agent obviously does not possess the knowledge and legal expertise of a patent attorney makes it even less likely that Jay Kim and Cyclone USA's reliance was

---

[100]   See discussion of Claim 14.

reasonable.  _See_ _CPG Prods. Corp. v. Pegasus Luggage, Inc._, 776 F.2d 1007, 1014-15 (Fed. Cir. 1985) (holding that where a potential infringer has actual notice of another's patent rights, he has an affirmative duty to seek the advice of counsel before the initiation of any possible infringing activity); _Rosemount, Inc. v. Beckman Instruments, Inc._, 727 F.2d 1540, 1548 (Fed. Cir. 1984) (finding no reasonable basis for believing infringing activity was permissible where defendant failed to seek the advice of counsel).  Moreover, Cyclone USA has not demonstrated that the patent agent was fully informed of all the relevant facts, or that the patent agent's advice was accompanied by an explanation that made any sense.  While obtaining an objective opinion letter from counsel may provide the basis for a defense to a claim of willful patent infringement, "counsel's opinion must be premised upon the best information known to the defendant."  _Comark Commc'ns., Inc. v. Harris Corp._, 156 F.3d 1182, 1191 (Fed. Cir. 1998).  As stated by the Federal Circuit, "[w]henever material information is intentionally withheld, or the best information is intentionally not made available to counsel during the preparation of the opinion, the opinion can no longer serve its prophylactic purpose of negating a finding of willful infringement." _Id._  _See also_ _Goodwill Construction Co. v. Beers Constr. Co._, 991 F.2d 751, 758 (Fed. Cir. 1993) (provider of opinion must be informed of all relevant facts); _Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc._, 976 F.2d 1559, 1580-81 (Fed. Cir. 1992) (factual analysis underlying opinion must be explained); _Datascope Corp. v. SMEC, Inc._, 879 F.2d 820, 828-29 (Fed. Cir. 1989) (legal analysis underlying opinion must be explained); _Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc._, 761 F.2d 649, 656 (Fed. Cir. 1985) (opinion

cannot be merely conclusory).[101]  Accordingly, even if the unwritten advice of a patent agent were afforded the same weight and credibility as the written opinion of a patent attorney, the evidence does not suggest that Cyclone USA actually relied in good faith on the advice of the patent agent under the circumstances.

Regardless of what the patent agent did or did not say, Jay Kim (and therefore Cyclone USA) knew perfectly well that the Tornado II patent did not cover the Tornado III.  Cyclone USA falsely marked its unpatented devices as patented in an effort to deceive the public either into thinking the Tornado III was more desirable than it actually was or at least was comparable or superior to the devices that Cyclone USA previously had been selling.

Cyclone USA has asserted the defense of unclean hands in response to this claim.  [Pretrial Order, Ex. B, at 2].  The law regarding unclean hands was presented earlier.[102]

Cyclone USA's false patent marking occurred before any trademark infringement, counterfeiting, or state or federal unfair competition for which Sei Kim is directly or contributorially liable.  Thus, there is no relationship, whether causal or otherwise, between any wrongful conduct of Sei Kim and Cyclone USA's false patent marking.  Further, whatever might be said about Sei Kim's conduct in the context of his contractual relationship with Cyclone USA, it was not fraudulent, deceptive, or otherwise so offensive as to support an unclean hands defense.  See Brother Records, 318 F.3d at 909 ("To prevail on an

_____

[101]  Although these cases arose in a different context – the reliance on advice of counsel defense to an allegation of willful patent infringement – their rationale is equally applicable here.

[102]  See discussion of Claim 1.

unclean hands defense, 'the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims.") (quoting Levi Strauss, 121 F.3d at 1313).  Therefore, Cyclone USA's unclean hands defense is rejected.

The final question is how many violations of section 292 Cyclone USA committed.  The statute imposes a penalty of $500 per violation, with one-half to be paid to the plaintiff and one-half to be paid to the United States Treasury.  35 U.S.C. § 292(a)-(b).  Cyclone USA procured 82,500 devices which were falsely marked as patented.  [RT 253].  If each falsely marked device gives rise to a separate penalty, then Cyclone USA would be liable for a total of $41,250,000.  Fortunately for Cyclone USA, that is not the way in which the penalty is calculated.  Instead, courts consider whether the circumstances suggest that the false patent marking constituted one transaction or multiple separate transactions.  See London v. Everett H. Dunbar Corp., 179 F. 506, 509 (1st Cir. 1910) (stating that if the evidence shows a "divergence of time and circumstances as to make one act of marking separable and distinct from other acts of marking," then multiple offenses may be found).  See also Brose v. Sears, Roebuck & Co., 455 F.2d 763, 766 n.4 (5th Cir. 1972) (suggesting that a court may divide a course of false marking into reasonable increments of time, such as by finding one offense for each week during a multi-week period in which the false marketing occurred); Krieger v. Colby, 106 F. Supp. 124, 131 (S.D. Cal. 1952) ("[T]o authorize the recovery of more than a single penalty the proof must be sufficiently specific as to time and place and circumstances to show a number of distinct offenses of marking, although it need not show the specific date of each.").  If the court finds that only a single offense was committed,

then only a single $500 penalty may be imposed.  <u>London</u>, 179 F. at 508

("The statute does not measure the penalty by the extent of

publication, but affixes the penalty regardless of the fact of

publication.  It can hardly have been the intent of Congress that

penalties should accumulate as fast as a printing press or stamping

machine might operate.").

Sei Kim has not shown that Cyclone USA's false patent marking

constituted multiple separate transactions.  Therefore, Cyclone USA's

false patent marking must be treated as a single violation of Section

292(a).  Accordingly, Cyclone USA must pay a fine of $500 ($250 to Sei

Kim and $250 to the Treasury of the United States) in respect of Sei

Kim's false patent marking claim.

### 18. Sei Kim's Federal Unfair Competition Claim Against Cyclone USA

This claim already has been resolved against Cyclone USA.  The

Court previously determined that Cyclone USA committed false

advertising under 15 U.S.C. § 1125(a) by promoting sales of devices

not manufactured by Sei Kim using test data regarding devices

manufactured by Sei Kim, and testimonials concerning the performance

of devices manufactured by Sei Kim, on packaging, on Cyclone USA's

website, or in marketing materials relating to devices not

manufactured by Sei Kim.  The Court also concluded that Cyclone USA

violated 15 U.S.C. § 1125(a) by using photographs or video depicting

devices manufactured by Sei Kim to promote sales of devices not

manufactured by Sei Kim.  [<u>See</u> Order Granting in part LL&C's Motion

for Partial Summary Judgment, August 11, 2003, at 6-13].

In addition, the Court has determined that Cyclone USA falsely

marked unpatented devices as patented.[103]  False patent marking constitutes unfair competition under federal law.  Peterson v. Fee Int'l, Ltd., 381 F. Supp. 1071, 1080 (W.D. Okla. 1974) (finding unfair competition where defendants mis-marked their products with plaintiff's patent).  Cyclone USA's reliance on Sheldon Friedlich Mktg. Corp. v. Carol Wright Sales, Inc., 219 U.S.P.Q. 883 (S.D.N.Y. 1983), in arguing to the contrary is misplaced.  In Sheldon Friedlich, unlike the present case, the court concluded that the false marking was done "mistakenly."  Id. at 890 n.41.

Cyclone USA asserts the following defenses to this claim: (1) laches; (2) equitable estoppel; (3) waiver; (4) unclean hands; and (5) failure to mitigate.  [Pretrial Order, Ex. B at 2].  Except for the defense of failure to mitigate, the law regarding these defenses was presented earlier.[104]

A party who is harmed by the wrongful acts of another "is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damages . . . ."  Commodity Credit Corp. v. Rosenberg Bros. & Co., 243 F.2d 504, 511 (9th Cir. 1957).  Further, the injured party "is bound to protect [itself] if [it] can do so with reasonable exertion or at a trifling expense . . . . [It] must do nothing to aggravate [its] loss, but must do all [it] can to mitigate or reduce it."  Id.

Because Cyclone USA submitted no proposed findings as to any of these defenses, they are deemed to have been abandoned, at least insofar as this claim is concerned. In addition, there does not appear

---

[103]    See discussion of Claim 17.

[104]    See discussion of Claim 1.

1    to be any factual support for these defenses in the record.  Because

2    the Court need not construct Cyclone USA's defenses on its behalf,

3    they are rejected.  <u>Collins</u>, 50 Cal. Rptr. 3d at 157.

4        Sei Kim has not proven any damages based on this claim, so no

5    monetary relief is awarded.  Sei Kim, however is entitled to a

6    permanent injunction prohibiting Cyclone USA from engaging in such

7    federal unfair competition in the future.

8        **19.  Sei Kim's Declaratory Relief Regarding Trademark Ownership**

9            **Claim Against Cyclone USA**

10       Sei Kim's request for a declaration that he, rather than Cyclone

11   USA, owns the Tornado trademark and the slogan trademarks is rejected.

12   Cyclone USA owns those trademarks, except for the "More Power, More

13   Mileage!" trademark, which is not owned by either Cyclone USA or Sei

14   Kim.[105]

15       **20.  Sei Kim's Breach of Contract Claim Against Cyclone**

16       This claim has two aspects.  First, Sei Kim seeks to recover from

17   Cyclone USA a royalty as compensation for Cyclone USA's second

18   sourcing[106] of devices.  Second, Sei Kim seeks payment for

19   approximately $252,000 worth of devices shipped by Sei Kim to Cyclone

20   USA, but never paid for by Cyclone USA.  [Sei Kim's Proposed Findings

21   at 15-16].

22       The elements of a claim for breach of contract were presented

23   earlier.[107]

24       There obviously was a written contract between Cyclone USA and

25

26       [105]    See discussion of Claim 13.

27       [106]    The term "second source" means a source other than Sei Kim.

28       [107]    See discussion of Claim 6.

Sei Kim.  [SF 16; Ex. 17].  The contract between Sei Kim and Cyclone
USA was an installment contract because it "require[d] or authorize[d]
the delivery of goods in separate lots to be separately accepted . .
. ."  Cal. Com. Code § 2612(1).  Although Sei Kim may have been a
difficult contracting partner in some respects, and although his
performance of his obligations was imperfect [RT 129-31, 135-38], he
performed all of his material obligations while the contract between
Sei Kim and Cyclone USA was in force.[108]  Finally, if there was a
breach by Cyclone USA, it consists of the failure to pay money.
Obviously, if such a breach occurred, Sei Kim was damaged thereby.

The contract between Sei Kim and Cyclone USA [SF 16; Ex. 29], was
modified.  The following provision drafted by Cyclone USA was added by
a letter counter-signed by Sei Kim at Cyclone USA's suggestion: "At
the request of our bankers, we must hereby ask you to confirm that
Cyclone USA could produce the product (Cyclone) by means of its own
manufacturing sources if KIDC fails to supply sufficient quantity of
the product to satisfy Cyclone USA's needs.  It is agreed that if
Cyclone USA does produce some products using KIDC's patented design
then Cyclone USA will pay KIDC a royalty on every unit that it sells."
[Ex. 29].

Cyclone USA eventually did second source [SF 63], apparently both
to improve its ability to fill orders placed by its customers and to
lower its costs.  [RT 1294].

There are two possibilities: either Cyclone USA breached the
contract by improperly second sourcing or Cyclone USA was entitled to

---

[108]  The fact that Sei Kim sometimes was tardy in shipping some
installments [RT 111, 191, 1105] or portions thereof [RT 647] was not
a material breach of the contract as a whole.  See Cal. Com. Code §
2612(3). It simply triggered Cyclone USA's right to second source.

1    second source but breached its obligation to pay Sei Kim a royalty on

2    properly second sourced sales.  If Cyclone USA breached the contract

3    by improperly second sourcing, then Sei Kim would be entitled to the

4    benefit of his bargain, namely, his lost profits on the devices

5    Cyclone USA should have bought from him but instead purchased

6    elsewhere.  Alternatively, if Cyclone was entitled to second source,

7    Sei Kim would be entitled to a royalty on devices purchased by Cyclone

8    USA from a second source.  The Court need not determine which of these

9    two possibilities occurred[109] because Sei Kim is not entitled to

10   recover damages for the second sourced sales under either scenario.

11       Sei Kim did not prove his lost profits.  He never showed what

12   Cyclone USA would have had to pay Sei Kim per unit during the relevant

13

14       [109]   Sei Kim appears to take the position that it does not matter
     whether Cyclone USA properly invoked its right to second source or

15   improperly invoked its right to second source because in either event,
     Sei Kim would have been entitled to a compensation.

16
         Perhaps for this reason, it has not been shown that Cyclone USA

17   breached the contract between Sei Kim and Cyclone USA by second
     sourcing.  The contract allowed Cyclone USA to second source if Sei

18   Kim "fails to supply a sufficient quantity of the product to satisfy
     Cyclone USA's needs." [Ex. 29].  There is evidence that Sei Kim did

19   not do that.  [RT 129-31, 135-38].  While Cyclone USA might have been
     a more considerate business partner if it had handled the second

20   sourcing differently, nothing in the contract between Cyclone USA and
     Sei Kim obliged Cyclone USA to notify Sei Kim before second sourcing

21   or to handle the second sourcing in any particular way.  Of course,
     whether Cyclone USA breached the contract by not paying a royalty to

22   Sei Kim is a separate question.

23       Sei Kim also has not convincingly demonstrated that he would have
     been willing and able to scale up his manufacturing capacity to meet

24   the dramatically increased demand.  While Cyclone USA's purchases from
     Sei Kim increased significantly over time (for example, from 16,020

25   devices in 2000 [SF 42] to 129,500 devices in 2002 [SF 74]), Cyclone
     USA ordered more than three times as many devices from LaVang or other

26   sources than from Sei Kim during that period.  [SF 54].  Given Sei
     Kim's admitted difficulties in timely shipping a much smaller number

27   of units [RT 129-31, 135-38], it has not been shown that he could have
     timely shipped the much larger number of units that would have been

28   required to satisfy Cyclone USA's needs.

period (only what prices Cyclone USA had historically paid (which varied over time) for smaller quantities, exactly how many units (and what types of units, that is, whether for carburetor or for fuel injection) Cyclone USA second sourced, or what Sei Kim's cost per unit would have been during the relevant period. Sei Kim's testimony regarding his cost was especially unconvincing. He said only the following: "Although the material cost every single year increase by 30 percent, but I believe as for the KI unit, the cost was $4, and as for the KC, it costs like $6.50." [RT 1396]. No documentation substantiating that testimony was provided. Moreover, Cyclone USA was deprived of a meaningful opportunity to develop evidence or rebut Sei Kim's theory by the fact that Sei Kim did not disclose it prior to trial. While the Court declined to exclude Sei Kim's damages claim because it was not adequately disclosed before trial, since both Sei Kim's counsel and Cyclone USA's shared responsibility for that shortcoming [see Order dated November 8, 2007], to promote accuracy and prevent unfairness it is sensible to require that the proof of Sei Kim's damages claim at trial be unusually convincing. Sei Kim's lost profits claim did not even come close to meeting that test. Thus, there is no reliable basis for calculating the amount of Sei Kim's lost profits.

Sei Kim also suggested an alternative approach: awarding Sei Kim some or all of the cost savings Cyclone USA realized by purchasing devices from a cheaper source. [9RT 49-51; Sei Kim's Proposed Findings at 7].

Although the contract provides [Ex. 29], and Cyclone USA concedes [RT 246, 937-38, 950], that Cyclone USA agreed to pay Sei Kim a royalty if it exercised its right to second source, the second a

sourcing provision is vague in two crucial respects.  First, it does not make clear the types of devices on which a royalty is payable.  It employs the phrase "products using KIDC's patented design." [Ex. 29]. Sei Kim contends that the phrase means devices of the general sort provided by Sei Kim, whether or not they are within the scope of Sei Kim's patents.  [9RT 41-43].  Cyclone USA, on the other hand, argues that the term covers only devices that are within the scope of Sei Kim's patents.  [9RT 125].  The most reasonable interpretation of this provision is that the obligation to pay a royalty applies only to devices that would infringe one or more of Sei Kim's patents.  There is, however, no evidence that the devices acquired by Cyclone USA from sources other than Sei Kim infringed Sei Kim's patents. [See Pretrial Order para. 5 ("[N]one of plaintiff's patented devices (the version II and version III devices) infringe any of Sei Kim's patents.")].

Even if Sei Kim's interpretation of the term "patented design" were correct, the second sourcing provision is vague in a second important respect.  As a general rule, "[i]f an essential element is reserved for the future agreement of both parties, . . . the promise can give rise to no legal obligation until such future agreement." Weddington Prods., Inc. v. Flick, 71 Cal. Rptr. 2d 265, 277 (Cal. Ct. App. 1998) (citation omitted).  In such cases it is impossible to affix any obligation to the promise, "[s]ince either party in such a case may, by the very terms of the promise, refuse to agree to anything to which the other party will agree."  Id.  Insofar as the royalty is concerned, the parties agreed upon neither a specific amount nor a mechanism by which such an amount could be determined. [See Ex. 29; RT 937-38, 950; 9RT 46].

One possibility would be to take the term "royalty" literally,

1   and to assume that the parties intended that the royalty would be
2   computed by multiplying the money obtained by Cyclone USA from selling
3   devices acquired from a source other than Sei Kim by a percentage.  On
4   this record, that approach will not work.  Not only did the parties
5   fail to agree on the base (whether gross sales price, net profit, or
6   something else) that would be multiplied by the percentage, but the
7   parties never agreed upon a specific percentage and no evidence was
8   presented as to what percentage would be reasonable for products such
9   as the devices.  Under such circumstances, any damages award would be
10  pure speculation.  See Toscano v. Greene Music, 21 Cal. Rptr. 3d 732,
11  738 (Cal. Ct. App. 2004) (stating that a court's damage award "must
12  not be speculative, remote, contingent or merely possible.").

13      Another possibility is that the term "royalty" means a fixed
14  payment for each device sold by Cyclone USA which was acquired by
15  Cyclone USA from a second source.  If that interpretation is adopted
16  then the question is what the amount of that payment should be or how
17  it should be calculated.  Sei Kim suggests that the amount should be
18  all or a portion of Cyclone USA's cost savings for each device it sold
19  that it had purchased from a second source at a lower price than Sei
20  Kim would have charged.  [9RT 41-58].

21      Sei Kim's "reallocation of Cyclone USA's cost-savings" theory is
22  flawed.  First, this approach is not consistent with the language of
23  the contract.  The contract indicates that the royalty is to be paid
24  on "every unit that [Cyclone USA] sells," rather than on every unit
25  Cyclone USA buys.  [Ex. 29].  Without more, this suggests that the
26  royalty would be based on Cyclone USA's revenue (or profits) rather
27  than on its costs (or cost savings).  Further, the interpretation
28  urged by Sei Kim implies that if Cyclone USA achieved no cost savings

116

by second sourcing, then no royalty would be payable to Sei Kim. That, however, would be an implausible interpretation of the phrase "Cyclone USA will pay [Sei Kim] a royalty on every unit that it sells." [Ex. 29].

Second, Sei Kim has not provided a satisfactory account of exactly what the amount of the cost savings per device achieved by Cyclone USA was.  Although the amount of money Cyclone USA saved by having goods manufactured at a cost lower than the price charged by Sei Kim possibly could be calculated, whether Cyclone USA incurred other costs for product development, excess returns, more expensive shipping or the like, has never been determined or quantified. Arguably, those extra costs, if any, should be deducted from any cost savings reflected in the difference between what Cyclone USA would have paid Sei Kim for devices and what it actually paid to the second source.  Sei Kim's theory, however, fails to take these collateral costs into account, and Cyclone USA had no opportunity to present evidence about them because Sei Kim's theory was not disclosed until trial.

Even if the precise amount of the cost savings were known, the question of how the cost savings should be divided would remain. Should Sei Kim get all of the cost savings, or two-thirds, or one-half, or merely one-quarter?  Sei Kim has not offered a convincing rationale for allocating the cost savings that Cyclone USA achieved by second sourcing in any particular way.  Moreover, Sei Kim has provided the Court with no standards by which such an allocation could be made. No industry expert, no examples of similar transactions, nothing at all.

While this may seem a bit unfair to Sei Kim, it really is not.

Sei Kim did not have to agree to the second sourcing clause, but if he was willing to, he could have insisted that it be clear, that it more narrowly restrict the circumstances under which Cyclone USA could second source, and that it expressly state how much Cyclone USA would have to pay. Inexplicitly, he did not. Further, if he had simply satisfied Cyclone USA's requirements, the second sourcing right would not have been triggered. In sum, Sei Kim easily could have protected himself against inappropriate or uncompensated use of the second sourcing right by Cyclone USA, but he neglected to do so.[110]

"The buyer must pay at the contract rate for any goods accepted." See Cal. Com. Code § 2607(1). Cyclone USA had two potential goods-oriented remedies it might have invoked to free itself from its obligation to pay the purchase price of goods delivered by Sei Kim: (1) rejection; and (2) revocation of acceptance. 1 James J. White & Robert S. Summers, Uniform Commercial Code § 8-3 (5th ed. 2006). Rejection is available before acceptance, and revocation is available after acceptance. Id. §§ 8-3, 8-4. "A buyer who . . . revokes [his acceptance] has the same rights and duties with regard to the goods involved as if he had rejected them." Cal. Com. Code § 2608(3).

By canceling the contract between Sei Kim and Cyclone USA on October 2, 2002, and twice instructing Cyclone USA not to sell any devices, Sei Kim essentially repudiated its implied warranty of title

---

[110] One also would have thought that, if he was as concerned about maintaining quality control as his testimony suggests [RT 128, 1389], Sei Kim would have insisted that he be notified before Cyclone USA could second source, that only his designs be used, that any different designs would have to be approved by him in advance, that only specified manufacturers or other manufacturers approved by him in advance could be used, and the like. Sei Kim, however, requested none of those things.

1  in the devices he had supplied to Cyclone USA for resale to the
2  latter's customers.  [Ex. 107, 148, 518; RT 1430].  Cyclone USA
3  reasonably interpreted those actions as indicating that it could no
4  longer resell the devices it had received from Sei Kim.  [RT 944].
5  These actions substantially impaired the value of the devices to
6  Cyclone USA, and it could not be obliged to keep and pay for devices
7  under such circumstances.  See Cal. Comm. Code § 2608(1).  Sei Kim's
8  actions entitled Cyclone USA to reject, or to revoke its acceptance
9  of, the devices.  See Gawlick v. American Builders Supply, Inc., 519
10 P.2d 313, 314-15 (N.M. Ct. App. 1974) (applying New Mexico's version
11 of the UCC in finding that a breach of the implied warranty of title
12 justifies revocation of acceptance).[111]

13     The buyer must invoke goods-oriented remedies promptly.
14 "Rejection of goods must be within a reasonable time after their
15 delivery or tender.  It is ineffective unless the buyer seasonably
16 notifies the seller." Cal. Com. Code § 2602(1).  Similarly,
17 "[r]evocation of acceptance must occur within a reasonable time after
18 the buyer discovers or should have discovered the ground for it and
19 before any substantial change in condition of the goods which is not
20 caused by their own defects." Cal. Com. Code § 2608(2).  Revocation

21 _____

22     [111]  It might have been best if Sei Kim had told Cyclone USA
    exactly what it should do with any unsold devices. Sei Kim, however,
23  had no way of knowing whether Cyclone USA still had an appreciable
    quantity of devices received from Sei Kim, or merely a hand full, in
24  its inventory.  Moreover, Cyclone USA never told Sei Kim that it was
    holding an appreciable quantity of unsold devices, and never asked for
25  precise instructions regarding the disposition of those devices. [RT
    943-44].  Cyclone USA knew exactly how many devices it had.  In the
26  circumstances, Cyclone USA had an obligation to notify Sei Kim
    promptly and unambiguously of its rejection or revocation of
27  acceptance of the unsold devices, to inform Sei Kim of the quantity of
    unsold devices remaining in its inventory, and to explicitly request
28  instructions from Sei Kim regarding disposition of the unsold devices.

1    of acceptance "is not effective until the buyer notifies the seller of

2    it." Id.

3        There is no evidence of any notice of rejection or revocation of

4    acceptance by Cyclone USA.  Cyclone USA's initial complaint did not

5    contain one.  [See Complaint, filed February 11, 2003, at 16-17, 22-

6    23].  Indeed, Cyclone USA did not even contemporaneously protest what

7    it construed as Sei Kim's instruction not to sell the devices.

8    Cyclone USA did attempt to return the unsold devices to Sei Kim.

9        Simply attempting to return goods, however, may or may not be

10   sufficient notice of rejection or revocation of acceptance.  See 4

11   Lary Lawrence, Anderson on the Uniform Commercial Code § 2-608:199

12   (2006) ("Notice of revocation of goods to the seller must be clearly

13   demonstrated.  In many circumstances, merely returning goods to the

14   seller without more explicit indications of intent is inadequate as a

15   notice of revocation of acceptance.").  Id. § 2-608:221. ("When the

16   buyer returns goods to the seller but does not specify the purpose of

17   the return, the buyer's conduct is ambiguous . . . .)".  The record

18   does not contain any evidence of an explanation by Cyclone USA as to

19   why it was attempting to return the devices.

20       The record does not reveal exactly when Cyclone USA attempted to

21   return the devices.  The Court assumes that Cyclone USA's attempt to

22   return the devices occurred shortly before that attempt was rejected

23   by Sei Kim.  Sei Kim refused to accept the return of the devices on

24   July 15, 2004.  [Ex. 155].  This was almost a year after Sei Kim

25   formally demanded payment for those devices.  [Sei Kim's Answer to

26   Cyclone USA's Third Amended Complaint, filed July 31, 2003, (including

27   a claim for payment of $252,374.50 for Cyclone USA's "failing to pay

28   the amount due as a result of orders it placed for the device, which

were timely delivered by Sei/KIDC")]. This matters because ordinarily actions taken by the buyer after the seller files a claim for payment cannot constitute revocation of acceptance. Fleet Maint., Inc. v. Burke Midwest Corp., 728 P.2d 408, 410-11 (Kan. Ct. App. 1986) (applying Kansas' version of the UCC in barring buyer from defending seller's suit on basis of revocation of acceptance where buyer accepted goods and failed to notify seller of the defective condition of the goods until after suit was filed).

The amount of time that may be permitted to elapse between discovery of a defect or nonconformity and rejection or revocation of acceptance depends on the circumstances. Here, Cyclone USA waited more than 21 months after learning of the defect (that is, Sei Kim's repudiation of its warranty of title) before it attempted to return the devices. In general, delay of this magnitude renders an attempted revocation of acceptance untimely. See, e.g., Pac. Commercial Co. v. Greer, 19 P.2d 543, 546 (Cal. Ct. App. 1933) (finding buyer's attempted rejection of goods seven months after discovery of a defect untimely, reasoning that failure to notify a seller of rejection within two months after knowledge of the defect has been held to be an unreasonable delay) (applying former Cal. Civ. Code § 1769) (cited with approval in Cal. Com. Code § 2607 cmt. 4); Imex Int'l, Inc. v. Wires Eng'g, 583 S.E.2d 117, 122-23 (Ga. 2003)(applying Georgia's version of the UCC in holding that attempted revocation of acceptance six months after delivery and five months after learning of the defect was untimely); Pac. Am. Leasing v. S.P.E. Building Sys., Inc., 730 P.2d 273, 278 (Ariz. Ct. App. 1986) (applying Arizona's version of the UCC in holding that a buyer's delay of more than one year without notice to the seller of the defect was untimely revocation as a matter

of law); <u>Oda Nursery, Inc. v. Garcia Tree & Lawn Co., Inc.</u>, 708 P.2d 1039, 1042-43 (N.M. 1985) (applying New Mexico's version of the UCC in finding that a delay of more than 12 months rendered attempted revocation of acceptance untimely as a matter of law); <u>Knapp Shoes, Inc. v. Sylvania Shoe Manufacturing Corp.</u>, 72 F.3d 190, 201 (1st Cir. 1995) (finding that a buyer's attempted revocation 18 months after acceptance was untimely under the UCC).

In the circumstances of this case, whether Cyclone USA was attempting to reject the devices or revoke its acceptance of them is immaterial.   In either event, it waited too long.

Cyclone USA's only defense to this claim is unclean hands. [Pretrial Order, Ex. B, at 2].   The law regarding the defense of unclean hands was presented earlier.[112]

Cyclone USA's unclean hands defense is rejected.   Nothing Sei Kim did or failed to do in the course of the contractual relationship between Cyclone USA and Sei Kim amounted to the sort of wrongful conduct that could support an unclean hands defense.

Although the evidence regarding the precise amount owed by Cyclone USA to Sei Kim for devices delivered but not paid for was discrepant [<u>compare</u> RT 253 ($252,000) <u>with</u> RT 650 ($248,000)], the most reliable estimate is $252,000.   Accordingly, Cyclone USA must pay that sum to Sei Kim.

Sei Kim is entitled to prejudgment interest at a rate of 10% per annum.   Cal. Civ. Code §§ 3287(a), 3289(b).   The law regarding prejudgment interest was presented earlier.[113]   While the sum owed by

---

[112]   See discussion of Claim 6.

[113]   See discussion of Claim 6.

Cyclone USA to Sei Kim for shipped but unpaid for devices is readily
ascertainable from the business records of Sei Kim and Cyclone USA, it
is unclear from which date the prejudgment interest accrues. See N.
Oakland Med. Clinic, 76 Cal. Rptr. 2d at 746 ("Under section 3287,
subdivision (a) the court has no discretion, but must award
prejudgment interest upon request, from the first day there exists
both a breach and a liquidated claim."). The contract between Sei Kim
and Cyclone USA does not contain a term requiring payment within a
fixed period after the devices were shipped or received or resold, and
the parties' testimony was not consistent on that point. Because the
record is unclear about exactly when the unpaid for devices were
shipped or when payment was first demanded, the precise amount of
prejudgment interest cannot be determined now.

Since it owns the devices, Cyclone USA is free to sell or
otherwise dispose of the devices in any manner that it wishes
consistent with law.

**E.    Sei Kim's Claims Against Jay Kim**

**21.    Sei Kim's Federal Unfair Competition Claim Against Jay Kim**

"[A] corporate officer or director is, in general, personally
liable for all torts which he authorizes or directs or in which he
participates, notwithstanding that he acted as an agent of the
corporation and not on his own behalf." Comm. for Idaho's High
Desert, Inc. v. Yost, 92 F.3d 814, 823 (9th Cir. 1996) (quoting
Transgro, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1021
(9th Cir. 1985), cert. denied, 474 U.S. 1059 (1986)). This principle
extends to federal unfair competition and federal trademark
infringement claims brought under the Lanham Act. Coastal Abstract
Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 734 (9th Cir.

123

1  1999).

2      Jay Kim founded Cyclone USA and served as its president

3  throughout the relevant period. [SF 1, 10; RT 169]. He exercised

4  tight control over Cyclone USA's operations, was thoroughly familiar

5  with its activities, and was personally responsible for, or directly

6  involved in, all of the conduct Sei Kim contends was wrongful. [See,

7  e.g., RT 269 (package design), 270 false patent marking)]. Therefore,

8  it is unnecessary for Sei Kim to "pierce the corporate veil" in order

9  to impose liability on Jay Kim as well as on Cyclone USA under either

10 federal law. See Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d

11 Cir. 1978) ("A corporate officer is individually liable for the torts

12 he personally commits and cannot shield himself behind a corporation

13 when he is an actual participant in the tort. This principle applies

14 where the conduct constitutes unfair competition.").

15     In response to this claim, Jay Kim has interposed the following

16 defenses: (1) laches; (2) equitable estoppel; (3) waiver; (4) unclean

17 hands; and (5) failure to mitigate. [Pretrial Order, Ex. B, at 2].

18 The law regarding these defenses was presented earlier.[114]

19     Jay Kim has presented nothing in support of the defenses of

20 laches, equitable estoppel, waiver, or unclean hands that is unique to

21 him (as distinct from Cyclone USA), so the defenses are rejected for

22 the same reasons that they were rejected when they were asserted by

23 Cyclone USA.[115]

24     The defense of failure to mitigate is rejected. Cyclone USA has

25 not pointed to anything that Sei Kim should have done. If anything,

26

27     [114]   See discussion of Claims 1, 2, 7, and 18.

28     [115]   See discussion of Claims 17 and 18.

124

1   Cyclone USA was in the better position to take steps to avoid loss.[116]

2       Therefore, to the extent that Cyclone USA is liable to Sei Kim

3   for federal unfair competition, Jay Kim also is personally liable to

4   Sei Kim.

5                              **CONCLUSION**

6       For the foregoing reasons, the Court has resolved the claims,

7   defenses, and requests for relief asserted in this case as explained

8   above.  Some further proceedings, and some additional determinations

9   by the Court may be necessary before judgment can be entered.  That

10  issue is addressed in a separate order.

11

12  Dated: November 8, 2007

13                              _____/s/_____

14                              Andrew J. Wistrich
                                United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28      [116]    See supra, note 111.